UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA, )
)   No. CV-05-020-JLQ
                          Plaintiff, )
)   MEMORANDUM OPINION AND
vs. )   ORDER DENYING MOTION OF
)   THE UNITED STATES FOR
)   SUMMARY JUDGMENT AS TO
)   NEWMONT USA LIMITED
NEWMONT USA LIMITED, et al, )
)
                          Defendants )
_____ ___)

This matter came regularly on for hearing on the 3rd day of July, 2007 on the innumerable then pending motions including the Motion of the United States seeking Summary Judgment as to the liability as a matter of law of Newmont USA Limited (hereafter "Newmont") as an "operator" of the Midnite uranium mine. Newmont is the parent corporation and majority owner of Dawn Mining Company, LLC (hereinafter "Dawn"). There is no dispute that Dawn was an "operator" of the Midnite Mine, a "facility" under 42 U.S.C. § 9607 of the Comprehensive Environmental Response, Compensation, and Liability Act (hereinafter "CERCLA"). The issue raised by this motion is whether Newmont is also liable as an "operator" of the Midnite Mine. Because of the voluminous number of documents submitted by the parties on this and other matters, the court took the motions under advisement.

ORDER - 1                              1

Michael J. Zevenbergen, David Rosskam, Scott Jordan, Colleen Kelley, and Paul Gormley appeared for the Plaintiff, the United States of America. Nathan M. Longenecker, Michael R. Thorp, and Elizabeth Temkin appeared for Newmont. The following is the court's summary of the relevant facts.

## BACKGROUND

As this is the United States' motion, the evidence and inferences arising therefrom are viewed in the light most favorable to Newmont. Certain facts are undisputed, except where otherwise noted. The parties' motion and the response tend to focus on the inferences arising from the evidence.

The Midnite Mine Superfund Site (hereinafter "Site") is an inactive uranium mine located on the Spokane Indian Reservation, in the state of Washington, that produced uranium concentrate for the government and private companies between 1955 and 1981. (Plaintiff United States' St. Fact Ct. Rec. 139-2 ¶ 1). The Site consisted of up to six pits sprawled across 350 acres. It produced approximately 33 million tons of waste rock and 2.4 million tons of uranium ore and low grade ore that remains on the Site. (PSF ¶¶ 34, 164). The contaminated areas consist of ore stockpiles, waste rock dumps, backfilled pits, open pits, and gravel roads believed to contain cadmium, chromium, nickel, zinc, radium 226, uranium 234, uranium 238, polonium 210, copper, lead, and lead 210. (PSF ¶¶ 166-67). There is no dispute that this has resulted in the releases of hazardous substances, (PSF ¶ 167), that have contaminated and continue to migrate into groundwater, surface water, sediments, and soils. (PSF ¶¶ 164, 166; Hale Decl. ¶ 10-11). As a result, the Site's present condition poses risks to human health and the environment. (PSF ¶ 163; Hale Decl. ¶ 9).

Uranium mineralization was first discovered on the Spokane Indian Reservation in the spring of 1954 by two brothers, Jim and John LeBret. (PSF 139-2 ¶ 2). In July 1954, the Lebrets, along with four members of the Wynecoop family, all members of the Spokane Tribe of Indians, obtained a mining lease for the property.

(Defendant Newmont's St. Fact ¶ 1).  Later that year, these six individuals incorporated to form Midnite Mines, Inc. (hereinafter "MMI") and contracted with the United States Atomic Energy Commission (hereinafter "AEC") to deliver 2400 tons of uranium ore.  (NSF ¶¶ 2, 4).  Thereafter, Robert J. Hundhausen, an AEC employee who had worked with the Lebrets and Wynecoops to explore the extent of the uranium mineralization, resigned to assist MMI with the Site's development.  (NSF ¶¶ 3-4).  On behalf of MMI, Hundhausen, with the assistance of Spencer Hinsdale, a banker from Portland, Oregon, began business negotiations with Newmont, (NSF ¶ 5; PSF ¶ 7), and on April 20, 1955, Newmont and MMI entered into an agreement to form Dawn.  (PSF Exh. 1; NSF ¶ 121).

**I. The April 20, 1955 Agreement Creating Dawn:**

The Agreement provided that Newmont would own 51% and MMI would own 49% of the shares of the newly created company.  (PSF ¶ 12).  Dawn would have seven directors, with four nominated by Newmont and three nominated by MMI.  An Executive Committee would be formed with two members nominated by Newmont and one by MMI.  (PSF Exh. 1).  Furthermore, Dawn's officers would be selected "from nominees of Newmont, of whom G.S. Hinsdale of Portland, Oregon, shall be the first president nominated by Newmont."  In addition, the agreement provided, in pertinent part, that work at the Site would commence promptly:

> [D]uring the initial period following execution of this agreement, while [Dawn] is being organized . . . the work of uncovering and developing the properties . . . should be continued diligently.  Accordingly, Newmont shall have the exclusive right to enter said properties, under the consent and license of Midnite, with the requisite personnel, mining equipment and supplies, for the purpose of commencing a program of development of said properties which shall tend to determine the grade, extent and continuity of the mineralization now indicated . . . It is agreed that Newmont may delegate the actual mining and development activities herein provided to a wholly-owned subsidiary, on the understanding, which is hereby confirmed that Newmont shall guarantee the

performance of all work so delegated.  It is further agreed that all work done at the said properties prior to the assumption of such work by [Dawn] shall be done under the supervision of Newmont and at its initial cost and expenses as hereinabove provided.  During said initial period, all development ore mined shall be stockpiled on the property and shall become the property of [Dawn] when formed.

(Id.).  However, a later subsection of the agreement addressing "Subsequent Financing of New Company," if needed, stated:

It is the declared intention of the parties hereto that [Dawn] shall serve as the exclusive vehicle through which they shall cooperate in the business of mining exploration, prospecting, development and exploitation of mining prospects and properties within the area indicated on the sketch map appended hereto as "Exhibit B."

(Id.).  Further, the provision providing for additional financing stated:

Newmont represents and declares its willingness to advance such additional funds as required by [Dawn] in the orderly, conservative and business-like expansion of its operation, which expansion may include the construction, ownership and operation of a mill and sampling plant, provided that in the instance of each such advance, the decision as to whether the advance shall be made shall rest with Newmont's engineers who shall weigh the advisability of such expenditure by [Dawn], as operator, and also determine whether the interest of Newmont . . . will best be served.

(Id.).

## II.  Dawn's Early Activity at the Site:

On April 27, 1955, a week after entering into the agreement, Dawn was incorporated and its board of directors was elected.  (NSF ¶ 119 ; PSF ¶ 13).  The next day, April 28, 1955, the Board met for the first time and elected Spencer Hinsdale, the Portland Banker, as Dawn's first president and authorized Robert Hundhausen, the former AEC employee who helped MMI develop the property, to serve as Dawn's general manager.  (NSF ¶¶ 6, 128).  Soon thereafter, as provided by

ORDER - 4                                 4

the agreement, MMI transferred the lease to Dawn.

Although the mine officially began operating in the fall of 1956, with the mill operating in 1957, significant preliminary exploration and development operations took place throughout the spring and summer of 1955.  (PSF Exh. 42; Connochie Dep. pg. 282-85).  These activities consisted of 25,000 feet of drilling, 550 feet of underground work, geological engineering and radiometric mapping, bulldozer trenching, stripping of selected areas, the excavation of an adit a mile and a half into one of the ore bodies, the development of two open pit mines, and limited mining in three areas.  (PSF ¶ 29, 31).  By the end of May 1955, the Site had produced enough uranium ore to fill nine railroad cars.  (PSF ¶ 28).  These activities generated thousands of tons of ore, protore, and waste rock.  (PSF ¶¶ 33, 35).

Newmont provided Dawn's initial financing, mining equipment, and some on-site personnel for these activities. (PSF ¶ 24).  Several employees from Newmont's wholly-owned subsidiary Newmont Exploration Limited ("NEL"), including G.W.H. Norman, Bob Sheldon, and Pete Loncar assisted in these operations.  For example, these men identified the mine's waste disposal site, assisted in selecting the location of the mine's adit, and supervised the adit's excavation.  (PSF ¶¶ 26-27).  Meanwhile, Norman provided NEL's Fred Searls with preliminary technical assessments regarding the Site's suitability as an investment, and submitted a report on the Site's activities from August 16 to September 13, 1956, which included bulldozer stripping, drilling, and trenching.(PSF ¶ 32, Exh. 29).

Newmont generally admits that NEL personnel were assisting on-site during this period.  However, to show that NEL personnel worked under the direction and control of Dawn's management, Newmont points to General Manager Hundhausen's reports to President Hinsdale and Hinsdale's correspondence with others.  Hundhausen's reports to Hindsdale, covering the period from May 1, 1955 through July 1, 1955, detailed Dawn's exploration and development program, including  the

ORDER - 5                          5

hiring of employees, specifically several NEL employees.  (NSF ¶¶ 132, 134, 136). It appears that Hinsdale and Hundhausen viewed and treated NEL personnel as their employees and NEL's submitted invoices to Dawn for their services.  (NSF ¶¶ 151-52).  For example, Hinsdale referred to Robert Sheldon as "our geologist" and noted that "Bob Hundhausen is greatly pleased with the ability and effectiveness of Pete Loncar."  (NSF ¶¶ 147, 149). Notably, Pete Loncar viewed Robert Fulton, when Fulton served as Dawn's general manager and vice president, as his "boss" because he "managed the whole operation."  (NSF ¶ 150).  Finally, to show that Dawn's employees were making the early decisions at the mine, Newmont points to a letter dated May 5, 1955, wherein Hinsdale wrote to Dawn's Secretary John Grunow discussing his conversations with Hundhausen concerning the locations of ore stockpiles and a letter dated September 1955, wherein Hinsdale instructed Hundhausen to scale back production in view of contract difficulties with the AEC. (NSF ¶¶ 139-41).

**III.  1956 Management Agreement**

After these early exploratory activities, Dawn and Newmont entered into a four-page Management Agreement dated July 1, 1956.  The agreement begins:

> WHEREAS Dawn requires management, technical and administrative services in connection with the conduct of its corporate activities in the State of Washington and desires to have available for its operations the advice and technical assistance of men experienced in mining and treatment of ores such as will be produced from its properties, which Newmont is willing to provide to the extent and for the consideration herein expressed;

In pertinent part, the agreement continues:

> Newmont shall, subject to the Board of Directors of Dawn, act as Manager of all operations and corporate affairs of Dawn.  Newmont shall provide office space in its New York offices and the services of its regular New York staff of engineers, attorneys, accountants, purchasing and clerical employees, when and to the extent required for carrying out

ORDER - 6                                   6

this Agreement; without charge to Dawn for any part of such office rental or salaries of such staff, but with the understanding that all other expenses, including salaries of resident Washington personnel, whether or not Newmont employees, shall be paid by Dawn.

(PSF Exh. 2 ¶ 1). In return for Newmont's New York-based corporate support services, Dawn agreed to pay $500 per month prior to the production of ore and 1% of the gross sales prices of uranium concentrates thereafter. (PSF Exh. 2 ¶ 2(a)). In addition, the agreement provides that "[a]ll specialists and special services furnished by Newmont during the term of this Agreement in connection with the Dawn operation, such as metallurgical, engineering, legal or accounting consultants, not on the regular New York staff of Newmont, shall be retained in the name of Dawn and paid by Dawn." (PSF Exh. 2 ¶ 2(b)).

The meaning and interpretation given to this agreement and the way it was implemented is contested by the parties. The United States views all subsequent activities at Midnite Mine as a reflection of the agreement's language providing that "Newmont shall . . . act as Manager of all operations and corporate affairs of Dawn." In addition to the resident manager's role at the mine, the United States views the assistance provided by Newmont's wholly-owned subsidiaries, NEL and Newmont Services Limited (hereinafter "NSL"), and instances where Newmont's corporate officers represented that Newmont was managing Dawn's operations, often making direct reference to the 1956 Management Agreement, as evidence that Newmont carried out the terms of the agreement and managed the mine. (PSF ¶¶ 46-51).

In contrast, Newmont's expert Mr. Connochie characterized the Agreement as a "services agreement," whereby Newmont agreed to provide general corporate support, general administrative support, and certain specialized on-site assistance to Dawn on an "as requested" basis. (NSF ¶ 110). Furthermore, Mr. Connochie opines that the agreement was never used by Newmont as authority to operate the Site. (NSF ¶ 112). In support of this characterization of the Agreement, the Board of Director's

minutes from Dawn's July 31, 1956 meeting describes the Agreement in the following terms:

> The Secretary then presented and described the proposed Management Agreement pursuant to which Newmont Mining Corporation would undertake to provide Dawn Mining Company with all services of its New York personnel, including engineers, attorneys, accountants, purchasing and clerical staff, for which Newmont would receive reimbursement of a fixed sum of $500 per month until production commences, and thereafter would receive a fee equal to 1% of the gross sales price of uranium concentrates produced in the proposed Dawn mill, such Agreement to be effective July 1, 1956 and to be subject to cancellation by either party on one year's prior notice.

(NSF Ex. 19). The minutes never mention that Newmont would act as manager of Dawn's operations. In addition, the minutes from the August 28, 1956 meeting of Newmont's Board of Directors describe the agreement as "providing the terms and conditions upon which Newmont Mining Corporation shall act as manager of the corporate activities of Dawn Mining Company in the State of Washington." (NSF Exh. 57). Again, no mention is made of Newmont managing Dawn's operations. According to Jack Thompson Sr., a Newmont employee beginning in 1964 and Newmont's president from 1974 until 1986, Newmont never managed Dawn's operations. (NSF ¶ 164).

**IV. Dawn's Basic Corporate and Operational Structure:**

Dawn's Board of Directors consisted of four members nominated by Newmont and three members nominated by MMI. The Board was not involved in the day-to-day operations of the Site. (PSF ¶ 38; NSF ¶¶ 35-36). Instead, meeting on a regular basis, the Board made major company decisions, such as appointing senior Dawn staff, annually reviewing treasurer and general manager reports, approving mining and milling budgets, reviewing mine plans, ratifying the acts of Dawn's officers and directors, and approving the payment of dividends, financing arrangements, sales contracts, capital expenditures, and exploration programs. (NSF ¶¶ 36-37). The

Board elected Dawn's officers, and with few exceptions, those officers held positions with Newmont, or one of Newmont's wholly-owned subsidiaries, and served Dawn without additional compensation. (NSF ¶ 39-40). In other words, with the exception of Dawn's first president, all of Dawn's officers were on Newmont's payroll. (PSF ¶ 122; Connochie Dep. 273-74).

The actual mining process was performed by a contractors, such as Isbell Construction or N.A. Dagerstrom, under the supervision of the mine superintendent, and in accordance with mining plans developed by engineers and reviewed and approved by the resident manager. (NSF ¶ 154; PSF ¶ 165). Typically, the superintendent was a Dawn employee. He maintained a staff of Dawn employees, was responsible for mining operations, and oversaw Dawn's mining contractors. (NSF ¶ 23). The superintendent reported to the resident manager. (NSF ¶ 22).

**A. Resident Managers**

At Dawn's July 1956 meeting of the Board of Directors, the Board ratified the appointment of Robert Fulton as Dawn's first resident manager. The Board delineated his powers and duties, including the authority:

> (1) To have charge of, conserve and manage the operation of the Company's mining properties and to conduct its ordinary and usual business and affairs in the State of Washington;
> . . .
> (3) To appoint or employ, and to remove, suspend or discharge employees and agents of the Company and to fix their compensation;
> . . .
> (5) To purchase machinery, equipment, tools, materials and supplies which are necessary in his opinion for the construction of plant facilities and for the satisfactory and effective operation of the Company's mining properties, provided that each capital expenditure in excess of $10,000 shall require the prior express approval of the President or Mr. M.D. Banghart or Mr. P. Malozemoff . . .

(PSF ¶ 56-57). These responsibilities did not change significantly throughout the

ORDER - 9                                    9

mine's operation.  (PSF ¶ 57).  Dawn, during its operation at Midnite Mine, had the following resident managers:

> Robert Fulton – July 1956 until April 1958.  (PSF ¶¶ 56, 64).
> Jack Crowhurst – April 22, 1958 until January 31, 1960.  (PSF ¶¶ 69).
> James Pike – February 1, 1960 until mid-July 1965.  (PSF ¶ 70).
> Earl Craig –  August 1969 until November 1978.  (PSF ¶¶ 74-75).
> Jack Thompson Jr. – November 1978 until June 30, 1981.  (PSF ¶ 86).
> Marcel DeGuire – August 1981 through February 1983.  (PSF ¶ 101, 112).

With the exception of Jack Crowhurst, the resident managers were either on Newmont's payroll or were on the payroll of one of Newmont's wholly-owned subsidiaries rather than Dawn's payroll.  Dawn would later reimburse the primary employer for their services.  (PSF ¶ 39, 62, 66, 72, 79, 97, 101). Many of these men were longtime employees within the Newmont group of companies prior to serving at the Site and continued their employment with other Newmont companies after leaving their role as resident manager.  (PSF ¶¶ 61, 67, 68, 80, 98, 110, 112).  It is also noted that none of the resident managers served as officers or directors of Dawn. (PSF ¶¶ 73, 82).

Essentially, Mr. Fulton, and all subsequent resident managers, "directed, managed, and implemented the day to day operations" at the Site.  (PSF ¶¶ 58-59, 71, 76, 77, 87, 104).  When asked during his deposition about his role as resident manager from 1978 until 1981, Mr. Thompson Jr. stated that he "[was] in charge of anything local," and "had responsibility for the mine, the mill, the contracts we had for hauling of ore between the two, the mining contractor, relationships with government entities, locals, the tribe, the work force, the union.  Basically, any activity on-site, I was the – where the buck stopped."  (Thompson Jr. Dep. 9-10). Among these various duties, the resident managers planned reclamation activities, made decisions such as where to store waste rock and low grade ore, and made decisions concerning pollution control.  (NSF ¶ 60, 88, 95, 107, 108; PSF ¶ 59, 87,

92).  As an example, resident manager Thompson Jr., decided to install a pollution control dam, bring in truckloads of reagents to treat the material at the dam, and install a pumping system to address environmental issues at the pollution control dam.  (PSF ¶¶ 89-90).

Although it is uncontested that Dawn's resident managers were typically on Newmont's or a subsidiary's payroll, Newmont presents evidence it argues shows that the resident managers acted as Dawn employees, viewed themselves as Dawn employees, held themselves out as Dawn employees, and worked at all times under Dawn's management.  (NFS Exh. 1, 2, 5, 16).  Robert Fulton was the only resident manager approved by Dawn's board of directors, (NSF ¶¶ 53-56, 59, 60; PSF ¶ 63), but there is evidence that they reported to Dawn's officers. (NSF ¶¶ 61, 62, 65-69, 72-77).  Also, the resident managers held themselves out as Dawn representatives in correspondence with outside parties, such as the United States, the State of Washington, the Spokane Tribe of Indians, and contractors.  (NSF ¶¶ 80-83, 154). Thompson Jr., when asked whether he thought Newmont operated the Site, stated:

> No, I don't think so.  Everything was Dawn.  And even though I was a Newmont Services employee, everything I did was on behalf of Dawn. And even my business card, which I don't have anymore, was a Dawn Mining Company card.  And I would talk to the public as resident manager for Dawn.  All my relationships with the Department of Ecology of the state of Washington and the EPA and so on, were in my role as a Dawn – head of the Dawn operations there at the site . . . [moreoever] I worked for Dawn.  I was not supervised by, nor did I report to, anyone at NSL, anyone at Newmont Exploration Limited, or anyone at Newmont Mining Corporation who was not a Dawn officer or director.

(NSF ¶ 84; Thompson Jr. Dep. pg. 35).  In his declaration, Thompson Jr., reiterated:

> While I was resident manager, I was on the payroll of [NSL], but Dawn reimbursed NSL for the cost of my salary and benefits.  Nonetheless, I worked for Da at NSL, anyone at Newmont Exploration Limited, or anyone employed by Newmont

Mining Corporation who was not a Dawn officer or director . . . While I was resident manager of Dawn, I acted at all times in Dawn's best interest.  I carried a "Dawn" business card and held myself out as a Dawn representative in all of my dealings with third parties, including in my dealings with the United States, the State of Washington and the Spokane Tribe.  Likewise, these third parties addressed me as a Dawn representative.

(Thompson Jr. Decl. ¶¶ 7-8).

Furthermore, both Thompson Jr. and Thompson Sr., viewed the June 1, 1979 Assignment Contract between NSL and Dawn rather than the 1956 Management Agreement to more accurately reflect the resident manager's relationship with Dawn. (NSF Exh. 37; ¶¶ 89, 91-93).  In that agreement, Thompson Jr. was assigned to serve as Dawn's resident manager while Dawn agreed to reimburse NSL for his salary, payroll taxes, insurance costs, pension costs, and an allocable portion of all fringe benefits.  (NSF ¶¶ 85-86, Exh. 37 ¶¶ 1-2).  The contract further provided that:

> With respect to the said duties, and during the period of the assignment, the individuals assigned will take orders from, be supervised by, report to and be under the control solely of the Board of Directors and designated Officers of the Operator and not of NSL or any other person and Dawn could remove the Resident Manager from all duties and authority at any time.

(NSF ¶¶ 86-87, Exh. 37 ¶¶ 2, 7).

## V.  Newmont's Wholly-owned Subsidiaries:

After regular mining operations began in 1956, employees of Newmont's wholly-owned subsidiary NEL continued to assist at the mine, providing metallurgical expertise and exploration assistance.  (NFS ¶¶ 116-117).  Through 1959, NEL employee Pete Loncar served as mine superintendent. (PSF ¶¶ 116, 118, 120).  Then from 1966 through 1968, when the mine was inactive, NEL employee Bryon Hardie  participated in further developmental and exploratory activities at the mine, such as drilling.  (PSF ¶¶ 36-37; NSF ¶¶ 36-37).

Newmont's President and Chairman Plato Malozemoff sent a "Memorandum

ORDER - 12                                    12

re[:] Environmental Control" to all Dawn subsidiaries on May 8, 1970.  (PSF Exh.

13).  Therein, he stated that in an effort to

> strive actively to improve, and certainly to minimize damaging, the
> quality of the environment wherever Newmont's subsidiaries operate . . .
> [and] to take appropriate steps to win public awareness of such action
> and their results . . . it is essential that Newmont and its subsidiaries act,
> and speak, in concert.  As our technical and public relations programs
> develop, we will attempt, in consultation with our public relations
> people, to establish guidelines and policies that hopefully may lead to a
> clearly defined position that can be taken when confronted with
> questions by reporters, governmental officers, and the public at large.
> This will be set forth in subsequent memoranda, which also will indicate
> which members of the management of Newmont and its subsidiaries
> should respond to inquiries from the press, government or the public.

(Id.).  The subsequent memorandum has not been provided.

In 1971, Newmont created another wholly-owned subsidiary, Newmont
Services Limited ("NSL"), and on January 1, 1971 Dawn and NSL entered into an
agreement whereby NSL would provide Dawn with personnel and Dawn would
reimburse NSL for the costs.  (PSF ¶ 129).[1]  In his declaration, Thompson Jr.
described NSL as providing Dawn with "technical" expertise and "occasional
environmental services."  (Thompson Decl. ¶ 9).  Specifically, David Ridinger, the
Director of Environmental Affairs at NSL assisted Dawn and other Newmont
subsidiaries with environmental issues.  He provided advice on mine water discharge,
new federal regulations, and guidelines for dealing with regulatory agencies.  He
reviewed Dawn's Spill Prevention Control and Countermeasure plan, recommended
methods of complying with the Toxic Substances Control Act, and communicated
with and submitted documents to the EPA on behalf of Dawn.  (PSF ¶¶ 133-35, 139,
141-44, 147; Ridinger Dep. pg. 127).  In addition, Dale Buob, a Project Engineer for

---

[1] In June of 1979, the 1971 Agreement was replaced with a similar "Employee
Assignment Contract."  (PSF ¶ 129).

ORDER - 13                              13

NSL assisted with a mine water disposal project.  (PSF ¶ 153).  Among other things, he supervised a consultant's engineering study regarding the feasibility of a spray evaporation system for the mine water, attended a meeting concerning mine water, and reported to Newmont regarding the mine's water problem.  (PSF ¶¶ 154-57).

Although NSL provided environmental assistance, Thompson Jr. and Dawn's former vice-president W.A. Humphrey testified in their depositions that Dawn handled environmental issues without interference from Newmont.  According to Thompson Jr. and Humphrey, the resident managers addressed minor environmental issues and the Board of Directors and the vice-president reviewed and approved significant environmental issues.  (NSF ¶¶ 97-99).  Specifically, in Thompson Jr.'s declaration, he states:

> I understand that the United States claims that David Ridinger, Dale Buob and or others from [Newmont], NSL or [NEL] were responsible for environmental compliance and decision-making at the Midnite Mine. This is not true.  Mr. Ridinger, Mr. Buob and others provided occasional environmental services and opinions to Dawn but did not direct or conduct environmental matters at the Midnite Mine.

(NSF Exh. 1, Thompson Decl. ¶ 9).  In his deposition, Mr. Humphrey affirmed this assessment.  He stated that Ridinger "didn't have any decision-making authority with Dawn Mining Company."  (NSF ¶ 102).  Moreover, Thompson Sr. testified that Newmont never managed the environmental affairs of its subsidiaries.  (NSF Exh. 37, Thompson Dep. pg. 125-26).  Finally, according to Richard McAnany, Dawn's Chief Accountant from 1978-1983, it was his experience that "occasionally, consulting services would be provided by employees of [NSL] or [NEL]" but "[a]s with any consultant hired by Dawn, Dawn was billed for the services of NSL and NEL personnel and paid for those services."  (NSF Exh. 3; McAnany Decl. ¶ 3).

## SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is

no dispute as to the material facts before the court.  *Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975).  In meeting this burden,  the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Miller v. Glenn Miller Productions*, 454 F.3d 975, 987 (9th Cir. 2006) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

Whether Newmont is liable under CERCLA as a "operator" is controlled by *United States v. Bestfoods*, 524 U.S. 51 (1998) where the United States Supreme Court addressed the "extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries." *Id*. at 60.  The Court addressed the two circumstances where a parent corporation may be subject to CERCLA liability, but recognized that nothing in its decision or in CERLA changed the bedrock principle that a corporate parent, exercising the type of

ORDER - 15                    15

control stock ownership gives to stockholders, is not liable as an "owner" or an "operator" under 42 U.S.C. § 9607 simply because its subsidiary is subject to liability for owning or operating a polluting facility. *Id.* at 60. A parent corporation may be subject to derivative, or indirect, CERCLA liability for its subsidiary's actions where the corporate form is misused and the corporate veil may be pierced. *Id.* at 62-65. Alternatively, a parent corporation may be directly liable for its own actions in actively operating a facility owned by its subsidiary. *Id.* at 65. As the Court explained:

> Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. *See* 42 U.S.C. § 9607(a)(2). This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice. If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability.

*Id.* at 65. To constitute direct parental operation under CERCLA, "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67. Therefore "[t]he question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68 (citations omitted). It is not enough to establish liability, however, to show that dual officers and directors of the parent and subsidiary made policy decisions and supervised activities at the facility, "[s]ince courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* at 69 (citations and quotations omitted). So, it must be shown that, "despite the general presumption to the contrary, the officers and directors were acting in their capacities as [parent] officers and

directors, and not as [subsidiary] officers and directors when they committed those acts." *Id.* at 70.

The Court appeared to envision three ways a parent corporation could operate a subsidiary's facility: (1) "when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture," (2) when "a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility," and (3) when "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* at 71. Identifying one of these acts of direct operation requires reference to the "norms of corporate behavior." *Id*. at 71. The Court explained as follows:

> Just as we may look to such norms in identifying the limits of the presumption that a dual officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 71-72 (citations omitted).

In *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 436 F.3d 1201, 1206 (11th Cir. 2006), the Eleventh Circuit applied *Bestfoods* to address whether operator liability should be imposed upon UGI, a shareholder in St. Augustine Gas & Electric Light Company, because a UGI employee was temporarily appointed "acting superintendent" of St. Augustine Gas' manufacturing plant. *Id.* Faced with these circumstances, the court extended the "dual hat" presumption stating:

ORDER - 17                                      17

> Finally, to the extent that Kingsley Patterson, who apparently was normally an UGI employee, managed the plant for a short while, he was appointed acting superintendent during that period, and thus is presumed to have been working on behalf of St. Augustine Gas, not UGI . . . His testimony that he "practically rebuilt the plant in 1926" refers to that period during which he replaced an ill superintendent; he is presumed to have been working on behalf of St. Augustine Gas. In sum, [plaintiff] had pointed to nothing in the record that would support a finding that UGI operated the St. Augustine plant, let alone operated the pollution-causing sources.

*Id.* (citations omitted); *contra United States v. Kayser-Roth Corp.*, 272 F.3d 89, 103 (1st Cir. 2001) ("There is evidence that an agent of Kayser-Roth – Norman Hinerfeld, executive vice-president of Kayser-Roth – directly exerted operational control over environmental matters at the Forestdale facility. Hinerfeld was neither an officer nor director of Stamina Mills. With 'no hat to wear but the parent's,' Hinerfeld acted solely on behalf of Kayser-Roth in his actions affecting Stamina Mills").

## APPLICATION

The United States does not argue that Newmont is liable as an "owner" under a veil piercing theory. Instead, the United States argues that Newmont's acts, during the period in which hazardous substances were disposed of at Midnite Mine, make Newmont an "operator" as construed by the Supreme Court in *United States v. Bestfoods*, 524 U.S. 51 (1998) because: (1) pursuant to the 1955 Agreement between Newmont and MMI, Newmont operated the mine prior to Dawn becoming an independently operating entity; (2) pursuant to the 1956 Management Agreement, Newmont managed Dawn's operations at the mine through the resident managers, NEL, and NSL personnel, and; (3) the actions of Newmont's personnel exceeded the level of involvement consistent with investor status by managing, directing, and conducting the mine's environmental operations.

However, at this stage of the proceedings, the court must view the evidence and the inferences arising therefrom in the light most favorable to Newmont. Applying

that rule, the court cannot determine as a matter of law that Newmont was an "operator" for CERCLA purposes under *Bestfoods*, especially as extended by the Eleventh Circuit in *Atlanta Gas*.  Each of the United States' bases for assigning "operator" liability are addressed in turn:

**(1)  Newmont's Actions From 1955 Until Dawn Was a Functioning Entity:**

It is the government's position that Newmont acted as an "operator" of the Midnite Mine from April 20, 1955 when Dawn and MMI entered into their agreement until Dawn was a functioning entity.  In pertinent part, the 1955 Agreement provided that "during the initial period following execution of this agreement, while [Dawn] is being organized . . . Newmont shall have the exclusive right to enter said properties, under the consent and license of Midnite, with the requisite personnel, mining equipment and supplies, for the purpose of commencing a program of development . . ."  The United States argues that this Agreement, combined with NEL employees advising where to drill and where to locate waste dumps and stockpiles of ore, protore, and waste evidences that Newmont was operating the facility during this initial period.  *Bestfoods*, 524 U.S. at 71.

However, within a week of the Agreement, Dawn was incorporated and its board of directors were elected.  Within eight days, Spencer Hindsdale was elected Dawn's president and Robert Hundhausen was appointed Dawn's general manager.  Soon thereafter, the mine's development activities began, including trenching, stripping, percussion drilling, exploration drilling, underground work on an adit, and significant ore production.  An unresolved issue is who performed this early work.  Clearly, NEL personnel were assisting at the mine during the spring and summer of 1955.  In his reports covering May 1, 1955, through July 1, 1955, Hundhausen reported on hiring employees, including NEL staff for which  NEL submitted invoices to Dawn.  Newmont  also submitted reports and correspondence showing that Hundhausen and Hinsdale were making executive decisions regarding the mine's

management and viewed the NEL staff as employees of Dawn.  Therefore, under an assumption, without deciding, that  the NEL employees were working and advising Hundhausen under Dawn's direction based upon an informal service for fee arrangement, the court can not now determine as a matter of law that the NEL employees took any actions to "manage, direct, or conduct operations" as envisioned by the court in *Bestfoods.*

### (2) The Management Agreement and Role of the Resident Managers:

It is the United States' position that *Bestfoods*' dual hat analogy does not apply to the resident managers because they were not simultaneously holding positions with Newmont and Dawn.  The Government argues that the resident managers were Newmont employees working at a Dawn facility and were therefore "an agent of [Newmont] with no hat to wear but the parent's hat." *Bestfoods*, 524 U.S. at 71. Thus, "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.*

The United States argues that the resident manager's role is defined by the 1956 Management Agreement, wherein it states "Newmont shall, subject to the Board of Directors of Dawn, act as Manager of all operations and corporate affairs fo Dawn."  According to the United States, this contract provides the context for the actions that occurred thereafter and that the resident managers are evidence that Newmont was supplying staff in fulfillment of its contract obligations to manage all of Dawn's operations.

Read in its totality, however, the agreement might be understood as a services agreement, whereby Newmont provided expert personnel for a fee.  The agreement begins:

WHEREAS Dawn requires management, technical and administrative

services in connection with the conduct of its corporate activities in the State of Washington and desires to have available for its operations the advice and technical assistance of men experienced in mining and treatment of ores such as will be produced from its properties, which Newmont is willing to provide to the extent and for the consideration herein expressed;

Also therein, Dawn agrees to provide $500 per month and then 1% of its gross sales for Newmont's New York-based corporate support services. The agreement continues: "all other expenses, including salaries of resident Washington personnel, whether or not Newmont employees, shall be paid by Dawn" and "[a]ll specialists and special services furnished by Newmont . . . such as metallurgical, engineering, legal or accounting consultants, not on the regular New York staff of Newmont, shall be retained in the name of Dawn and paid by Dawn." To support its interpretation that the agreement provided the assistance of Newmont employees for a fee, Newmont has provided contemporaneous descriptions of the agreement from Dawn and Newmont officers wherein they focus on the service for fee aspect of the Agreement rather than the managerial aspect, thereby implicitly minimizing its importance. Moreover, Newmont's expert Mr. Connochie opines that the agreement never provided a basis for Newmont to operate the mine, although that matter is probably one left for the court's determination. The importance of the agreement and the degree to which it determines the actual role of the resident managers is disputed.

It is undisputed that the resident managers managed and directed day-to-day activities, including environmental issues, at the mine and were, for the most part, on the payroll of either Newmont or one of Newmont's wholly-owned subsidiaries. However, it is also undisputed that Dawn reimbursed the companies for their salaries and benefits and the resident managers reported to Dawn's officers. Conspicuously missing from the record before the court on summary judgment is a persuasive showing that the resident managers were following Newmont's direction. Newmont characterizes this arraignment as employees being "seconded," whereby the secondee

remains on the payroll of the seconding employer, but is subject to the rules and requirements of the organization to which he or she is seconded. *See, e.g., Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 293 n.1 (S.D.N.Y. 1987). For example, in his deposition, resident manager Jack Thompson Jr., stated:

> Everything was Dawn. And even though I was a Newmont Services employee, everything I did was on behalf of Dawn. And even my business card, which I don't have anymore, was a Dawn Mining Company card. And I would talk to the public as resident manager for Dawn. All my relationships with the Department of Ecology of the state of Washington and the EPA and so on, were in my role as a Dawn -- head of the Dawn operations there at the site.

Moreover, in his declaration, Thompson stated that "I worked for Dawn. I was not supervised by, nor did I report to, anyone at NSL, anyone at Newmont Exploration Limited, or anyone at Newmont Mining Corporation who was not a Dawn officer or director."

By reason of the foregoing, there are facts and inferences arising therefrom that prevent this court from determining this issue on summary judgment.

### (3)  Other Newmont Personnel's Involvement In Dawn's Environmental Operations:

In addition to the resident managers, the United States points to a 1970 memorandum released by Plato Malozemoff, Newmont's President and Chairman, to all Newmont subsidiaries regarding environmental issues and the subsequent involvement of employees from Newmont's wholly-owned subsidiaries with the mine's environmental issues to show, in degree and detail, that the actions directed to the facility by Newmont's agents were eccentric under accepted norms of parental oversight of a subsidiary's facility. *Bestfoods*, 524 U.S. at 71. Contrary to the government's portrayal, when read in its totality, the memorandum provides advice and guidance to Newmont's subsidies and suggests coordinated communication across Newmont subsidiaries regarding environmental issues. It does not direct, *per*

1  *se,* environmental policy.  Moreover, in his declaration, Thompson Sr., one time

2  president and chairman of Newmont, stated

3
4           I understand that the United States claims that David Ridinger, Dale
            Buob and other from NMC, NSL or Newmont Exploration Limited were
5           responsible for environmental compliance and decision-making at the
            Midnite Mine.  This is not true.  Mr. Ridinger, Mr. Buob and others
6           provided occasional environmental services and opinions to Dawn but
            did not direct or conduct environmental matters at the Midnite Mine.
7
8  Described in this fashion, the environmental services provided by employees of

9  Newmont's wholly-owned subsidiaries are consistent with a services for fee

10  agreement rather than being evidence that Newmont directed and controlled Dawn's

11  environmental policies.

12                              **CONCLUSION**

13         The United States and Newmont have submitted nearly thirty years of

14  documentary evidence, including mountains of correspondence and innumerable

15  depositions and declarations from experts and ex-personnel from Dawn, Newmont,

16  NEL, and NSL, with much of it expressing different points of view and different

17  historical understandings of the events that took place at the Midnite Mine.  Thus,

18  after viewing it all in the light most favorable to Newmont, the court cannot conclude

19  that Newmont is undisputedly and as a matter of law, subject to "operator" liability on

20  summary judgment.  Likewise, while Newmont has not filed its own Summary

21  Judgment Motion seeking to be exculpated from liability as an "operator," under the

22  state of the record, such a Motion would likewise be denied.

23         The Summary Judgment Motion of the United States seeking pre-trial judgment

24  that Newmont is liable as an "operator" or the Midnite mine, must be and is

25  **DENIED**.

26         The Clerk of this court shall enter this Memorandum Opinion andOrder and

27  forward copies to counsel.

28  ORDER - 23                         23

**DATED** this 17th day of August 2007.

s/ Justin L. Quackenbush

JUSTIN L. QUACKENBUSH

SENIOR UNITED STATES DISTRICT JUDGE