UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>NEWMONT USA LIMITED AND DAWN<br>MINING COMPANY, LLC,<br><br>    Defendants. | NO. CV-05-020-JLQ<br><br><br>MEMORANDUM OPINION AND<br>ORDER RE: THE UNITED STATES<br>OF AMERICA'S LIABILITY AS AN<br>"OWNER" UNDER CERCLA |
| DAWN MINING COMPANY, LLC,<br><br>    Third-party Plaintiff,<br><br>  vs.<br><br>ORTENCIA FORD and DONNELLY<br>VILLEGOS,<br><br>    Third-party Defendants. | |

BEFORE THE COURT are (1) United States' Motion To Dismiss Counterclaims By Newmont and Dawn, and/or For Summary Judgment (Ct. Rec. 121), and (2) Defendants Newmont USA Limited's and Dawn Mining Company, LLC's Motion for Summary Judgment. (Ct. Rec. 126) These are cross-motions for summary judgment on the issue of whether the United States of America is liable under the Comprehensive

Environmental Response, Compensation and Liability Act ("CERCLA") as an "owner" of the Midnite Mine Superfund Site, a former open-pit uranium mine located on the Spokane Indian Reservation in Washington State. Oral argument was heard on July 3, 2007. Assistant United States Attorney **Scott J. Jordan** argued on behalf of the United States of America. **Michael R. Thorp** representing Newmont USA Limited argued on behalf of Newmont USA Limited and Dawn Mining Company, LLC.

## Background

How the court views the facts in this matter, and which summary judgment "lens" it uses, is complicated because the parties have each filed motions for summary judgment on the same issue. For the most part, however, the material facts are not in dispute, despite differing views of how the facts should be characterized.

The Government does not deny that it acquired ownership of the involved real property as the "conqueror" of its former occupants, *infra*, pps. 13-15. The Government did not acquire title to the property by cession or treaty with any Indians or Tribes. The history of the Government's acquisition of lands formerly occupied by Indians and the Government's dealings with the Indians is concisely set forth in William C. Canby, Jr. , *American Indian Law (4th Ed., 2004)* @ pages 18-33. The treatment and policies by the United States of the conquered Indian people could be described by the undersigned as the Flying Trapeze Policies, swinging back and forth from protection to termination as the political winds directed.

In the early to mid 1800s the United States acquired title to some lands formerly occupied by Indians through treaties "in which the tribe ceded much of the land it occupied to the United States and reserved a smaller portion to itself (hence the term reservation)". Canby @ 18-19. Such was not the case with the Spokane Indians. Chief Garry of the Spokanes attended only as an "observer" at the 1855 Walla Walla Council between the United States led by Governor Stevens of the Washington Territory, and five thousand Indians and their Chiefs from Tribes throughout the Inland Empire, including Washington, Oregon, and Idaho. Contrary to other Chiefs, (there was more than one

Chief in most Tribes) Chief Garry did not sign a treaty on behalf of the Spokane Tribe with Governor Stevens. N. W. Durham, *Spokane and the Inland Empire,* Vol I, page 176 (1912). In fact, following the Walla Walla Council, warriors from the Spokane Tribe and other Tribes engaged in violent and ongoing wars with the United States Army throughout the late 1850s in the areas surrounding now Spokane, Washington. The wars ended under terms dictated by Colonel George Wright to the Indians during peace councils. To show the Indians who was winning the wars, Col. Wright had Head Chief Polotkin of the Spokanes hanged after taking him hostage at a "peace council" as were many other Indians. The horses belonging to the Indians were rounded up and over 200 shot by soldiers. Col. Wright then informed the Indians as to the terms of a "Peace Treaty". Those terms did not reference land, and no Treaty was signed by the United States and the Spokane Tribes concerning ownership or occupation of land formerly occupied by the Indians. Durham, Vol. 1, pps 229-263. It is undisputed that the United States became the owner of the Spokane's lands as the "conqueror."

In 1871, Congress passed legislation which effectively terminated the entry by the United States of treaties with tribes since that legislation provided that no tribe was thereafter to be recognized as an independent nation with which the United States could make treaties. Canby @ 19. The Spokane Indian Reservation was created on January 18, 1881, by an executive order of President Rutherford B. Hayes, wherein the land was designated to be "set aside and reserved for the use and occupancy of the Spokane Indians." (United States' St. Fact, Exh. 1).[1] No Congressional action was taken to establish this Reservation. During the period of American Indian law and policy commonly referred to as the period of "assimilation," the years between 1887 and 1934,

---

[1] A condensed history of the Spokane Indians and the creation of the Spokane Indian Reservation can be found in *Northern Pac. Ry. Co. v. Wismer*, 246 U.S. 283 (1918) based upon the stipulated facts agreed upon by the parties in that action, but not in this action.

ORDER - 3

the United States' Congress passed a series of acts affecting the lands of the Executive-created Spokane Indian Reservation. In the Congressional Act of May 27, 1902, the United States opened the mineral lands of the Spokane Reservation, providing that they "shall be subject to entry under the laws of the United States in relation to the entry of mineral lands." (Dft. St. Fact, Exh. 4). In a subsequent act dated June 19, 1902, Congress directed the Secretary of the Interior to "make allotments in severalty to the Indians of the Spokane Indian Reservation in the State of Washington, and upon the completion of such allotments the President shall by proclamation give public notice thereof, whereupon the lands in said reservation not allotted to Indians or used or reserved by the Government, or occupied for school purposes, shall be opened to exploration, location, occupation, and purchase under the mining laws." (Dft. Exh. 5). Nothing in this legislation suggested that Congress did not have full plenary authority and ownership of the Spokane Reservation lands. No subsequent Congressional action has changed the "plenary" position of the United States.

Several years later, on June 21, 1906, Congress passed an act authorizing the Secretary of the Interior to sell and convey by patent up to three hundred and sixty acres of the Spokane Indian Reservation lying at or near the junction of the Columbia and Spokane rivers for "town-site and terminal purposes." Then, on May 29, 1908, Congress passed a statute entitled an "Act [t]o authorize the Secretary of the Interior to sell and dispose of the surplus unallotted agricultural lands of the Spokane Indian Reservation, Washington, and for other purposes." (Dft. Exh. 6). The Act directed the Secretary of the Interior to make allotments to all Indians having tribal rights and belonging to the Spokane Indian Reservation who had not theretofore received allotments, and directed the Secretary of Interior to classify the surplus lands as agricultural and timber lands. (Id.). Under Section 2 of the Act, surplus agricultural lands were to be opened for settlement and entry under the homestead laws by any United States citizen, Indian or not, with the net proceeds to be deposited in the United States Treasury "to the credit of the Spokane Indians". (Id.). There is no evidence in the record as to whether any monies

were so deposited in the United States Treasury or if so, whether any of such monies were ever disbursed to or for the benefit of the Spokane Indians.  Section 5 of the Act provided, in part, for the United States Secretary of the Interior to "sell and dispose of for the benefit of the Indians such timber upon said timber lands as in his judgment has reached maturity and is deteriorating and which, in his judgment, would be for the best interests of the Indians to sell."  (Id.).  By another act dated May 18, 1916, Congress authorized and directed the Secretary of the Interior to:

> [L]ease . . . for mining purposes unallotted mineral lands on the diminished Spokane Reservation . . . for periods of twenty-five years with privileges of renewal, on such reasonable renewal conditions as may be determined by the Secretary of the Interior, and also with reasonable conditions to be fixed by the Secretary of the Interior providing for the prosecution of mining development and operation . . . and rental shall be based upon mining production, and shall be reasonable, and the proceeds of rental shall be paid into the Spokane Indian tribal fund.

(Dft. Exh. 7).  Finally, in 1940, Congress added a provision to the Columbia Basin Project Act authorizing the Secretary of the Interior to acquire portions of the Spokane Reservation as needed for the Grand Coulee Dam and reservoir project.  16 U.S.C. § 835d.

Pursuant to the Congressional instruction provided in the foregoing Acts of June 19, 1902 and May 29, 1908, allotment #156, located on the Spokane Reservation was issued to Edward Boyd on January 24, 1910.  (Ct. Rec. 238, Tab A).  The issued allotment states that:

> [T]he UNITED STATES OF AMERICA, in consideration of the premises, has allotted, and by these presents does allot, unto the said Edward Boyd the land above described, and hereby declares that it does and will hold the land thus allotted (subject to all statutory provisions and restrictions) for the period of twenty-five years, in trust for the sole use and benefit of the said Indian, and at the expiration of said period the United States will convey the same by patent to said Indian, in fee, discharged of said trust and free from all charge and incumbrance whatsoever, if said Indian does not die before the expiration of the trust period; but in the event said Indian does die before

the expiration of said trust period, the Secretary of the Interior shall ascertain the legal heirs of said Indian and either issue to them in their names a patent in fee for said land, or cause said land to be sold for the benefit of said heirs as provided by law.

(Id.)  The allotment consisted of 120 acres, located at "[t]he northwest quarter of the southeast quarter and the east half of the southwest quarter of Section twelve in Township twenty-eight north of Range thirty-seven east of the Willamette Meridian, Washington." (Id.).  On February 21, 1939, apparently prior to a fee patent being issued, Edward Boyd died intestate and his interest in the allotment was divided between his spouse and six children by an Order Determining Heirs issued by the United States Department of the Interior.  (Ct. Rec. 238, Tab B).  Between March 31, 1946 and March 20, 1956, many of Edward Boyd's heirs died intestate and their interests in the allotment gradually became concentrated in Lucy and Richard Boyd.  (Ct. Rec. 238, Tab C). The land on which the Midnite Mine was subsequently located was that part of the original Spokane Reservation that was not allotted to Indians or "white men" plus the Boyd allotted land.

In the spring of 1954, two brothers, Jim and John LeBret discovered uranium mineralization on the Spokane Reservation at the site that would eventually become the Midnite Mine.  After their discovery, on July 15, 1954, the LeBrets, along with four members of the Wynecoop family, leased from the United States approximately 571 acres of Spokane Indian Reservation lands for mining purposes (for minerals other than oil and gas) for a period of ten years.  (Dft. St. Fact, Exh. 9).  According to the United States, although without supporting evidence in the record, the 571 acres consisted of land that was classified as timber lands pursuant to the Act of May 29, 1908 and had not been allotted nor disposed of under the homestead laws.  (Ct. Rec. 238).  The mining lease was not signed by a representative of the Spokane Indian tribal government.  (Dft. Exh. 9). Instead, Floyd H. Phillips, Superintendent of the Colville Indian Agency, an agency of the United States Department of Interior, entered into the mining lease "for and on behalf of the Spokane Tribe of Indians," and the lease was later approved by the Acting Director of the United States Bureau of Indian Affairs.  (Id.).

The lease provided, *inter alia*, that the lessee would be paid for uranium pursuant to the price schedule established by the United States Atomic Energy Commission, would submit monthly reports to the Superintendent, and pay rents and royalties directly to the Superintendent, for the use and benefit of the tribe, or directly "to the Treasury of the tribe where the tribe is organized under the act of June 18, 1934 (48 Stat. 984)." (Id.). There is no evidence that the Treasury of the Spokane Tribe ever directly collected any rents or royalties under this provision. Additionally, the lease provided that the Superintendent could audit the lessee's accounts and books. (Id.). Finally, the lease authorized the United States Secretary of the Interior to suspend operations under certain circumstances, grant permission for assignments of the lease, collect the bond, inspect the property, approve the lessee's attempt to terminate the lease upon a satisfactory showing that full provision had been made for the conservation and protection of the property, approve or disapprove of the location of roads and required the lessee to hold the United States harmless from any negligent construction, and terminate the lease for violations of the lease's terms and conditions. (Id.).

Later in 1954, the LeBrets and Wynecoops incorporated to form Midnite Mines, Inc., a Washington corporation, and on December 15, 1954, they assigned the mining lease to their corporate entity, an act that was later approved by the Acting Director of the Bureau of Indian Affairs. (Dft. Exh. 10). By December of 1954, Midnite Mines, Inc. had shipped approximately 54 tons of rock to the United States Atomic Energy Commission's plant in Utah for testing. (Dft. Exh. 43 ¶ 6). In early 1955, the United States Atomic Energy Commission began a preliminary program of diamond drilling at the Site in an effort to better understand the nature and extent of the ore body. (Id.). In the spring of 1955, the Atomic Energy Commission issued Midnite Mines, Inc. a license to transfer uranium source material and executed a contract that allowed Midnite Mines, Inc. to ship 2400 tons of ore to the AEC processing facility in Salt Lake City, Utah. (Id.). During that same spring, on May 16, 1955, Midnite Mines, Inc. assigned the mining lease to Dawn Mining Company ("Dawn"), an act which was again approved by the Acting

Director of the Bureau of Indian Affairs on August 17, 1955. (Dft. Exh. 11). By the fall of 1955, Dawn and the Atomic Energy Commission had executed at least three small quantity ore procurement contracts under the Commission's Uranium Ore Procurement Program,[2] whereby the Atomic Energy Commission performed geologic surveying, free testing and assaying, and guaranteed a minimum ore purchase price. (Dft. Exh. 43, Stipulation of Facts Regarding the Atomic Energy Commission ¶ 6).

The following summer, on June 22, 1956, despite Edward Boyd's interest in the allotment seemingly being held by Lucy and Richard Boyd through inheritance, the Superintendent of the Colville Indian Agency, acting as "attorney-in-fact for the legal heirs of Edward Boyd, deceased" leased the 120-acre allotment to Dawn for a period of 15 years, (Dft. Exh. 12), because, as the Government summarily explains, "the individual Indian ownership was not entirely clear due to pending probate." (Ct. Rec. 238). On June 25, 1956, the Acting Area Director of the United States BIA approved the mining lease of the Boyd property. (Dft. Exh. 12). The terms of the 1956 lease for the allotment were substantially similar to the 1954 lease for the other lands within the reservation. The leases, *inter alia*, provided the United States Secretary of the Interior with the authority to suspend operations under certain circumstances; permission for assignments of the lease; collect the bond; inspect the property; approve the lessee's attempt to terminate the lease upon a satisfactory showing that full provision had been made for the conservation and protection of the property, and; terminate the lease for violations of the lease's terms and conditions. (Id.). The lease required Dawn to pay annual rents and royalties directly to the Superintendent for the use and benefit of the individual Indians,

---

[2] "To stimulate exploration and production, the AEC, which was the sole buyer of uranium in the United States at the time, offered fairly long-term contracts to mining companies, contracts in which the government would pay a relatively generous price for uranium meeting certain standards until 1962, when the contracts were due to expire." (Dft. Exh. 43 ¶ 3).

and to submit monthly reports to the Superintendent detailing all mining operations. (Id.). In addition, the Superintendent could direct audits of the lessee's accounts and books. (Id.). Finally, the lease provided that Dawn would be paid pursuant to the price schedule established by the United States Atomic Energy Commission. (Id.).

A few months later, on August 8, 1956, Dawn entered into its first contract with the United States Atomic Energy Commission for the production and sale of uranium concentrate. (Dft. Exh. 13 & 43 ¶ 7). The contract provided, *inter alia*, that Dawn would construct and operate a mill for processing uranium and the Atomic Energy Commission would purchase all of Dawn's uranium concentrate with processing caps set at 80,000 tons of ore in any six-month period and 2.7 million tons of ore in total. (Id.). Thereafter, in 1960, Dawn and the Atomic Energy Commission entered into another contract, substantially similar to the 1956 contract, but with the following differences: the contract adopted a flat base rate for concentrate; permitted Dawn to sell uranium concentrate to licensed third parties with the approval of the United States, and; specified exactly which independent producers and which properties Dawn could purchase ore from and allowed Dawn to negotiate a reasonable price, rather than requiring adherence to the Atomic Energy Commission-established price structures (although there is no evidence Dawn ever did purchase or process ore from third parties). (Dft. Exh. 43 ¶¶ 8-9). The Atomic Energy Commission then purchased all of the uranium ore and concentrate produced at the Midnite Mine through 1966. (Dft. St. Fact, Exh. 43 ¶ 11).

In 1964, Dawn renewed its mining leases for the reservation lands and the allotment. First, on September 18, 1964, the "Spokane Tribe of the Spokane Reservation, acting by and through the Superintendent of the Colville Indian Agency," entered into a second mining lease for the same approximately 517 acres for another ten-year period. (Dft. Exh. 15). It is noted that, although not required, the Spokane Tribal Business Council authorized the Superintendent to enter into this lease on behalf of the tribe. (United States' Reply St. Fact, Exh. 9). Second, on the same day, acting as Edward Boyd's remaining heirs to the 120-acre allotment, "Ortencia Anne Ford; the

Superintendent of the Colville Indian Agency on behalf of Donnelly Robert Villegos, a minor; and the Old National Bank of Spokane, as Guardian of the Estate of Richard Boyd" entered into a mining lease with Dawn for another ten-year term.[3]  (Dft. Exh. 16). On October 26, 1964, the Area Director of the United States Bureau of Indian Affairs approved both leases.  (Id.).  Their terms are nearly identical and both are substantially similar to the earlier 1954 and 1956 leases.  The leases provided the United States Secretary of the Interior with authority to adjust the royalty rate at the end of each ten-year period,  suspend operations under certain conditions,  approve or reject assignments of the lease,  increase the bond,  inspect the leased premises and books of the lessee, and terminate the lease for violations of the lease's terms.  (Dft. Exh. 15-16). The lessee could construct roads only with the written approval of the Superintendent and the lessee was required to "hold the United States harmless" and indemnify it "against any loss or damage that might result from the negligent construction or maintenance by the lessee of the roads."  Specifically, the United States Secretary of the Interior, or his authorized representative, had authority to cancel the lease if: (1) the lessee failed to exercise diligence in the conduct of prospecting and mining operations or failed to carry out development and operations in a workmanlike manner, or; (2) in the opinion of the United States Secretary of Interior, the lessee held the leasehold for speculative purposes in violation of the terms of the lease.  (Dft. Exh. 15-16 & 18, Responses to Requests for Admission No. 4 & 5).

   The evidence presented to the court on summary judgment, consisting mainly of letters, indicates that throughout the leasehold, the United States, through the Department

---

[3]  Later, in an Order Approving Compromise, *In the Matter of the Estates of Richard Boyd*, dated May 4, 1973, a one-half interest in the 120 acres covered by the lease with Dawn Mining Company was awarded to the Spokane Tribe, with the remaining interest retained by Ortencia Ford and Donnelly Villegos.  (United States' St. Fact, Exh. 8).

of Interior and its various agencies -- including the Bureau of Indian Affairs, United States Geological Survey, United States Bureau of Land Management, and the United States Mining Management Service -- exercised authority granted by the lease and by Congress through statute and regulation. Dawn paid its rents and royalties directly to the United States Bureau of Indian Affairs and audits were conducted by the Mineral Management Service. (Dft. Exh. 22, Smith Dep. pg. 12-13, 21; Exh. 45). The Mineral Management Service also monitored the status of the Midnite Mine's reclamation fund maintained by Dawn. (Dft. Exh. 26). The United States Geological Survey was involved in royalty rate adjustment negotiations, (Dft. Exh. 37), and the United States Bureau of Indian Affairs appears to have independently raised the royalty rates in 1975. (Dft. Exh. 25). In 1976, it approved the new royalty rates negotiated between Dawn, the Spokane Tribe, and allottees Ortencia Ford and Donnelly Villegos on the condition that Dawn provide the United States Geological Survey with a new mining and reclamation plan for approval. (United States' Exh. 50-51; Dft. Exh. 18, Response to Request for Admission No. 9). In addition, the United States Bureau of Indian Affairs supervised the mine's surety bond and pursuant to authority granted in the leases and regulations, periodically required Dawn, as lessee, to increase the amount of money paid into the bond. (Dft. Exh. 28-29).

Throughout this period, either the United States Geological Survey, the United States Mineral Management Services, or the United States Bureau of Land Management reviewed and approved Dawn's mining and reclamation plans pursuant to the terms of the 1964 mining leases and applicable regulations. (Dft. Exh. 14, Smith Dep. pg. 50; Dft. Exh. 39-41). For example, in early 1981, Dawn proposed a change in their mining plan that would have allowed it to mine exclusively from Pit 3. (United States' St. Fact ¶ 28B). This change was resisted by the Spokane Tribe and in a letter dated March 23, 1981, the Tribe informed Dawn that "[t]he Tribal Council had directed the Tribal Mining Consultant, the USGS and BIA staff to determine the complete, overall effect of [Dawn's] changed plan on the life and profitability of the mine, and has instructed them

to order the immediate suspension of mining operations." (United States' St. Fact, ¶ 28C; Exh. 49). As a result of this proposed change, in the spring of 1981, the Bureau of Indian Affairs and the United States Geological Survey notified Dawn that it must suspend its mining activities pending submittal and approval of the proposed change. (Dft. Exh. 27 & 40). Despite the actions of the Tribe, in July of 1981, the United States Geological Survey approved the changes to Dawn's mining plan that had been challenged by the Tribe. (Dft. Exh. 18, Response to Request for Admission No. 11; United States' Exh. 47). However, in September of 1981, after several months of informal administrative proceedings, the United States Geological Survey reversed its decision and officially withdrew its approval of Dawn's mining plan and ordered Dawn to stop mining operations until a revised mining plan was approved. (Dft. Exh. 18, Response to Request for Admission No. 12; United States' Exh. 47).

Defendants have submitted various letters and other evidence showing that after suspending mining activities at the site, and throughout the 1980's, the various agencies of the United States Department of Interior monitored the site's environmental conditions and Dawn's reclamation activities, particularly those related to water quality issues. The agencies periodically inspected the site for compliance, and even ordered corrective action. Specifically, the United States Mineral Management Service monitored water quality and appears to have advised Dawn concerning proposed modifications to the drainage-monitoring program. (Dft. Exh. 42). In addition, the United States Bureau of Indian Affairs monitored the site's water quality, (Dft. Exh. 22, Smith Dep. pg. 13), and in a letter dated March 17, 1983, notified Dawn that it was in violation of the terms of the 1964 leases and ordered Dawn to take steps to prevent further degradation of water resources in the area. (Dft. Exh. 18, Response to Request for Admission No. 14; Dft. Exh. 30). The United States Bureau of Land Management also invoked the terms of the 1964 leases in October of 1983, when the agency directed Dawn to install and operate a siphon system to transfer water from Pit 4 to Pit 3, monitor flow volume in all active seeps and surface drainages, provide the agency with a drainage control plan, and to re-soil and re-

vegetate parts of the site.  (Dft. Exh. 18, Response to Request for Admission No. 15).  It also appears that the Bureau of Land Management periodically inspected the site and in 1984 ordered Dawn to implement corrective action to improve water quality, minimize run-off, correct erosion, and improve the general "safety and good housekeeping" of the site.  (Dft. Exh. 33).  Further, the Bureau of Land Management cooperated with other agencies -- specifically the Environmental Protection Agency and the Bureau of Indian Affairs -- to ensure environmental compliance and approval of reclamation projects addressing water storage at the site, such as the pollution control pond, and piping and pumping for mine water seepage as part of the seepage control plan.  (Dft. Exh. 34-35).

Finally, on or about April 30, 1990, after an informal hearing, the United States Bureau of Indian Affairs terminated Dawn's rights under the 1964 mining leases based, in part, on findings and conclusions that Dawn had failed to comply with the terms of the leases and failed to provide the United States with an adequate mining plan.  (Dft. Exh. 18, Response to Request for Admission No. 8 & 13; Dft. Exh. 32).

## Standard of Review

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court.  *Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975).  In meeting this burden,  the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Miller v. Glenn Miller Productions*, 454 F.3d 975, 987 (9th Cir. 2006) (quoting FED. R. CIV. P. 56(e)).

## Analysis

CERCLA's overarching purpose is to make the polluters pay for the damage they cause.  *See, e.g., Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 6 (1989) (stating that "CERCLA both provides a mechanism for cleaning up hazardous-waste sites . . . and imposes costs of the cleanup on those responsible for the contamination") *overturned on other grounds by Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996).  The Act imposes liability when "(1) the waste disposal site is a 'facility' ...; (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred ...; and (3) such "release" or "threatened release" has caused the plaintiff to incur response costs . . ." and (4) the defendant falls within one of four classes of persons subject to CERCLA's liability provisions.  *Long Beach Unified School Dist. v. Dorothy B. Goodwin Cal. Living Trust*, 32 F.3d 1364, 1366-67 (9th Cir. 1994) (citing 42 U.S.C. § 9607(a)).  The four classes of persons subject to CERCLA liability are:  (1) present owners and operators of a hazardous waste facility; (2) past owners or operators of such a facility; (3) arrangers of hazardous waste disposal; and (4) transporters of such waste.  *Id.* at 1367 (citing 42 U.S.C. §§ 9607(a)(1)-(4)).  The issue raised by these motions is whether the United States is a past or present "owner" of the Midnite Mine Superfund Site for purposes of CERCLA liability.

## I.  Whether the United States is a Past or Present "Owner"

CERCLA, 42 U.S.C. § 9601(20)(A), defines "owner or operator" as "any person owning or operating" a toxic waste facility.  *See Long Beach*, 32 F.3d at 1368 (pointing

ORDER - 14

out this "is a bit like defining 'green' as 'green'").  The Ninth Circuit has stated that the circularity of the definition "strongly implies . . . that the statutory terms have their ordinary meanings rather than unusual or technical meanings."  *Id.* (quoting *Edward Hines Lumber v. Vulcan Materials Co.*, 861 F.2d 155, 156 (7th Cir. 1988).   Therefore, in the Ninth Circuit, the statute is read as "incorporating the common law definitions of its terms," such as "owner."  *Id.* at 1368-69 & n.5 (stating that "[w]hile we deem a defendant's status as an owner under common law as necessary to being an owner under CERCLA, we do not consider whether it is sufficient"). Issues of ownership and property rights concerning Indian land are generally the province of the federal statutory and common law. *Onieda Indian Nation v. County of Oneida*, 414 U.S. 661, 667-70 (1974).

In instances where a party is deemed to hold "bare legal title," courts in this Circuit and without have looked for other "indicia of ownership" to determine owner liability under CERCLA.   *See Castlerock Estates, Inc. v. Markham*, 871 F. Supp. 360, 366 (N.D. Cal. 1994) (stating that "bare legal title is not enough in determining whether a fiduciary should be held liable as an owner under CERCLA . . . [the fiduciary] must not only hold bare title, but must possess other indicia of ownership"); *United States v. Friedland*, 152 F. Supp. 2d 1234, 1241-44 (D. Colo. 2001) (concluding that holding legal title was not enough to show owner liability); *but see City of Phoenix v. Garbage Servs. Co.*, 816 F. Supp. 564, 566-68 (D. Ariz. 1993) (a trustee bank was deemed to qualify as an "owner" of a contaminated site, even though it was never involved in the site's day-to-day operation and its involvement was limited to exercising an option to buy the contaminated site, holding legal title to the land as trustee, paying property taxes, and procuring liability insurance).

### i.  Common Law "Ownership":

It is undisputed that the United States holds title to the Spokane Indian Reservation and that in 1881, by Executive Order, it was reserved for the occupancy of the Spokane Indians.  It is also undisputed that the United States holds title to the Boyd allotment for

the use and benefit of the individual Indian allottees.  It has long been recognized by the United States Supreme Court that title to the lands of this nation, originally occupied by the Indians, became vested in the colonial European nations and then the United States of America through "discovery" and "conquest".  *See Johnson v. McIntosh*, 21 U.S. 543, 588 (1823) (stating that "[c]onquest gives a title which the Courts of the conqueror cannot deny, whatever the private and speculative opinions of individuals may be, respecting the original justice of the claim which has been successfully asserted");  *see also Spalding v. Chandler*, 160 U.S. 394, 403 (1896) (stating that "[i]t has been settled by repeated adjudications of this court that the fee of the lands in this country in the original occupation of the Indian tribes was, from the time of the formation of this government, vested in the United States");  *Oneida Indian Nation v. Oneida County*, 414 U.S. 661, 667 (1974) (same).  As explained by the United States Supreme Court years later, "[t]he whites enforced their claims by the sword and occupied the lands as the Indians abandoned them." *Northwestern Bands of Shoshone Indians v. United States*, 324 U.S. 335, 338-39 (1945) (describing *Johnson v. McIntosh* as giving "rationalization to the appropriation of Indian lands by the white man's government").

Although exclusive title to former Indian lands is held by the United States, it was subject to what is called "original Indian title," "aboriginal Indian title," or simply "Indian title."  Felix S. Cohen, *Handbook of Federal Indian Law*, 487 (1982 ed.).  "Indian title" amounted to a "right of occupancy" to lands occupied by the Indians prior to European and American "discovery," conquest, and white settlement, which the sovereign granted and protected against intrusion by third parties.  *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955); *Confederated Tribes of Chehalis Indian Reservation v. State of Washington*, 96 F.3d 334, 341 (9th Cir. 1996).  "Indian title" existed at the pleasure of the United States and was extinguished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, and its justness is not open to inquiry in the courts." *Confederated Tribes*, 96 F.3d at 341 (quoting *United States v. Santa Fe Pac. R.R. Co.*,

314 U.S. 339, 347 (1941));  *see also Tee-Hit-Ton Indians*, 348 U.S. at 281 (citing *Santa Fe Pac. RR. Co.*, 314 U.S. at 347) (explaining that the power of Congress to extinguish "Indian title" is supreme, and the manner, method, and time of such extinguishment raises political, not justiciable issues); *McIntosh*, 21 U.S. at 585-88 (explaining that the United States may extinguish "Indian title" by "purchase or conquest").  The United States Supreme Court has described the federal government's policy toward the Indian "right of occupancy" as respectful, *Oneida Indian Nation*, 414 U.S. at 668, and it has been described as being "as sacred as the fee simple of the whites."  *United States v. Adair*, 723 F.2d 1394, 1413 (9th Cir. 1983) (quoting *Mitchel v. United States*, 34 U.S. 711, 746 (1835)).  Nevertheless, the "right of occupation" of non-treaty lands may be terminated and the lands disposed of by Congress without any legally enforceable obligation to compensate the Indians.  *See Tee-Hit-Ton Indians*, 348 U.S. at 279 (1955) (noting that the United States Supreme Court has never held that taking of "Indian title" or use of such land by Congress required compensation).  Accordingly, "the taking by the United States of unrecognized Indian title is not compensable under the Fifth Amendment."  *Id.* at 285. Ownership of the land formerly occupied by the Spokane Tribe was acquired by the "conquest" of the Tribe as described in Volume I of Durham*: Spokane and the Inland Empire (1912).*

There is no contention that the Spokane Indian Reservation was established through a treaty between the United States and the Spokane Indians.[4]  The Spokane

---

[4]   Contrary to assertions made by the United States, only where Congress by treaty or other agreement has explicitly declared that Indians were to hold lands permanently thereafter must the United States compensate a tribe for a taking.  *Tee-Hit-Ton Indians*, 348 U.S. at 277-78 (citing *United States v. Creek Nation*, 295 U.S. 103, 109-110 (1935); *Shoshone Tribe v. United States*, 299 U.S. 476, 497 (1937); *Chippewa Indians v. United States*, 301 U.S. 358, 375-76 (1937); *United States v. Klamath Indians*, 304 U.S. 119 (1938); *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942)).

Indian's "right of occupancy" was created when President Rutherford B. Hayes, by Executive Order dated January 18, 1881, established the Spokane Indian Reservation "for the use and occupancy of the Spokane Indians." This Executive Order did not change the fact that the United States was then and thereafter remained the owner of the land. *See Northern Pac. Ry. Co. v. Wismer*, 246 U.S. 283, 287 (1918). "An Indian reservation created by Executive Order conveys no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President." *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103 (1949). Accordingly, a tribe's right to "use and occupancy" may be terminated by the unilateral action of the United States without legal liability for compensation. *Id.; see also Sioux Tribe of Indians v. United States*, 316 U.S. 317, 330-31 (1942) (holding that although Congress delegated to the President the power to create reservations, it never delegated the power to confer compensable property interests in the Indians); *United States v. Sioux Nation of Indians*, 448 U.S. 371, 415 n.29 (1980) (stating that "it has long been held that taking by the United States of 'unrecognized' or 'aboriginal' Indian title is not compensable under the Fifth Amendment").

The Ninth Circuit summarized the status of Executive Order reservations as follows:

> [T]he Indians have the exclusive right to possession but title to the lands remains with the United States. <u>Congress has plenary authority to control use, grant adverse interests or extinguish the Indian title</u>. In these respects, executive order reservations do not differ from treaty or statutory reservations. The one difference is that so long as Congress has not recognized compensable interests in the Indians, executive order reservations may be terminated by Congress or the Executive without payment of compensation. (Emphasis supplied).

*S. Pac. Transp. Co.*, 543 F.2d 676, 687 (1976). Therefore, "[u]nless recognized as vested by some act of Congress, tribal rights of occupancy and enjoyment, whether established by executive order or statute, may be extinguished, abridged, or curtailed by the United

States at any time without payment of just compensation." *Karuk Tribe of California v. United States*, 41 Fed. Cl. 468, 470 (Fed. Ct. Cl. 1998).

In an attempt to show  that Congress has recognized that the Spokane Indians have a compensable interest in the Reservation lands, the United States points to occasions where Congress provided compensation for the taking of specified portions of the reservation.  For example, when Congress passed legislation authorizing the construction of the Grand Coulee Dam, 16 U.S.C. § 835 et seq.,  on portions of reservation and allotted lands within the Spokane and Colville Reservations, 16 U.S.C. § 835d, as part of the Act, Congress provided for compensation:

> As lands or interests in lands are designated from time to time under . . . this title, the Secretary of the Interior shall determine the amount of money to be paid to the Indians as just and equitable compensation therefor.  As to the tribal lands, the amounts so determined shall be transferred in the Treasury of the United States from the funds now or hereafter made available for the construction of the Columbia Basin project to the credit of the appropriate tribe . . . The amounts due individual landowners or their heirs or devisees shall be paid from funds now or hereafter made available for the construction of said project to the superintendent of the Colville Indian Agency or such other officer as shall be designated by the Secretary of the Interior for credit on the books of said agency to the accounts of the individuals concerned.

16 U.S.C. § 835e.  Prior to that, Congress passed the Act of June 21, 1906, which provided, in pertinent part, that:

> [T]he Secretary of the Interior be, and he is hereby, authorized, in his discretion, to sell and convey by patent with such reservations as to flowage rights, dam sites, and mill sites appurtenant to water powers, as he may prescribe, such tract or tracts of lands of the Spokane Indian Reservation, State of Washington, lying at or near the junction of the Columbia and Spokane rivers, not exceeding three hundred and sixty acres in extent, for town-site and terminal purposes, upon the payment of such price as may be fixed by him, and that the money received therefrom shall be deposited in the Treasury of the United States to the credit of the Spokane Indians.

34 stat. 377.  Finally, in an Act dated May 29, 1908, Congress provided, *inter alia*, that

upon the completion of allotments being made to those Spokane tribal members who had
not previously received allotments, "the Secretary of the Interior shall classify the surplus
lands as agricultural and timber lands, the agricultural lands to be opened to settlement
and entry under the provisions of the homestead laws by proclamation of the President"
and the net proceeds derived from the sale of agricultural lands and timber shall be
deposited in the Treasury of the United States to the credit of the Indians of the Spokane
Reservation.  35 stat. 458-460.  As stated, *supra,* there is nothing in the record as to any
distribution of the proceeds, if any, after being deposited in the United States Treasury.

  According to the United States Supreme Court in *Tee-Hit-Ton Indian v. United
States*, 348 U.S. 272, 278-79 (1955), "[t]here is no particular form for congressional
recognition of Indian right of permanent occupancy . . . but there must be the *definite
intention* by congressional action or authority to accord legal rights, not merely
permissive occupation."  (emphasis added);  *see also Hynes*, 337 U.S. at 104 (stating that
"[w]hen Congress intends to delegate power to turn over lands to the Indians
permanently, one would expect to and doubtless would find definite indications of such a
purpose").  There is a complete void in the record of any such language or intention by
Congress as to the lands in the matter, *sub judice*. In *Miami Tribe of Oklahoma v. United
States*, 175 F. Supp. 926, 930-31, 937 (Ct. Cl. 1959), where the treaty referred to the
United States' "relinquishment" of claims to certain lands and where the government
granted the tribe lands "as long as they please," the court held that such language
constituted a clear indication of the government's intent to recognize title. *Cf. Strong v.
United States*, 518 F.2d 556, 563-64 (Ct. Cl. 1975) (holding that even a guarantee of
"territorial rights" constitutes only a declaration of intention to respect Indian title as
against third parties). The United States Claims Court, in *Zuni Indian Tribe of New
Mexico v. United States*, 16 Cl. Ct. 670, 675 (Ct. Cl. 1989), cautioned that "Congressional
policy awarding *adequate compensation* to the Indians for interferences with aboriginal
title is frequently confused with the obligation under the Fifth Amendment to pay *just
compensation* for taking recognized title."  (emphasis in original).

Nothing in the language contained in the various acts of Congress affecting the lands of the Spokane Indian Reservation demonstrates "definite intention by congressional action," *Tee-Hit-Ton*, 348 U.S. at 278-79, to create a vested interest in the Spokane Indians of the remaining portions of the Reservation not previously conveyed pursuant to acts of Congress.   Instead, it appears that Congress' decision to compensate the tribe for the takings was an act of grace rather than a recognition of a legal obligation. *See Zuni*, 16 Cl. Ct. at 672 (explaining that "Congress and the courts have long honored a policy of awarding Indian gratuities for the termination of Indian occupancy of government-owned land rather than making compensation for its value a rigid constitutional principle . . . [t]his policy allows Indian tribes to recover the value of their land at the time of the taking without interest *as a matter of grace, not because of legal liability*" (emphasis added) (citations and quotations omitted)). Based on the foregoing, it is apparent that the United States holds fee title to the lands of the Spokane Indian Reservation per the 1881 Executive Order, subject only to the gratuitous and permissive use and occupancy of the Spokane Indians, which is a non-compensable ownership interest.

Based upon the record before the court on summary judgment, it also appears that the United States holds fee title to the Boyd allotted lands as well, but the United States' relationship to allotted lands is completely different.  In the General Allotment (Dawes) Act of 1887, 25 U.S.C. § 331 et seq. and in 1902 and 1908, Congress authorized the President to allot reservation land to individual Indians and thereafter to non-Indians, a further recognition of the complete ownership and dominion by the United States over reservation lands and the Spokane lands in particular. 25 U.S.C. § 331.  The Act provided that the United States would retain title to such allotted lands in trust for the benefit of the allottees:

> Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of

twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made . . . and that at the expiration of said period the United States will convey the same by patent to said Indian . . ., in fee, discharged of said trust and free of all charge or incumbrance whatsoever:  Provided, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void.

*United States v. Mitchell*, 445 U.S. 535, 541 (1980) (quoting 25 U.S.C. § 348).  Due to the discretionary nature of this presidential power to open reservations for allotment, Congress, from time to time, enacted special legislation subjecting a particular reservation to allotment.  *Mattz v. Arnett*, 412 U.S. 481, 497 (1973).  In this matter, Congressional acts dated June 19, 1902 and May 29, 1908, provided for the allotment of the lands within the Spokane Indian Reservation.  As a result, on January 24, 1910, the 120-acre allotment, upon which a portion of the Midnite Mine Superfund Site is located, was issued to Edward Boyd.

Under the General Allotment Act and related legislation, tribal lands were allotted to individual Indians "in severalty" and "in trust for the sole use and benefit of the Indian," *S. Pac. Tranp. Co.*, 543 F.2d at 683 (citing 25 U.S.C. §§ 331, 348), with each Indian allottee initially receiving a "trust patent."  *Arenas v. Preston*, 181 F.2d 62, 64 (9th Cir. 1950).  Once allotted in severalty, the land was "no longer a part of the reservation, nor [was] it tribal land."  *Nicodemus v. Washington Water Power Co.*, 264 F.2d 614, 618 (9th Cir. 1959) (quoting *United States v. State of Minnesota*, 113 F.2d 770, 773 (8th Cir. 1940); *see also United States v. Oklahoma Gas & Electric Co.*, 127 F.2d 349, 353 (10th Cir. 1942) (same).

This initial "trust patent" gave the allottee "full possessory right[s]," *S. Pac. Tranp. Co.*, 543 F.2d at 683, "but without the right of alienating or encumbering the land." *Arenas*, 181 F.2d at 64; *but cf. United States v. State of Minnesota*, 113 F.2d 770, 773

(8th Cir. 1940) (generously describing allottees as holding "virtual fee . . . with certain restrictions on the right of alienation").  Only after the expiration of the trust period, which was typically twenty-five years, were fee patents issued and the Indian received an absolute right of ownership.  *S. Pac. Tranp. Co.*, 543 F.3d at 683 (citing F. Cohen, *Handbook of Federal Indian Law* 220 (Univ. of N.M. Press reprint of 1942 ed.)).  However, in 1934, because of the abuses of "white men" in purchasing lands from Indians who had acquired fee title, with the passage of the Indian Reorganization Act, 25 U.S.C. § 461 et seq., title to those allotments that had not been conveyed in fee was retained by the United States indefinitely.  *Id.* (citing 25 U.S.C. § 462).  See also, Canby*, American Indian Law,* 20-23 *(4th Ed. 2004)*.

Apparently, a fee patent was not issued to Edward Boyd or his heirs prior to the passage of the Indian Reorganization Act.  Accordingly, the parties do not dispute that the United States has held fee title to the allotment for the use and benefit of the individual Indian allottees from January 24, 1910 until the present.  Although "[t]he legal title to the allotted land was retained by the United States under the immediate supervision of the Secretary of Interior," *Arenas*, 181 F.2d at 64, the allottee's possessory rights are a recognized compensable ownership interest under the Fifth Amendment's Takings Clause.  *See* 25 U.S.C. § 357 (stating, in pertinent part, that "[l]ands allotted in severalty to Indians may be condemned for any public purpose under the laws of the State or Territory where located in the same manner as land owned in fee may be condemned, and the money awarded as damages shall be paid to the allottee"); *United States v. Clark*, 445 U.S. 253, 259 (1980) (explaining that  25 U.S.C. § 357 authorizes state or local government to condemn allotted Indian trust lands after a formal judicial proceeding).

Despite the federal government clearly holding fee title for the individual allottees, the United States attempts to characterize its interest in allotted lands as merely "governmental" by relying upon statements made by the Supreme Court in *Poafpybitty v. Skelly Oil Company*, 390 U.S. 365, 376 (1968) (holding that Indian lessors have

sufficient property interests to maintain an action seeking damages for the alleged breach of an oil and gas lease).  Therein, the Court quoted from an earlier opinion, *Heckman v. United States*, 224 U.S. 413 (1912), for the proposition that "the allotment system created interests in both the Indian and the United States," with the United States' interest limited to the following:

> This national interest is not to be expressed in terms of property, or to be limited to the assertion of rights incident to the ownership of a reversion or to the holding of a technical title in trust . . . [and] . . . A transfer of the allotments is not simply a violation of the property right of the Indian.  It violates the governmental rights of the United States.

*Poafpybitty*, 390 U.S. at 369, n.7 (quoting *Heckman*, 224 U.S. at, 428, 437).  The United States' reliance upon this language is misplaced, however, as it was taken from a general discussion about the passage of the General Allotment Act, operation of the allotment system, and the government's trust responsibilities thereto.  *Id.* at 368-69.  Moreover, the *Heckman* Court  used the above-quoted language to describe how, due to the United States' guardianship relationship with the Indians, the rights and duties of the United States is not limited to its property interest.  *Heckman*, 224 U.S. at 437-38 (holding that the United States could sue to protect the unauthorized conveyance of allotted lands).  Neither case stands for the proposition that the United States' only interest in non-patented allotted lands is governmental, and other courts have explicitly stated that one of the government's interests in allotted lands is a property interest.  *See United States v. City of Tacoma*, 332 F.3d 574, 579 (9th Cir. 2003) (holding that the United States had standing to bring an action on behalf of itself and as trustee for the Skokomish Indian Tribe and its members seeking to void land transfers made by the Tribe involving three allotments held in fee by the tribal members with a reversionary interest in the United States, and two allotments held in trust by the United States for tribal members' benefit because  United States "suffered injury in its property rights in all the allotments . . .[,] suffered injury as the trustee . . .[,] and has an independent governmental interest when it has not been made a party in condemnation proceedings of restricted Indian lands")

(citations omitted);  *Minnesota v. United States*, 305 U.S. 382, 386 (1939) (stating that the United States is an indispensable party defendant to condemnation proceedings regarding trust allotments because "[a] proceeding against property in which the United States has an interest is a suit against the United States").

Accordingly, the United States holds fee title in both types of Indian land.  The Tribe's interest in the reservation is limited the right of use and occupancy, which is subject to an unlimited right of defesance by the United States and is not protected by the Fifth Amendment's Takings Clause.  The individual allottees have a right to the use and benefit of the allotment, a right that is compensable for a taking.  Despite the foregoing, the United States argues that it holds only "bare legal title" without sufficient "indicia of ownership" to make the United States liable as an "owner" under CERCLA.

## ii.  Indicia of Ownership

There is some authority supporting the Defendants' argument that because the United States has, at all relevant times, held title to the Indian lands in question, the court need not look beyond CERCLA's strict liability provision to determine whether the United States also possessed some other "indicia of ownership." In *City of Phoenix v. Garbage Servs. Co.*, 816 F. Supp. 564, 567 (D. Ariz. 1993), the district court held that a bank, although holding only bare legal title as a trustee, was an "owner" of a contaminated landfill site even though the bank's ownership role was limited to acting as trustee of a decedent's estate.  Operating in that role, the bank exercised an option to purchase the landfill, continued to lease the site to a third party, paid the property taxes, and procured liability insurance.  In so holding, the court recognized that "there is no culpability requirement for ownership liability under CERCLA ," and "commentators uniformly agree that the term 'owner' . . . includes trustees who hold legal title only," as "Congress intended the term 'owner' to have the broadest possible meaning":

> The legislative history of CERCLA seems to take for granted that any titleholder is an "owner" under the statute.  The House Report on the legislation states that "'[o]wner' is defined to include not only those persons who hold title to a . . . facility, but those who, in the absence of holding a

title, possess some equivalent indicia of ownership . . . The single exception
to titleholder liability found in the statute exempts lenders who hold "indicia
of ownership primarily to protect [their] security interest."  42 U.S.C. §
9601(20)(A).

*Id.* at 567-68 (citations omitted).

Pursuant to the before mentioned House Report, Congress appears to have
envisioned "some equivalent indicia of ownership" as a separate basis for liability rather
than as an additional requirement when a party holds legal title.  In reaching its
conclusion, the Arizona district court conceded that:

It may seem unjust to subject trustees that are not involved in the
contamination of the property to liability for cleanup that, in some cases,
may far exceed the value of the trust's assets.  But . . . a defendant's degree
of culpability has nothing to do with owner/operator liability under
CERCLA.  If Congress had meant to exempt uninvolved trustees from
liability as "owners" under CERCLA, it would have said so in the statute.

*Id.* at 568.

Although the *City of Phoenix* court concluded that holding title was sufficient to
incur CERCLA liability, other courts have required indicia of ownership in addition to
bare legal title before assigning "owner" liability under CERCLA.  For example, in
*Castlerock Estates, Inc. v. Estate of Markham*, 871 F. 360, (N.D. Cal. 1994), the district
court, on a motion for summary judgment, faced the issue of whether a bank could be
held liable as an "owner" for acting as conservator and then as executor for the estate of
one of the owners of an environmentally contaminated cattle ranch.  The court analyzed
*Phoenix* and refused to necessarily apply ownership liability to other fiduciaries  holding
bare legal title, particularly conservators and executors.  *Id.* at 365.

Title is important, but it is merely one factor in establishing CERCLA
ownership liability in a fiduciary.  The court finds that bare legal title is not
enough in determining whether a fiduciary should be held liable as an owner
under CERCLA.  Other factors must be considered in determining this issue.
The conservators and executors must not only hold bare legal title, but must
possess other indicia of ownership.

ORDER - 26

*Id.* at 366.  The court thought "[a] stricter test for CERCLA liability should apply to conservators and executors because their title is much lesser than is the title held by trustees."  The court  recognized that generally, the powers of a trustee are greater and broader than those of an executor.  *Id.*  A conservator or executor's role is defined by the instrument that created his or her office, but the officer typically cannot act vis-a-vis the property without court approval, especially concerning decisions to sell or convey the property, unlike a trustee, which generally requires court approval for its actions in fewer instances.  *Id.*  In addition, conservators and executors hold title by reason of their office rather than by deed.  *Id.*  After describing how the bank had received the power to sell and convey property without further court order, the court noted that:

> The ability to sell and convey the property is one of the most basic elements
> of title.  Such an ability is an important indicator of ownership.  Involvement
> in the management and operation of an estate are other indicia of ownership.
> The key question is whether the fiduciary could have affected the disposal of
> the hazardous wastes on the subject property.

*Id.* at 367.  Ultimately, the court held that questions of fact remained as to whether the bank possessed sufficient indicia of ownership over the estate for purposes of CERCLA liability.

In *United States v. Friedland*, 152 F. Supp. 2d 1234 (D. Colo. 2001), the district court faced a motion for partial summary judgment in which it addressed whether or not the United States, as bare legal title holder of certain unpatented mining claims, was an "owner" for purposes of CERCLA liability.  To determine whether the United States possessed indicia of ownership sufficient to merit "owner" liability, the court "examined the relationship between the United States, as owner of bare legal title of the unpatented mining claim/property, and those entities utilizing the property subject to the unpatented mining claim."  *Id.* at 1244.  The court outlined how, under federal mining laws, private parties acquire exclusive possessory interests in federal land for mining purposes, while title to the underlying fee simple estate in the land remains in the United States.  Until a

patent issues, "the United States retains paramount rights and interests in the Federal lands . . . and maintains the authority to regulate the uses of those lands." *Id.* at 1245.

> [A]n unpatented mining claim, imparting a possessory mineral interest in land, gives the owner the right of present and exclusive possession for the purpose of mining. It does not divest the legal title of the United States nor impair its right to protect the land and its product from trespass or waste. The United States may regulate mining activities in the national forests in order to protect surface resources . . . Furthermore, the claimant may not prohibit or interfere with activities associated with public use of the surface of the unpatented mining claims not dealing with mining.

*Id.* at 1245 n.3 (internal citations omitted).  In other words, the United States retains title and broad powers over the terms and conditions upon which the lands can be used, leased, and acquired.  *Id.* at 1245-46.  However, the United States receives no financial benefit from these lands, cannot exclude individuals from the land, lacks the power to retain title if the claimant seeks title, is unable to set the boundaries of the conveyance or establish the terms of the sale based upon the land's value, and may only regulate mining activities in the national forests in order to protect surface resources.  *Id.*  The unpatented mining claimant, on the other hand, holds many of the benefits and privileges of ownership.  The claimant receives valid, equitable, possessory title, that may be sold, transferred, mortgaged, and inherited, and is protected by the Fifth Amendment against uncompensated takings, subject to taxation, and cannot be divested if the claimant demonstrates substantial compliance with maintenance requirements specified in the mining laws.  *Id.*  After balancing the parties' respective ownership rights, the court held, in part, that the United States was not an "owner" for purposes of CERCLA liability.  *Id.* at 1246.

Even if the court were to adopt the reasoning used in *Castlerock Estates* and *Friedland*, rather than the *Phoenix* analysis, and look for sufficient "indicia of ownership" in addition to bare legal title, the court is satisfied that the elements of ownership that the United States has exercised over the Indian lands at issue here dictates a finding that the United States was an "owner" under CERCLA during the relevant time

1  frames.

2        **(a)  The United States' Trust Responsibilities:**

3       The general historical and ongoing relationship between the federal government

4  and Indian tribes is generally described as that of a guardian to a ward.  *See, e.g., Crain v.*

5  *First Nat. Bank of Oregon*, 324 F.2d 532, 535 (9th Cir. 1963).  The Supreme Court and

6  Ninth Circuit have continually recognized that the federal government is bound by a

7  "distinctive obligation of trust" in its dealings with Indians.  *Hoopa Valley Indian Tribe*

8  *v. Ryan*, 415 F.3d 986, 992 (9th Cir. 2005) (citing *Seminole Nation v. United States*, 316

9  U.S. 286, 296-97 (1942) (stating that "[u]nder a humane and self imposed policy which

10 has found expression in many acts of Congress and numerous decisions of this Court, it

11 has charged itself with moral obligations of the highest responsibility and trust.  Its

12 conduct, as disclosed in the acts of those who represent it in dealings with the Indians,

13 should therefore be judged by the most exacting fiduciary standards").  However, the

14 Ninth Circuit has held that unless there is a specific duty that has been placed on the

15 Government with respect to Indians, federal government agencies may show compliance

16 with the general trust obligation by simply complying with "general regulations and

17 statutes not specifically aimed at protecting Indian tribes."  *Pit River Tribe v. United*

18 *States Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006) (quoting *Morongo Band of Mission*

19 *Indians v. F.A.A.*, 161 F.3d 569, 574 (9th Cir. 1998)).

20      In addition to the all-pervasive "general trust relationship between the United

21 States and the Indian people . . . [that] has long dominated the Government's dealings

22 with Indians," *United States v. Mitchell*, 463 U.S. 206, 224 (1983), many of the

23 government's trust responsibilities are codified in various statutes and their implementing

24 regulations.  The Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396-396g, including

25 its implementing regulations, is a detailed and comprehensive act that imposes extensive

26 responsibilities on the federal government when executing tribal mineral leasing on

27 allotted, but non-patented land or on land owned by the Tribe pursuant to treaty or other

28 acquisitions.  *Assiniboine and Sioux Tribe v. Board of Oil and Gas Conservation*, 792

F.2d 782, 794 (9th Cir. 1986).  Section 396 provides in part:

> All lands allotted to Indians in severalty, . . . may by said allottee be leased for mining purposes for any term of years as may be deemed advisable by the Secretary of the Interior;  and the Secretary of the Interior is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect: *Provided*, That if the said allottee is deceased and the heirs to or devisees of any interest in the allotment have not been determined, or, if determined, some or all of them cannot be located, the Secretary of the Interior may offer for sale leases for mining purposes to the highest responsible qualified bidder, at public auction, or on sealed bids, after notice and advertisement, upon such terms and conditions as the Secretary of the Interior may prescribe. The Secretary of the Interior shall have the right to reject all bids whenever in his judgment the interests of the Indians will be served by so doing, and to readvertise such lease for sale.

Section 396a provides, in pertinent part:

> Hereafter unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction . . . may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

Section 396c provides, in part:

> [L]essees of restricted Indian lands, tribal or allotted, for mining purposes, including oil and gas, shall furnish corporate surety bonds, in amounts satisfactory to the Secretary of the Interior, guaranteeing compliance with the terms of their leases[.]

Section 396d provides, in part:

> All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior.

Section 396e provides:

> The Secretary of the Interior may, in his discretion, authorize
> superintendents or other officials in the Indian Service to approve leases for
> oil, gas, or other mining purposes covering any restricted Indian lands, tribal
> or allotted.

As authorized under these sections, the United States Secretary of the Interior has promulgated extensive regulations for various agencies responsible for managing leases under the Act. *See* 25 CFR § 211 et seq. (implementing regulations for the Bureau of Indian Affairs); 30 CFR 201 et seq. (Minerals Management Service); 43 Part 3160, 3190, 3480, 3590 (Bureau of Land Management).

It is noted, however, that with respect to the mineral leases at issue here, the parties have not cited, and the court has not found, any authority suggesting that the Indian Mineral Leasing Act and its implementing regulations provide the requisite "substantive law" to impose the detailed fiduciary responsibilities necessary to support a claim for money damages for a breach of the fiduciary duty. *See United States v. Navajo Nation*, 537 U.S. 488, 507 (2003) (explaining that the federal government's role in the coal leasing process under the Indian Mineral Leasing Act does not give the federal government the full fiduciary responsibilities that would mandate liability under *United States v. Mitchell*, 463 U.S. 206, 222-24, 226-27 (1983) (holding that in addition to the bare trust created by the General Allotment Act, a network of other statutes and regulations expressly authorized and directed the Secretary of Interior to manage timber resources on allotted lands, thereby imposing full judicially enforceable fiduciary responsibilities)); *Gros Ventre Tribe*, 469 F.3d 801, 813 (9th Cir. 2006) (explaining that "the government does not bear complete fiduciary responsibilities unless it has 'take[n] full control of a *tribally-owned* resource and manage[d] it to the exclusion of the tribe'" (quoting *Marceau v. Blackfeet Housing Authority*, 455 F.3d 974, 984 (9th Cir. 2006))); *cf. Assiniboine and Sioux Tribes v. Board of Oil and Gas Consv.*, 792 F.2d 782, 794 (9th Cir. 1986) (finding that a full fiduciary relationship exists in the management of tribal oil

ORDER - 31

and gas resources)[5]; *Jicarilla Apache Tribe v. Supon Energy Corp.*, 728 F.2d 1555, 1565 (10th Cir. 1984) (finding that, as to the leasing of oil and gas, the "statutes and regulations contain such an explicit and detailed enumeration of duties . . .[that] Congress intended the Secretary to be a trustee").  Although no court has held that the Indian Mineral Leasing Act imposes full fiduciary responsibilities on the federal government for non-oil and gas leases, the Act imposes extensive responsibilities on the federal government in leasing mineral right for the benefit of the Indians in detailed and comprehensive fashion.  Therefore, the United States' general trust responsibilities, combined with the more specific responsibilities of the government in the Indian Mineral Leasing Act and its implementing regulations define, generally, the government's fiduciary responsibilities as to particular lands herein and thereby reflects the United States' "indicia of ownership," in part.

### (b)  The United States' Actions With Respect to Lands and Mineral Resources on the Spokane Indian Reservation:

While the codification of the United States' responsibilities is informative, and refutes the Government's argument that its actions were simply regulatory in nature, the court must also weigh the United States' actual actions with respect to the lands at issue.  For instance, at various times throughout the history of the Spokane reservation, Congress divested the Tribe of its right of use and occupancy to all or certain portions of

---

[5]  In addition to the provisions regarding mineral leasing, cited above, a number of other provisions of the Act deal specifically with oil and gas leases. *See, e.g.*, 25 U.S.C, § 396b (requirements for public auctions of oil and gas leases); 25 U.S.C. § 396d (oil and gas leases are "subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by [the] Secretary"); 25 U.S.C. 396g ("to avoid waste or to promote the conservation of natural resources or the welfare of the Indians," the Secretary may approve leases of Indian lands "for the subsurface storage of oil and gas").

ORDER - 32

the reservation.  Congress authorized the Secretary of the Interior to allot reservation lands to individual Indians and opened the remaining reservation lands to non-Indian exploration, occupation, and purchase under the mining laws.  *See* Act of May 27, 1902; Act of June 19, 1902; Act of May 18, 1916.  Congress also opened the reservation to non-Indian entry and settlement under the homestead laws.  *See* Act of May 29, 1908. Congress authorized the United States Secretary of the Interior to sell the timber resource, with the proceeds deposited in the United States Treasury for the tribe's unspecified benefit. *Id.* Nothing in the record reflects what accounting or disposition, if any, was made of that money.  Congress also authorized the United States Secretary of Interior to sell lands located near the junction of the Columbia and Spokane rivers.  *See* Act of June 21, 1906.  Finally, Congress authorized the Secretary to designate tribal and allotted lands within the Spokane Reservation to be used for the construction of the Grand Coulee Dam and reservoir project.  *See* 16 U.S.C. § 835d.  Several of these acts provided compensation for the tribe for land taken, but others did not. However, there has never been a suggestion or holding in legislative history, statute, or court opinion that the Spokane Tribe had any right to stop those actions.  In fact, those acts reflect Congress' "plenary" authority over the land in question.

The United States facilitated the execution of the mining leases at a time when the United States' urgent need for nuclear materials during the "Cold War" corresponded with the discovery of uranium mineralization on the Spokane Reservation.  The Superintendent of the Colville Indian Agency, an agent of the United States Bureau of Indian Affairs, executed the 1954 lease "for and on behalf of the Spokane Tribe of Indians," and the Bureau of Indian Affairs approved the subsequent lease assignments that eventually transferred the mining rights to Dawn.  The Superintendent also executed the 1956 lease  for the Boyd allotted lands by acting as "attorney-in-fact for the legal heirs of Edward Boyd, deceased."  *See* 25 U.S.C. § 380 (providing that "[r]estricted allotments of deceased Indians may be leased . . . by the superintendents of the

ORDER - 33

reservation within which the lands are located (1) when the heir or devisees of such decedents have not been determined . . .").  In 1964, when the time came to renew the leases, the Superintendent again executed the lease for reservation land, although it appears the Spokane Tribal Business Council also provided "authorization."  The 1964 allotment lease was executed by Ortencia Ford, the Superintendent on behalf of Donnelly Villegos, a minor, and a bank, as guardian of the estate of Richard Boyd.  All of the mining leases and lease assignments were approved by the Area Director (or Acting Area Director) of the United States Bureau of Indian Affairs in Portland, Oregon, as required by the Indian Mineral Leasing Act.

Each lease, for the most part, granted various authority and responsibilities to the United States rather than the Spokane Tribe.  The 1954 lease of reservation lands provided, *inter alia*, that the lessee would submit monthly reports to the Superintendent, pay rents and royalties to the Superintendent (or the tribe), and be paid pursuant to the price schedule established by the United States Atomic Energy Commission.  The Superintendent could audit the lessee's accounts and books.  Finally, the lease authorized the United States Secretary of the Interior to suspend operations under certain circumstances, grant or deny permission to assign the lease, collect the bond, require indemnification of the United States as to road construction, inspect the property, approve or deny termination of the lease by the lessee, and terminate the lease for violations of the lease's terms and conditions.  The 1956 lease for the allotted lands included the foregoing but also granted the United States additional authority to inspect the property and provided that annual rents and royalties be paid directly to the United States Bureau of Indian Affairs Superintendent for the use and benefit of the individual Indians.  The nearly identical 1964 leases for the reservation lands and the allotted lands provided the Secretary of the Interior with authority to adjust the royalty rate at the end of each ten-year period, suspend operations under certain conditions, approve or reject assignments of the lease, increase the bond, inspect the leased premises, inspect the

ORDER - 34

lessee's books, and terminate the lease for violations of the lease's terms.  The indemnification of the United States from claims for road construction was again included.

Throughout the leasehold, the United States exercised the specific authority provided in the leases and codified in statute and regulation.  The United States was especially involved in the leases' financial provisions.  The Government collected the rents and royalties, approved royalty rate adjustments, performed audits, monitored the reclamation fund, and supervised and periodically adjusted the surety bond amount.  The government also reviewed and approved Dawn's mining and reclamation plans.  When a proposed change to the mining plan met with Tribal resistence and potentially violated the applicable mining regulations, the United States suspended Dawn's mining activities, pending submission and approval of a  revised mining plan.  Thereafter, various agencies of the United States Department of Interior monitored environmental conditions at the mine, particularly relating to water quality issues.  The government advised Dawn in its reclamation activities and occasionally ordered corrective action.  Ultimately, the Government terminated Dawn's mining rights under the 1964 leases based, in part, on findings that Dawn had failed to comply with the terms of the leases and failed to provide the United States with an adequate mining plan.

In sum, in addition to holding fee title to the reservation lands and holding fee title to the allotments in trust for the individual Indians, the United States exercised much more control and exhibited greater "indicia of ownership" than the parties in either *Castlerock Estates* or *Friedland*, wherein the courts found that holding bare legal title was insufficient to establish ownership liability.  The *Friedland* decision provides useful comparison because, as here, the United States retained legal title to the lands but the court nevertheless provided a full analysis of the ownership interests needed for CERCLA liability.  Just as with federal lands subject to unpatented mining claims, the Government in this case had broad powers over the terms and conditions upon which the

lands could be used, leased, and acquired.  However, unlike federal lands subject to unpatented mining claims, from which the United States received no financial benefit whatsoever, the lands leased to Dawn provided the United States with a source of uranium for the nation's nuclear weapon and energy needs during the "Cold War".  In fact, the Government provided in the lease which it prepared that the United States Atomic Energy Commission was to be the sole purchaser of uranium from the Midnite Mine from 1954 until 1964.  Moreover, while the Government's role in holding title to land subject to an unpatented mining claim is almost entirely passive, the United States, through the Atomic Energy Commission and its other agencies, was involved in determining whether, *inter alia,* the Midnite Mine would prove to be a good source of uranium concentrate and throughout the leasehold, reviewed and approved Dawn's mining plans.

Furthermore, the interests of the Tribe and the individual Indians were fewer and less extensive than, for example, the unpatented mining claimant, whom the *Friedland* court attributed as holding many of the benefits and privileges of ownership.  Like unpatented mining claimants, the allottees here were given the sole use and benefit of the allotment, a right that is protected by the Fifth Amendment against uncompensated takings.  However, because the reservation was created by Executive Order, rather than by treaty, the Tribe's rights of use and occupancy in the land were not protected against uncompensated takings.  Also, the Tribe had no interest in the real property to sell, transfer, mortgage, or otherwise dispose of.  The allottees could not sell, transfer, mortgage, or divest the lands through a will without the approval of the Secretary of the Interior.

Accordingly, the United States' bundle of ownership rights, along with its title to the property, is more than sufficient to find the United States to be an "owner" under CERCLA.  When the court asks "the key question" in the "indicia of ownership" analysis -- "whether the fiduciary  could have affected the disposal of the hazardous wastes on the

subject property," *Castlerock Estates*, 871 F. Supp. 360, 367, the answer must be "yes," the United States had the authority to prevent the very contamination for which it brings this action. This finding is supported by CERCLA's overarching purpose, which is to "impose costs of the cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 6 (1989).

## II. Whether Statutory Provisions Within CERCLA Demonstrate That The United States Cannot Be An "Owner" of Indian Lands:

In furtherance of its argument that it is not an "owner" of the reservation lands under CERCLA the United States cites § 9604(c)(3) and 9620(a)(3) which exempts certain properties from State cost sharing requirements, arguing that since Indian trust lands are exempted along with facilities owned by the United States, a holding that the United States is the CERCLA "owner" would be redundant. The court disagrees. What the portion of CERCLA dealing with exemption from State cost sharing requirements states has no bearing on the liability of the United States under a federal cost sharing action under federal law.

The United States argues that a statutory construction that renders any statute superfluous or redundant should be avoided if possible. However, when interpreting CERCLA, it is not always possible to avoid redundancies, since "CERCLA is not a paradigm of clarity or precision . . . [due to] inartful drafting and numerous ambiguities attributable to its precipitous passage." *Otay Land Co. v. U.E. Ltd., L.P.*, 440 F. Supp. 2d 1152, 1169 (S.D. Cal. 2006); *see also United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1238 (9th Cir. 2006), *cert. denied*, 127 S.Ct. 379 (2006) (noting that "[i]t has become de rigueur to criticize CERCLA as a hastily passed statute that is far from a paragon of legislative clarity"); *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986) (noting that many CERCLA provisions are "not . . . model[s] of legislative draftsmanship," and are "at best inartful and at worst redundant"). Many of the inconsistencies are likely attributable to the legislative history of CERCLA, which was "passed hastily by Congress as compromise legislation after very limited debate under a suspension of the rules."

*United States v. Mottolo*, 605 F. Supp. 898, 902 (D. N.H. 1985) (citing Frank Grad, *A Legislative History of the Comprehensive Environmental Response, Compensation and Liability ('Superfund') Act of 1980*, 8 Colum. J. Envtl. L. No. 1, pp. 1-2 (1982)).  Where the statutory language of CERCLA is "muddled," the Ninth Circuit "follow[s] the Supreme Court's guidance in taking a comprehensive, holistic view of CERCLA because it is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *W.R. Grace & Co.***,** 429 F.3d at 1239 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Remaining cognizant of CERCLA's deficiencies and taking a holistic view of CERCLA, the court finds that allowing for federal government ownership of Indian lands would not render either 42 U.S.C. §§ 9604(c)(3) or 9620(a)(3) a nullity, nor would it lead to any inconsistencies.  In fact, allowing for that possibility is in line with CERCLA's overall statutory scheme.  Section 9604(c)(3) exempts "land or water held by an Indian tribe, held by the United States in trust for Indians, held by a member of an Indian tribe (if such land or water is subject to a trust restriction on alienation), or otherwise within the borders of an Indian reservation" from certain cost-sharing requirements.  Section 9620(a)(3) exempts facilities "owned or operated" by any department, agency or instrumentality of the United States from state cost-sharing requirements.  If anything, the similarity of the statutes show that the drafters of CERCLA intended that land held by the United States in trust for Indians be treated the same as land owned in fee simple by the United States.  By removing the normally mandated state cost-sharing requirements from Indian land held in trust, the statute requires the federal government to treat such land exactly as if it were owned by the government.  This does not demonstrate an intent to preclude government ownership under CERCLA for Indian land held in trust.  Neither section is rendered a nullity by this interpretation, nor does it lead to inconsistencies or contradictions between the two sections.  At worst, the interpretation makes Section 9604(c)(3) redundant in its specificity, a result that is expected and often hard to avoid

ORDER - 38

when interpreting CERCLA.    There is also no inconsistency or redundancy between the
information collection provisions in CERCLA § 9620(b), concerning an inventory of
contamination on federally owned facilities, and § 9626, concerning a separate collection
of information, in consultation with Indian tribes, to determine the extent of hazardous
waste sites on Indian lands.  The fact that the EPA does not include Indian land held in
trust on the list required under § 9620(b) does not conclusively show that CERCLA does
not require it to do so.  Additionally, there is a valid reason for singling out Indian land
for different treatment than land held in fee simple by the government.  No one disputes
that Indian tribes have certain rights in land held by the government in trust, regardless of
whether the government is an owner under CERCLA.  It is important in a piece of
legislation as wide-sweeping and significant as CERCLA to ensure that Indian tribes
maintain a role in the cleanup decisions and plans on their land, which is precisely what §
9626 provides.  There is nothing inconsistent or redundant with the statute specifying
additional requirements to be followed for Indian land "owned" by the United States
under CERCLA, particularly when those requirements further the notable goal of
increasing tribal participation in cleanup proceedings.

**III.  Whether Defendants May Recover Against the United States:**

       Finally, the United States argues that Newmont's and Dawn's counterclaims must
be dismissed because when 42 U.S.C. § 9607(n)(1) is combined with either the restraint
on alienation of Indian lands or the tribe's sovereign immunity, the Defendants are barred
from recovery.  In its entirety, 42 U.S.C. § 9607(n)(1) states:

> The liability of a fiduciary under any provision of this chapter for the release
> or threatened release of a hazardous substance at, from, or in connection
> with a vessel or facility held in a fiduciary capacity shall not *exceed* the
> assets held in the fiduciary capacity.

(emphasis added).  Assuming this section applies to the United States, it limits a
fiduciary's liability to the value of the trust assets -- in this case, the Indian lands and
revenues therefrom -- but does not, as the United States suggests, require that the
payment for potential liability be from the trust assets.  Any liability apportioned to the

ORDER - 39

United States would not necessitate the sale of Indian lands.  Accordingly, the argument that § 9607(n)(1) conflicts with the restraint on alienation and sovereign immunity is without merit and does not support dismissing the Defendants' counterclaims.

**Summary of Conclusions**

(1) United States' Motion to Dismiss Counterclaims by Newmont and Dawn, and/or For Summary Judgment (Ct. Rec. 121) is **DENIED.**

(2)   Defendants Newmont USA Limited's and Dawn Mining Company, LLC's Motion for Summary Judgment (Ct. Rec. 126) that the United States is an "owner" under CERCLA is **GRANTED.**.

**IT IS SO ORDERED**.  The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 21st  day of August, 2007.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 40