UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  vs.<br><br>NEWMONT USA LIMITED AND DAWN MINING COMPANY, LLC,<br><br>    Defendants. | NO. CV-05-020-JLQ |
| DAWN MINING COMPANY, LLC,<br><br>    Third-party Plaintiff,<br><br>  vs.<br><br>ORTENCIA FORD and DONNELLY VILLEGOS,<br><br>    Third-party Defendants. | ORDER GRANTING IN PART AND DENYING IN PART THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF RESPONSE COSTS |

BEFORE THE COURT is the United States' Motion For Summary Judgment on the Issue of Response Costs. (Ct. Rec. 130). The court heard oral argument on July 3, 2007. Assistant United States Attorney Michael Zevenbergen argued on behalf of the Government. Elizabeth H. Tempkin argued on behalf of Newmont USA Limited (hereinafter "Newmont"). Mark W. Schneider argued on behalf of Dawn Mining

ORDER - 1

Company, LLC (hereinafter "Dawn"). The purpose of this motion is to establish the amount of costs for which the responsible parties are liable through December 31, 2004. Apparently, once issues of liability are determined, the Government will bring another later suit to recover the costs associated with implementing the cleanup.

Defendants Newmont and Dawn do not dispute that the United States incurred $12,867,441, plus interest, in response costs through December 31, 2004. Instead, Defendants oppose the United States' motion in four respects. First, Defendants argue that the United States' exclusive remedy is provided under the mining leases. As explained in the court's prior order regarding Dawn's liability, this argument is without merit and therefore shall not be addressed herein. Second, Defendants argue that the Government's response action is arbitrary and capricious because the Administrative Record does not support the remedy chosen by the EPA, and therefore the costs are not recoverable. Third, the Defendants argue that some of the sampling conducted by the Government at the site was not consistent with the National Contingency Plan (hereinafter "NCP") because the sampling was duplicative and therefore those costs are not recoverable. Fourth, Defendants argue that the Agency for Toxic Substances and Disease Registry's activities at the site were inconsistent with the NCP and therefore the approximately $520,000 in costs associated with that agency's actions are not recoverable. At oral argument, the Government conceded this fourth argument. Accordingly, the United States' motion is **DENIED in part** and judgment shall not be entered as to costs incurred by the Agency for Toxic Substances and Disease Registry. For purposes of resolving this motion, the court need only focus its attention to the Defendants' second and third arguments.

## I. Background

Through December 31, 2004, the United States incurred response costs totaling $12,867,441 performing response actions at the Midnite Mine Site, exclusive of prejudgment interest. (United States St. Fact ¶ 55). A complete accounting of the Government's response costs are set forth in the Cost Summery attached to Wiley

ORDER - 2

Wright's declaration.  (Wright Decl. ¶ 17; Cost Summary).  The Government's detailed accounting is not challenged by Defendants and need not be recited here.  In short, the United States Department of Justice incurred $216,108 in litigation costs and the Environmental Protection Agency (hereinafter "EPA") incurred $12,651,333 in internal costs and costs expended on outside contractors.  (Kime Decl. ¶ 8; Wright Decl. ¶ 17).

Primarily, these costs were incurred performing action related to studying the environmental conditions at the Midnite Mine Site.  Beginning in 1998, the EPA performed an Expanded Site Investigation ("ESI") with the assistance of contractors. (United States' St. Fact ¶ 8).  Through the ESI, the EPA identified potential contaminant sources and pathways, gathered information to evaluate whether the site should be placed on the NPL, assessed whether early action/removal activities were necessary, and compiled information for future remedial activities.  (Id.).  As a result, in May of 2000, the Midnite Mine Superfund Site was included on the National Priorities List ("NPL"). (Id. ¶ 5).  In 1999, the EPA, again with the assistance of contractors, began performing a Remedial Investigation/Feasibility Study ("RI/FS"), which is a comprehensive study of the site and proposed cleanup alternatives.  (Id. ¶¶ 9-10).  The RI/FS included a human health risk assessment, an ecological risk assessment, and an evaluation of remedial technologies and cleanup alternatives.  (Id. ¶ 11).  The RI/FS was not concluded until after December 31, 2004.  In the meantime, the Spokane Indian Tribe developed its own remedial plan.  (Dfts. St. Fact  ¶¶ 37-38).

In June of 2003, the EPA produced its draft Feasibility Study outlining a series of cleanup alternatives.  Perhaps unsatisfied with EPA's proposed cleanup alternatives, by letter dated January 12, 2004, the Tribe invoked a dispute resolution mechanism provided within a December 2000 Memorandum of Agreement between the EPA and the Spokane Tribe.  The stated intent of the Agreement was to "provide a mechanism for the exchange of information between the EPA and the Tribe about decisions and actions at the Site under CERCLA."  (United States' Reply St. Fact ¶ 1).  The dispute resolution process provided a forum to address areas of disagreement between the Tribe and the

Government. (Def. St. Fact ¶ 40). The EPA met with the Tribe on January 28 and 29, 2004. Thereafter, the EPA included the Tribe's remedial alternative in the Feasibility Study. (Def. St. Fact ¶ 47, ¶ 60). Several more dispute resolution meetings occurred between the Tribe and EPA between December 2004, and May 2005. (Def. St. Fact ¶¶ 50-52).

Then, in June of 2005, EPA presented its anticipated cleanup approach to the National Remedy Review Board and received the Tribe's endorsement. (Def. St. Fact ¶ 61; United States' Reply St. Fact ¶ 2). The EPA issued its proposed plan in September 2005. (United States' Reply St. Fact ¶ 2). After accepting public comments, the EPA selected a remedy and issued its September 2006 Record of Decision (hereinafter "ROD") (United States' St. Fact ¶ 14). According to Defendants, the selected remedy contains aspects of the Tribe's alternative to an extent not explained by the administrative record. (Def. St. Fact ¶ 62).

Prior to the Site being added to the NPL in 2000, Defendant Dawn incurred its own costs for direct reclamation activities. In July of 1998, Dawn entered into an Interim Agreement with the Bureau of Land Management for "preparation and performance by the Companies of studies to be used in the planning and implementation of reclamation or remediation activities and the Midnite (sic) Uranium Mine" pursuant to Dawn's reclamation obligations under the 1964 leases. (Defendants' St. Fact ¶ 1). According to the Defendants, the objective of the data collection corresponding to this study was to "more fully characterize the Site and the nature and extent of hazardous substances releases (if any) and impacts . . ." (Def. St. Fact ¶ 2). The resultant study cost approximately $3 million and included the collection and analysis of nearly 1200 samples.

Defendants contend that during the RI/FS process the EPA ignored the existence of certain Interim Agreement data reports and therefore duplicated sampling that had already been conducted as part of the Interim Agreement. The United States admits that the EPA conducted sampling itself based upon its "data quality objective procedures", but

disputes that the sampling was unnecessary or inconsistent with the NCP.   (United States Reply St. Fact ¶¶ 16-21).

## II. Standard of Review

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court.  *Northwest Motorcycle Ass'n v. United States Dept. of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1975).  In meeting this burden,  the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Miller v. Glenn Miller Productions*, 454 F.3d 975, 987 (9th Cir. 2006) (quoting FED. R. CIV. P. 56(e)).

## III. Analysis

Pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (hereinafter "CERCLA"), the United States is entitled to recover "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan."  42 U.S.C. § 9607(a)(A)(4); *see California v. Neville Chemical Company*, 358 F.3d 661, 673 (9th Cir. 2004) (stating that

"[w]hether a party can recover certain costs under § 9607 depends on whether or not those costs were incurred consistently with the 'national contingency plan'"). The national contingency plan is promulgated by the Environmental Protection Agency and "provide[s] the organizational structure and procedures for preparing and responding to ... releases of hazardous substances." *Neville*, 358 F.3d at 673 (quoting 40 C.F.R. § 300.1). It outlines specific steps parties must take in choosing a remedial action plan and cleaning up hazardous waste. *Carson Harbor Village v. County of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006); *see also Washington State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 799 (9th Cir. 1995) (stating that the national contingency plan "identifies methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities" (citation omitted)). The national contingency plan is "designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment." *Carson Harbor Village*, 433 F.3d at 1265 (quoting *Washington State Dept. of Transp.*, 59 F.3d at 802).

When the Government is seeking recovery of response costs, consistency with the national contingency plan is presumed. *Chapman*, 146 F.3d at 1170 (citing *Washington State Dept. of Transp.* 59 F.3d at 800-01). Typically, response costs are proven by response cost summaries, supporting data, and affidavits describing the response action for which the cost were incurred. *See, e.g., United States v. Findett Corp.*, 220 F.3d 842 (8th Cir. 2000). Once the Government establishes liability under CERCLA, the burden shifts to the defendants to prove the government's actions were inconsistent with the national contingency plan by being arbitrary and capricious or otherwise not in accordance with law. *United States v. Chapman*, 146 F.3d 1166, 1171 (9th Cir. 1998); *Washington State Dept. of Transp.*, 59 F.3d at 800-02. If the response cost issue is being raise on summary judgment, as it is here, Defendants need only show that there exists a genuine issue on inconsistency. *Chapman*, 146 F.3d at 1169; *Findett Corp.*, 220 F.3d at 849 (8th Cir. 2000).

ORDER - 6

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 914 (9th Cir. 1995). Agency action satisfies this standard of review if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Id.* However, if the government's action is arbitrary and capricious, it is not entitled to recover its response costs under CERCLA. *Washington State Dept. Transp.*, 59 F.3d at 805.

## A. Whether the Remedy Chosen by the United States in the ROD is Arbitrary and Capricious:

The Defendants argue that the Government cannot recover any of the response costs incurred prior to December 31, 2004 because those actions contributed to the EPA's September 2006 ROD, which Defendants argue is not supported by the Administrative Record because the effect of the dispute resolution process between the EPA and the Tribe is not adequately addressed. To support this argument, Defendants rely on Fifth Circuit case, *In re Bell Petroleum Servs. Inc.*, 3 F.3d 889, 904-908 (5th Cir. 1993). Therein, Defendant Sequa Corporation challenged the EPA's decision to provide an alternate water supply as an interim measure pending the completion of final remedial action for the cleqanup of a contaminated aquifer. For various reasons, the Court determined that the EPA's decision to provide the alternate water supply was arbitrary and capricious and therefore inconsistent with the national contingency plan. *Id.* at 907. Accordingly, the Court determined that the EPA was not entitled to recover the costs of *designing* and *constructing* the interim measure.

The Defendants' reliance upon *In re Bell Petroleum Servs. Inc.*, 3 F.3d 889 (5th Cir. 1993) to avoid all of the Government's response costs is misplaced. The Government does not seek costs incurred "designing and constructing" the remedy selected in the September 2006 ROD. Instead, the Government seeks costs incurred through December 31, 2004. For the most part, these costs were incurred studying and

understanding the site and developing a series of cleanup alternatives. In fact, the EPA did not conclude the Remedial Investigation/Feasibility Study until after the period relevant for the costs sought by this motion. In addition, the dispute resolution discussions, which the Defendants argue unduly influenced the EPA's September 2006 ROD without explanation in the administrative record, began in January of 2004, but did not conclude until May of 2005. The ROD was not issued until September 2006, and it is unknown whether the Government has even begun implementing the ROD. Accordingly, the Defendants' challenge to the ROD is premature. If the EPA failed to properly document the impact of those discussions in the ROD, that deficiency, if any, occurred after the period of response costs germane to the United States' motion. Accordingly, whether the Government's selected remedy is not adequately supported by the administrative record is an issue better reserved for another day and nothing in this Order should preclude the Defendants from raising the issue at that time.

## B. Whether the EPA's Sampling-Related Activities were Duplicative and Unnecessary:

Defendants further argue that the EPA incurred substantial costs for sampling-related activities during the Remedial Investigation that were duplicative and unnecessary, therefore inconsistent with the NCP, and are accordingly, not recoverable under CERCLA. *See United States v. E.I . Dupont De Nemours and Co. Inc*., 432 F.3d 161, 179 (3rd Cir. 2005) (stating that "[c]osts that are unnecessary and excessive in light of the National Contingency Plan are arbitrary and capricious and should be disallowed under this standard of review). To support their argument, Defendants rely, in part, on *Louisiana-Pac. Corp. v. Beazer Materials and Serv., Inc.*, 811 F. Supp. 1421, 1425 (E.D. Cal. 1993), which the Court notes was followed by the decision in *Louisiana-Pacific Corp. v. Beazer Materials & Servs., Inc*. 842 F. Supp. 1243 (E.D.Cal.1994) (" LP II "). In LP I, the court suggested that the United States Environmental Protection Agency ("EPA") might have acted in an arbitrary and capricious manner by duplicating a private party's remedial investigation of a site. In LP II, the same court found that summary

judgment as to Louisiana Pacific's ("LP's") liability for particular costs was inappropriate because some of the EPA's alleged duplicative actions may have been in retaliation for LP's refusal to sign a consent decree, and therefore were potentially a violation of LP's constitutional rights.

For the most part, Defendants rely on the declaration of Dawn's expert, Paul Rosasco, wherein he states that at least $2,275,000 of EPA's past response costs were attributable to unnecessary or duplicative sampling that had already been performed by Defendants' contractor SMI. (Def. St. Fact, Exh. 3, Rosasco Decl. ¶ 11). Pursuant to the Interim Agreement between Dawn and the BLM, Dawn paid approximately $3 million for studies and investigations of the Site that resulted in nearly 1,200 samples being taken. (Rosasco Decl. ¶ 4-5). A majority of the EPA's Remedial Investigation planning and scoping activities occurred after the Interim Agreement investigations were complete, and that data was available for the EPA's use. (Rosasco Decl. ¶ 8). Therefore, it is Rosasco's opinion that "much of EPA's Remedial Investigation work failed to consider or inadequately considered data collection pursuant to the Interim Agreement. . . [and] [t]his resulted in EPA and its contractor undertaking unnecessary and duplicative investigations that were not necessary to adequately characterize the site for purposes of developing and evaluating effective remedial alternatives." (Rosasco Decl. ¶ 9).

The United States argues that Rosasco's declaration is somewhat undermined by his own deposition. Rosasco admits that even when data already exists, it would be legitimate for the EPA to take additional samples to verify prior sampling, to confirm an existing sample is representative and not an anomaly, to see if conditions have changed since the prior sampling occurred, to analyze different constituents, to use a different sampling methodology, and to increase statistical confidence. (United States' Reply St. Fact Exh. 6, Rosasco Dep. 100-117). Most significantly, Rosasco testified that he would not be offering an opinion that any of the EPA's remedial investigation was inconsistent with the NCP, although he thought the samples were unnecessary. (Rosasco Dep. 203).

Contrary to the assertions contained in Rosasco's declaration, the United States

asserts it has come forward with evidence that EPA knew about the data collected by Dawn's contractor SMI, considered and relied upon the SMI data, and chose nonetheless to take some of its own sampling.  Correspondence from the EPA dated 1998 (email) and 1999 (letter) indicates the EPA was aware of SMI's data.  (United States' Reply St. Fact ¶¶ 12-13).  In 2001, the Government's RI/FS contractor URS sent an email to Dawn's contractor SMI asking for complete SMI data sets in order to develop the hydrological model for the RI/FS.  A letter from Michael F. Gearhard, Acting Director, Office of Environmental Cleanup for the EPA to David W. Delcour, President of Dawn Mining Company, dated July 1, 1999, regarding the RI/FS suggests that the government was considering the SMI data in its study, but also considered the need for additional data. Therein, he stated:

> I must emphasize that the draft conceptual sampling plan is not "broad and unfocused" as you characterized it in your letter.  On the contrary, EPA intentionally followed its data quality objective procedures to ensure that the data identified will be what is needed to answer key remedial questions. EPA plans to collect data that are necessary and sufficient to assess risks to human health and the environment and to support the selection of a remedy at the Site . . . Your letter and SMI's comments repeatedly imply that EPA has overlooked data collected by SMI under the July 1998 Interim Agreement between Dawn, Newmont . . ., and the Bureau of Land Management (BLM).  EPA and its consultants have reviewed the documents submitted under this agreement and, where possible, incorporated the information into our understanding of site conditions.  Several of the key documents referenced by SMI have been submitted very recently or have not yet been submitted.  Anticipating that some of the information in these documents may affect the scope of work, EPA designed Phase I to include work least likely to be affected by incoming SMI data, least likely to be duplicative of existing studies, and most essential for determining whether and to what extent cleanup will be necessary outside the disturbed area of the mine.

(United States Reply St. Fact Exh. 5, pg. 137).  This letter indicates that the EPA was considering the data being provided by Dawn's contractor SMI very early on.

Viewing the evidence in the light most favorable to the Defendants', as this Court

must, the Court finds that Defendants' evidence is sufficient to raise an issue as to whether the EPA "examined the relevant data" and has "articulate[d] a satisfactory explanation" for its decision to conduct the sampling for the purpose of collecting data which was purportedly already in existence. *Hopi Tribe*, 46 F.3d at 914. Accordingly, Defendants have sufficiently raised a genuine issue on inconsistency with the NCP as to the sampling alleged to have been unnecessary and duplicative.

## CONCLUSION

The Government has undeniably incurred $12,867,441, plus interest, in response costs through December 31, 2004. The Court concludes the Government is able to establish, with admissible evidence, it has incurred necessary and recoverable response costs consistent with the NCP with the following exceptions:

1.    The Agency for Toxic Substances and Disease Registry's activities at the site were inconsistent with the NCP and therefore the approximately $520,000 in costs associated with that agency's actions are not recoverable.

2.    The evidence is not sufficient to remove all genuine issues of material fact as to 1) whether the particular response costs specifically objected to by the Defendants can legitimately be characterized as duplicative and unnecessary, and 2) if so, whether the EPA has articulated a satisfactory explanation for the action taken. Such questions are an appropriate matter for the fact-finder to determine at trial.

For the foregoing reasons, the United States' Motion For Summary Judgment on the Issue of Response Costs (Ct. Rec. 130) is **GRANTED** in part and **DENIED** in part as herein stated.

**IT IS SO ORDERED**. The Clerk is hereby directed to enter this Order and furnish copies to counsel.

**DATED** this 5th day of September, 2007.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE