UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.

NEWMONT USA LIMITED AND DAWN
MINING COMPANY, LLC,

    Defendants.

NO. CV-05-020-JLQ

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW AND
ORDER**

<u>**OUTLINE**</u>

I. INTRODUCTION

II. FINDINGS OF FACT

    A.    U.S. DEVELOPMENT OF DOMESTIC URANIUM SUPPLIES

    B.    THE EARLY PERIOD: SPRING 1954-FALL 1956;  EXPLORATION FOR ORE AND THE DEVELOPMENT OF THE MIDNITE MINE

    C.    THE 1956 MANAGEMENT AGREEMENT

    D.    PHASE I MINING OPERATIONS: 1956-1964

    E.    INTERIM PHASE: SUSPENSION OF MINING FROM 1965-1969

    F.    PHASE II MINING OPERATIONS: AUGUST 1969-NOVEMBER 1981

    G.    COMMAND OF THE MINE AND IMPLEMENTATION OF THE 1956 MANAGEMENT AGREEMENT

    H.    THE MIDNITE MINE AFTER THE CESSATION OF ACTIVE MINING OPERATIONS

    I.    ADDITIONAL FACTS REGARDING THE UNITED STATES' INVOLVEMENT AT THE MINE

    J.    INTERIM AGREEMENT SAMPLING, EPA'S SITE INSPECTION AND REMEDIAL INVESTIGATION

III. CONCLUSIONS OF LAW

A.    JURISDICTION AND VENUE

B.    CLAIMS GENERALLY

C.    NEWMONT IS LIABLE AS AN OPERATOR OF THE MIDNITE MINE UNDER *BESTFOODS*

D.    DISPUTED COSTS ARE NOT INCONSISTENT WITH THE NATIONAL CONTINGENCY PLAN

E.    JUDGMENTS ON THE UNITED STATES' CLAIMS AGAINST THE DEFENDANTS

F.    CONTRIBUTION CLAIMS OF NEWMONT AND DAWN: ALLOCATION

G.    ALLOCATION JUDGMENT AND COSTS INCURRED AFTER DECEMBER 31, 2004

IV.    ORDER

# I. INTRODUCTION

This action involves claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq. (1988). The parties are litigating who must pay past and future costs incurred in the environmental cleanup of the soil, surface water and groundwater surrounding an inactive open pit uranium mine called the Midnite Mine located on the Spokane Indian Reservation in the State of Washington. The dispute involves just three parties: the United States of America, Newmont USA Limited ("Newmont") and Dawn Mining Company, LLC ("Dawn"). The United States, acting through the Environmental Protection Agency (EPA), has incurred response costs preparing for cleaning up the mine. Newmont and Dawn are the entities from which the EPA seeks to recover its response costs under § 107 of CERCLA. Newmont and Dawn counterclaim against the United States for contribution under § 113(f) of CERCLA. Both sides contend the evidence demonstrates that the other should be held primarily or entirely responsible for the cost of remedying the contamination at the site.

The court has already held at the summary judgment stage that the United States has met its burden of proving 1) The Midnite Mine is a "facility" within the meaning of CERCLA; 2) There has been a release of hazardous substances from the facility; 3) The government incurred costs in response to the release; and 4) Dawn qualifies as an "operator" of the Site. Having proven these four elements, the United States has established Dawn's liability as a responsible party. In addition, the court held as a matter of law that the United States is an "owner" of the Site under CERCLA, 42 U.S.C. § 9601(20)(A), subjecting it to potential liability upon the CERCLA contribution claims of the Defendants. *United States v. Newmont USA Ltd.,* 504 F. Supp. 2d 1050 (E.D. Wash 2007) (Ct. Rec. 290). Finally, the court determined that the United States has incurred $12,867,441, plus interest, in response costs through December 31, 2004. This amount included $520,000 which the court deemed not recoverable, and $1.88 million in sampling costs which are in dispute. The remaining amounts have been deemed recoverable.

These rulings left for trial the following issues: 1) whether Newmont qualifies as an "operator" of the Site and is therefore liable under CERCLA; 2) whether the $1.88 million expended by the EPA on sampling is recoverable; and 3) the extent and scope of liability of all parties deemed liable on the cost recovery and the contribution claims. This third aspect involves issues of divisibility, allocation, and the request for declaratory judgment(s) as to future costs. The case was tried before the court over six days on July 7-14, 2008. The court heard live testimony from twelve witnesses, received all or part of a dozen testimonial depositions, and admitted over 1600 exhibits. See Ct. Rec. 484 [Post-Trial Order]; Ct. Rec. 490 [Final List of Admitted Trial Exhibits]. The parties stipulated to a number of facts in their Joint Pre-Trial Order, approved and filed July 3, 2008 ("JPTO"). *See* Ct. Rec. 474. For additional background facts, the court refers the to the undisputed facts contained in the summary judgment record and the stipulated facts contained in the JPTO.

FINDINGS, CONCLUSIONS, AND ORDER - 3

Following the trial, the court received supplemental briefing and held a hearing on August 25, 2008 to hear final argument on all remaining issues, including the recoverability of the $1.88 million in disputed response costs associated with EPA's sampling.  Following the hearing, the court received additional briefing from both Dawn and the United States on the issue of the disputed sampling costs.  The court also re-opened the trial record for the purpose of receiving additional materials pertaining to Dawn's financial condition and potential orphan share.

Having carefully considered the testimony presented and gauging the credibility of the witnesses, along with the voluminous evidentiary record, and the comprehensive pre- and post-trial briefs and other submissions, the court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).[1]  For the reasons set forth fully below, the court finds that Newmont is liable as an operator of the Midnite Mine

---

[1] To the extent that any of the Findings of Fact may be deemed Conclusions of Law, they also shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be deemed Findings of Fact, they shall be considered findings.  *See Miller v. Fenton*, 474 U.S. 104, 113-14, 106 S.Ct. 445, 451-52, 88 L.Ed.2d 405, 413-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).  Throughout the Findings of Fact section, the court cites to exhibits and portions of the record that support the findings.  These citations are by no means exhaustive.  The court's factual findings reflect the facts that were proven to be more likely true than not, based on the entire record.  By including some citation to portions of the record the court finds particularly relevant, the court does not mean to suggest that these are the only portions of the record that support that factual conclusion. Rather, in many cases, the court believes that other portions of the record provide similar factual support.

FINDINGS, CONCLUSIONS, AND ORDER - 4

for its actions in both managing, directing, conducting, and overseeing the operations at the Midnite Mine, and that the recoverable costs incurred by the United States include the $1.88 million in sampling disputed by Dawn. Having found the elements of liability under CERCLA § 107(a) have been met, the court directs the entry of final judgment in favor of the United States on its claim against the direct defendants, Newmont and Dawn, for recovery of response costs and also declaring Dawn and Newmont jointly and severally liable for any and all "future" response costs that the United States may incur (or already incurred after December 31, 2004) at the Midnite Mine Site consistent with the National Contingency Plan ("NCP"). In addition, the court directs entry of final judgment on the Defendants' contribution claims against the third-party defendant, United States, declaring the United States severally liable for one-third of all recoverable response costs.

## II. FINDINGS OF FACT

### A. U.S. DEVELOPMENT OF DOMESTIC URANIUM SUPPLIES

The Atomic Energy Act of 1946, Pub. L. No. 79-585, 60 Stat. 755, created the United States Atomic Energy Commission (AEC) and gave the AEC control of all fissionable material and facilities involved in the production of fissionable material within the United States. The Act encouraged the participation of private industry in the production of fissionable material; it allowed private individuals and companies to locate and mine uranium ore deposits and it allowed private mills to process the ore under AEC licenses. Ex. 2354.

In October 1947, the AEC established the Division of Raw Materials, which spearheaded development of a domestic uranium supply. The AEC issued a series of circulars starting in April 1948, and created incentives for uranium exploration and production. In February 1949 the AEC issued Circular 5, which consolidated previous circulars, raised the minimum price for uranium ore, and established premium prices for higher grade ore. Circular 5 was revised and expanded in March 1951 and remained in effect until March 1962,

serving as a key set of regulations governing the AEC's procurement program. Exs. 2354, 2049.

To stimulate exploration and production, the AEC, which was the sole buyer of uranium in the United States at the time, offered long-term contracts to mining companies under which the government would pay a relatively generous price for uranium until 1962, when the contracts were set to expire. This stimulus program led to increased exploration. Ex. 2354.

On April 17, 1959, the AEC released a press release of the remarks of Jesse C. Johnson, Director of the Division of Raw Materials, US AEC, that were for delivery to the Wyoming Mining Association. Ex. 2049. Mr. Johnson observed that "[p]art of our responsibility in the Raw Materials program is the assessment of the uranium resources which may be available to meet the future demand for atomic power." Ex. 2049. The AEC's "uranium procurement program, since its inception, has been directed toward the development and utilization of our domestic resources," and that the goal was "to make this country self-sufficient in a vital strategic mineral." Ex. 2049.

The AEC's domestic uranium procurement program was vital to the strategic position of the United States:

> In 1948 we had an urgent military requirement for uranium. Probably no military program undertaken by this country in peacetime has been considered more important, or given higher priority, than the atomic weapons program following the breakdown of the 1946-1947 discussions in the United Nations Atomic Energy Commission for control of nuclear weapons. Events of the succeeding years, particularly in 1949, 1950, and 1951, called for a series of expansions greatly increasing uranium requirements. Most of our uranium then was coming from the Belgian Congo. The problem there was to maintain the production rate – the possibilities for expansion were limited.

Ex. 2049.

Depending on Africa to satisfy the United States' need for uranium was problematic because of the vulnerability of this "highly strategic material" during transportation, both overland in Africa and oversea from Africa to the United States. Ex. 2049. Uranium was strategically important because of its use in atomic weapons, because "[a]tomic power for

FINDINGS, CONCLUSIONS, AND ORDER - 6

propulsion already has become a military necessity," and because [a]tomic energy for industrial power is considered essential to meet the world's growing energy requirements." Ex. 2049. Despite the AEC's uranium procurement program, even into the 1950s known uranium ore reserves in the United States were low; the United States was still acquiring 83% of its uranium from foreign sources. Ex. 2049. However, by June of 1962, after mining commenced at the Midnite Mine, 47% of the United States' uranium purchases came from domestic sources. Ex. 2049.

**B.    THE EARLY PERIOD: SPRING 1954-FALL 1956;  EXPLORATION FOR ORE AND THE DEVELOPMENT OF THE MIDNITE MINE**

*The Discovery of Ore on the Spokane Indian Reservation.*  In the spring of 1954, Jim and John LeBret, brothers and members of the Spokane Tribe, discovered uranium on the Spokane Indian Reservation at what would become the site of the "Midnite Mine", approximately 45 miles north of Spokane, Washington.   Although they had experience as prospectors, the LeBrets had no experience in mine development, mine operations, or mine management.  Quivik ¶ 42; Loncar Test. 85:17-24.  Robert Hundhausen, who at the time worked as a mining engineer for the United States Bureau of Mines, visited the discovery and advised the Lebrets that "the deposit warrants exploration and development"; that "the deposit be called to the attention of the Atomic Energy Commission"; and that they should seek to obtain a lease of the land.  He recommended that they find someone suitable to help them exploit the mine.  Exs. 001 at MIDFLQ0059, 0117, 2007.  Prior to this time, no significant uranium deposits had been found in the Pacific Northwest.  Ex. 611.

*The Land*.  As the court found in its Memorandum Opinion and Summary Judgment (Ct. Rec. 290), the land containing the discovered ore exists on the Spokane Reservation which was created by Executive Order of President Rutherford B. Hayes dated January 18, 1881, which set aside the land "for the use and occupancy of the Spokane Indians," without relinquishing title to the Tribe. Ex. 5018.  Title to the majority of the Midnite Mine site (approximately 571 acres) is held by the United States in trust for the use and benefit of the

Spokane Tribe.  An adjoining 120 acre parcel of the land which eventually encompassed the Midnite Mine consists of allotted Reservation land, known as the "Boyd allotment".

*The  Creation of MMI*. The LeBret brothers and four of their relatives, John C. LeBret, Samuel E. LeBret, Clair Wynecoop and Thomas E. Wynecoop, obtained  a mining lease from the United States for approximately 571 acres of reservation land encompassing the deposit "for the sole purpose of prospecting for and mining minerals." Ex. 2358A.  This lease, Lease No. 14-20-503-107, was executed on July 15, 1954, and was signed by Floyd H. Phillips, the United States Superintendent of the Colville Indian Agency (an agency of the United States Department of Interior) "for and  on behalf of the Spokane Tribe of Indians." *Id*.  Though not signed by a member of the Spokane Tribe, the negotiation of the lease was also later approved by the Spokane Tribe (*see* Ex. 5253 [Spokane Resolution 1954-16 dated July 30, 1954]).  The lease was thereafter approved by the United States Department of Interior on October 1, 1954. Ex. 2358A.

The LeBrets and Wynecoops formed a new corporation, Midnite Mines, Inc. ("MMI"), on December 6, 1954 in order to investigate the uranium showings.  Quivik ¶44; Exs. 611, 007, 2007. On December 15, 1954, they assigned their mining lease to MMI.  Ex. 2358B. That assignment was approved by the Spokane Tribe in Spokane Resolution 1954-29 (Ex. 5258; Smith ¶ 14) and by the  United States Department of the Interior on April 26, 1955 (Ex. 2358B). That same month, MMI shipped 54 tons of rock to the AEC plant in Utah for testing and after it became apparent ore occurred in economical mineable quantities, MMI and the AEC entered into a contract (AEC contract number 362-F) which allowed MMI to deliver 2,400 tons of uranium ore to the AEC. Exs. 611; 1792; 2354; Quivik ¶ 56.  To gain further information about the nature and extent of the Midnite Mine's ore body, in early 1955, the AEC began its own preliminary program of diamond drilling. Exs. 611, 2354.

*Newmont*.  MMI did not have the management, technical or financial capabilities to develop and operate the Midnite mine.  Quivik ¶¶ 36, 45. In early April 1955, Hundhausen

left his position with the Bureau of Mines to work for and assist MMI with exploration and development efforts. Hundhausen put MMI in touch with a Portland banker, Spencer Hinsdale, who knew Fred Searls of Newmont Mining Corporation ("Newmont") and had experience in mining investments. Quivik ¶ 49; Ex. 001 at MIDFLQ0059, 0117. Hinsdale contacted Searls to inquire whether Newmont, who had been conducting uranium exploration on the Colorado Plateau, was interested in participating in the venture to develop and exploit the uranium mine. Ex. 001 at MIDFLQ0059, 0117.

Newmont had experience in managing mining operations throughout the world. Ex. 098. Newmont possessed the resources, knowledge, and experience for mining and extracting ore. Lattanzi ¶¶ 60-62; Quivik ¶¶ 50-54, 130-36; Exs. 001, 002, 007, 046, 114, 958a.

In April 1955, Newmont sent G.W.H. "Hal" Norman to visit the Midnite Mine. Dr. Norman was an employee of Newmont's wholly owned subsidiary Newmont Exploration Limited ("Newmont Exploration" or "NEL") and worked at the Montrose, Colorado, office. Dr. Norman reported to Searls that "the subject property has merit and should be tied up if reasonable terms can be arranged." Lattanzi ¶ 81; Quivik ¶ 58, Exs. 006, 007.

*The 1955 Agreement.* Newmont was sufficiently interested in the property that it entered into an agreement with MMI to exploit the mining lease held by MMI. This Agreement, the 1955 Agreement, was executed on April 20, 1955. The 1955 Agreement provided for the establishment of a new company, later named Dawn Mining Company ("Dawn"). Under the terms of the Agreement, Newmont would own 51% and MMI would own 49% of the shares of the newly created company. Lattanzi ¶¶ 14, 63; Exs. 007, 009, 284. MMI's contribution to the business venture of Dawn was the mining lease and the contract to provide ore to the Atomic Energy Commission. U.S. Ex. 007; Ex. 2012; *See also* Quivik ¶ 60. Newmont's contribution to the venture included its experience and expertise in conducting mining operations. Lattanzi ¶ 15.

Clause 1 of the 1955 Agreement gave Newmont the right to designate the majority of the Board of Directors and the Executive Committee with Newmont personnel for the life of the operation and to nominate all of the officers of Dawn for the life of the operation. Lattanzi ¶¶ 14, 63; Quivik ¶ 59; Exs.7, 008a, 009, 917d, 302. Newmont would nominate four members to Dawn's seven-member Board of Directors, and MMI would nominate three. An executive committee consisting of three directors would also be formed. Newmont would nominate two members of this committee, and MMI would nominate one. Clause 1 of the 1955 Agreement further provided that Spencer Hinsdale (the Portland banker), who had no prior position with either Newmont or MMI, would be Dawn's first President.

Clause 6 of the 1955 Agreement provided that work at the Site would commence promptly:

> [D]uring the initial period following execution of this agreement, while [Dawn] is being organized...the work of uncovering and developing the properties...should be continued diligently. Accordingly, Newmont shall have the exclusive right to enter said properties, under the consent and license of Midnite, with the requisite personnel, mining equipment and supplies, for the purpose of commencing a program of development of said properties which shall tend to determine the grade, extent and continuity of the mineralization now indicated...It is agreed that Newmont may delegate the actual mining and development activities herein provided to a wholly-owned subsidiary, on the understanding which is hereby confirmed that Newmont shall guarantee the performance of all work so delegated. It is further agreed that all work done at the said properties prior to the assumption of such work by [Dawn] shall be done under the supervision of Newmont and at its initial cost and expenses as herein provided. During said initial period, all development ore mined shall be stockpiled on the property and shall become property of [Dawn] when formed.

*Ex. 007.*

Clause 10 of the 1955 Agreement further provided:

> It is the declared intention of the parties hereto that [Dawn] shall serve as the exclusive vehicle through which they shall cooperate in the business of mining exploration, prospecting, development and exploitation of mining prospects and properties...

*Id.*

The 1955 agreement required Newmont to provide the financing, equipment, supplies, and personnel for the development program but left it to the discretion of Newmont's engineers whether to provide additional financing after they weighed the advisability of the expenditure by Dawn and determined whether the interests of Newmont would be served. Ex.

007. Newmont and Midnite also entered into a Supplemental Agreement of the same date. That supplemental agreement related primarily to meetings of the Executive Committee. Lattanzi ¶ 67, Ex. 009. The 1955 Agreements are the type of agreements one would expect to see between an unsophisticated group of prospectors and an experienced mining company. Lattanzi ¶¶ 15, 64.

*Incorporation of Dawn.* Dawn was incorporated on April 27, 1955, one week after the execution of the 1955 Agreement. Newmont conducted all the arrangements for incorporating Dawn including filing incorporation papers, holding an incorporators meeting, adopting by-laws and electing the initial Board of Directors (which occurred the same day as the day of incorporation). Quivik ¶ 66; Exs. 008a, 306, 954a, 1020, 1023, 2012. The same day as its incorporation, Dawn's first Board of Directors was elected. A day later, on April 28, 1955, the Board met for the first time and elected Spencer Hinsdale as Dawn's President and authorized Robert Hundhausen (who had assisted MMI with its exploration work) to serve as Dawn's first General Manager.

On May 9, 1955, there was a special meeting of the Dawn Board of Directors, and at that meeting the board authorized certain officers of Dawn to execute, sign and deliver all documents that would be required to facilitate the assignment of the lease to Dawn. Ex. 2015. MMI assigned the lease to Dawn on May 16, 1955. Ex 1056. This assignment was approved by the Department of the Interior on August 17, 1955. Ex 1056. Dawn held the lease for the life of Dawn's operations. *See* Ex. 852.

During the entire operational life of the mine, only two officers of Dawn were not on the payroll of Newmont or a wholly owned Newmont subsidiary: Messrs Hinsdale and Hundhausen. Quivik ¶ 39(b); Ex. 917d.

*Initial Work at the Mine.* Various exploration and mining activities took place at the Midnite mine between the execution of the 1955 Agreement and the commencement of Phase I mining and stripping operations in the fall of 1956. Activities occurring at the site during

this early period included mapping, drilling, stripping overburden, bulldozer trenching, excavating, forming adits, stockpiling ores, creating waste dump areas, and shipping ore. Dahl ¶ 4; Lattanzi ¶ 17; Exs.004, 006, 011, 261, 263, 264, 278, 1204 at 2.

After entering into the 1955 Agreement, Newmont immediately conducted and directed operations at the Midnite mine, including exploration, geological studies, and development of the mine producing small ore lots to ship to the Atomic Energy Commission. Lattanzi ¶ 17; Quivik ¶¶ 37, 68, 69, 74-83; Loncar ¶ 3; Exs. 004, 006, 015, 019, 020, 021, 278. Newmont provided all of the financing for start up of mining activities at the Midnite Mine. Exs. 007, 168. For example, Newmont provided the mining equipment. Lattanzi ¶ 82; Exs. 165, 168. The purpose of this initial work was to determine whether the quantity, continuity and grade of mineralized material existed to support an economic mining operation.

Mr. Hundhausen, who was already onsite assisting with the development efforts, continued to do so after the 1955 Agreement and after being named General Manager of Dawn. Mr. Hundhausen reported to Spencer Hinsdale, Dawn's first president. See e.g., Ex. 1824, Tabs 1 – 8 (Reports of Hundhausen to Hinsdale). However, Mr. Hundhausen did not have any authority over NEL employees conducting the work at the mine. Lattanzi ¶¶ 109; Loncar ¶ 14; U.S. Ex. 184; Loncar Test. 16:10-22; Loncar Test. 26:4-19. See also Lattanzi ¶¶ 103-109, U.S. Exs. 006, 008a, 026, 027, 182, 183,184. The reports of Mr. Hundhausen to Mr. Hinsdale covering the period from May 1, 1955 to July 1, 1955, summarize the operations of the Mine during this period. Ex. 1824, Tabs 1-8. These reports evidence Mr. Hundhausen interacted with third parties regarding the development of the mine, but do not evidence Hundhausen was directing or making any of the decisions regarding the mining operations outlined in his reports and being carried out by NEL employees at the Mine.

Mr. Hundhausen lacked operating experience and this was the basis for Newmont's later decision not to name him general manager of the mine in 1956. On June 21, 1955 NEL's Hal Norman identified this in a letter he wrote to his Newmont boss, Fred Searls, regarding

Mr. Hundhausen's role at the Mine: "Hundhausen I am sure would be the first to recognize that he has had no operating experience and that his main experience lies in proving up additional ore reserves at prospects in various parts of the country." Ex. 27.  Norman goes on to advise that the "wisest course to follow" would be to persuade Hundhausen to devote his time to the discovery of ore, his area of expertise, and only give him "very general supervision" over operations. *Id.*

Mr. Hinsdale was a banker and had no experience in mining operations.  Lattanzi ¶¶ 96-97.  Mr. Hinsdale did not supervise the NEL employees conducting exploration and development in 1955.  Lattanzi ¶¶ 96-102; Loncar ¶ 14.

Additionally, Newmont provided some of the onsite personnel in 1955, whom managed, supervised and directed early mine operations and exploration efforts.  Lattanzi ¶¶ 82-83. 115; Ex. 261.  In 1955, invoices and payment information demonstrates that NEL was charging Dawn for the salaries of the following individuals: Messrs. Pete Loncar (named "mine superintendent" for the Mine), G.W.H. Norman, Joe Kalliokoski, R.F. Sheldon (named "Chief engineer and geologist" for the Mine), H.E. Pickett, Leonard Chase, James Wilson (named "Assistant engineer" for the Mine), Ben Short and A.A. Schierman. Exs. 433d-e, 433h, 470e, 933b, 942b, 1824 tab 1.

One of these individuals, Pete Loncar, an employee of NEL since the 1940s, was assigned by his boss, Hal Norman of NEL, to the Midnite Mine to "supervise mining exploration and development operations."  Lattanzi ¶¶ 83-84; Loncar ¶ 3 - 5; Loncar Test. 7:25-8:22; Ex. 011.  He supervised bulldozing to expose near surface ore and the excavation of the mine adit, and also ensured compliance with the AEC contracts. In April 1955, it was NEL employees Loncar, Kalliokoski, and Norman who met with Hinsdale and Hundhausen to help them select the location for an exploration adit.  Ex. 1027.  Mr. Norman reported the details of their decision regarding the location of the adit to NEL management in New York. Ex. 1027.

The purpose of the adit opening was to appraise the positive results from earlier surface exploration drilling, to assess the physical character of the mineralized material, and to obtain additional, mineralized material to ship to the AEC. Ex. 1204. The adit was started in May 1955 and was excavated by laborers employed by Dawn. Ex. 1824, Tab 1 (June 17, 1955 Hundhausen to Hinsdale report). The exploration adit was approximately 550 feet in length. By spring of 1955, NEL had extracted enough uranium ore from the adit to make its first shipment to the AEC. By the end of May 1955, nine car loads of ore had been shipped out of the production from the adit. Exs. 169, 524. Mr. Loncar supervised driving the adit. Loncar Test. 13:2-8. Mr. Loncar decided where to put the waste from the adit. Loncar Test. 13:9-24. Almost all of the material excavated from the adit was shipped offsite to the AEC for testing.

R.F. Sheldon, a geological engineer with Newmont Exploration reported that in the summer of 1955, there was an intensive development program consisting of 25,000 feet of wagon drilling, 550 feet of underground work, geological engineering and radiometric mapping, bulldozer trenching, stripping of selected areas, and limited mining in three of the uranium ore bodies. Ex. 611; s*ee also* Ex. 262 (report stating that in the two-week period between June 16 and July 1, 1955: bulldozer trenching and stripping operations had been conducted; 21 drill holes had been completed to a total depth of 2,356 feet; an adit had been excavated to 96 feet; and twelve train car loads of ore had been shipped off-site during this period).

On September 13, 1955, Fred Searls of NEL wrote to Mr. Hinsdale regarding the initial work performed by NEL at the Midnite Mine. Mr. Searls noted that this work "resulted in a total expenditure of $120,000. Strictly construed according to our Dawn contract, Newmont Exploration's role in performing this work was that of contractor for Newmont Mining Corporation, so that it is the latter company which is entitled to the $120,000 reimbursement from Dawn Mining Company." Ex. 470e.

FINDINGS, CONCLUSIONS, AND ORDER - 14

By the fall of 1955, Dawn and the AEC had executed a series of small quantity ore procurement contracts under the AEC's Uranium Ore Procurement Program. Under this program, the AEC performed geologic surveying, free testing and assaying, and guaranteed minimum ore prices as set forth in the program circulars. Dawn executed at least three contracts under this program. Ex. 2354. One of these contracts, executed on November 17, 1955, provided that the AEC, which "in the acquisition of uranium source material is interested in encouraging the domestic production of uranium concentrate from new uranium producing areas," would purchase from Dawn 500 tons of uranium ores "for the purpose of metallurgical testing and research." Exs. 2025, 2026. By November 30, 1955, Dawn had shipped the complete 500 ton mill sample as required by the November 17, 1955 contract. Ex. 2029. Ore from Dawn's early exploration efforts was shipped to the AEC in accordance with these small quantity ore procurement contracts. Exs. 1031; 918a; 918b; 1078; 1792. The hope was that enough ore could be located to justify the establishment of an AEC ore-buying station nearby. Ex. 1021, 1070, 1071, 1072, 1077, 1078, 1081.

*Hopes for Mill or Ore-buying Station.* In June 1955, the AEC had expressed its hope that ore reserves at the Mine would justify building a mill and that a mill could be built and operational "without any unnecessary delays." Ex. 2017. That same month, Dawn requested permission to stockpile ore at the Mine and proposed to the *AEC* that the *AEC* establish an ore-buying depot near the Mine. Ex. 2018. The AEC rejected the ore-buying depot concept and informed Dawn by letter in September 1955 that, to obtain a long-term uranium supply contract, *Dawn* would have to "give serious consideration to the construction" of a mill to process ore. Exs. 2021; 1021; 1037; 1055; 1060; 1063; 1090. The AEC expected that Dawn would "take on the obligation of building a plant" provided that a reasonable agreement could be reached with the AEC regarding the production of concentrate from that plant. Ex. 2030.

Because the AEC was the only purchaser of uranium at the time, securing a contract with the AEC was a critical driver to the development of the Mine. Ex. 1792. Dawn was

willing to construct a mill "provided its current negotiations with the Atomic Energy Commission terminate in a signature of a concentrate purchase contract" that was satisfactory. Ex. 2035. The question of whether enough ore existed at the property to justify the costly expenditure of a mill remained. Connochie ¶47; Exs. 1071; 2042. Dawn responded to the AEC that it anticipated "considerable difficulty in justifying" construction of a mill unless more uranium ore was identified either at the Mine or in the immediate area." Ex. 2023. Assessments of the property indicated that significant mineralization likely existed on the nearby Boyd allotment.

The AEC's insistence on the construction of a costly mill as a part of the transaction also changed the economics of Newmont's potential investment in Dawn. Connochie ¶43; Ex. 2042. By December 1955, Newmont officials had concluded that the Midnite prospect merited development of a mine and mill. Quivik ¶ 84; Ex. 023. Newmont attempted to persuade MMI to bring in Hecla Mining Company to invest in Dawn in order to support mill construction and "take over the management and be responsible for the operation of the Dawn Mining Company." Lattanzi ¶¶ 71, 116; Quivik ¶ 84; Exs. 004, 023; Connochie ¶¶44-46 (and exhibits cited therein). When that effort failed, Marcus Banghart, Newmont Vice President of Operations wrote to Hecla, "We are proceeding on the basis that we will be running the show and are making a study as to whether or not it would be to our best advantage to operate the mine and farm out the milling to others, or whether to plan on an integrated operation of the mine and mill." Ex. 24. In February 1956, he wrote to Plato Malozemoff of Newmont that he was confident that Robert Fulton and Don Hargrove would do a good job in "mining the show." Ex. 025. Mr. Banghart also wrote that Frank McQuiston would help with AEC negotiations and mill planning. At this time, neither Banghart, Malozemoff, Fulton, Hargrove nor McQuiston were Dawn officers, directors, or employees. They were Newmont employees or associates. Quivik ¶¶ 85-90.

FINDINGS, CONCLUSIONS, AND ORDER - 16

In December 1955, Mr. Banghart wrote to Dawn's President, Mr. Hinsdale.  Mr. Banghart informed Mr. Hinsdale that Newmont did not intend to use Mr. Hundhausen as the manager of the mine.  Lattanzi ¶¶ 110, 113; Quivik ¶¶ 92- 95; Exs. 026, 176f, 331b.  Mr. Hundhausen's lack of experience in mining operations had been noted by Dr. Norman of Newmont Exploration  as early as June 1955.  Quivik ¶ 96; Ex 027 (Hundhausen has "no operating experience"); Ex. 026 (Marcus Banghart of Newmont wrote: Hundhausen's "record does not show any experience in a management capacity of an operation such as contemplated.  Therefore, we do not intend to use him as the responsible manager of the property.").  By January 1956, Newmont had decided that Robert Fulton would become Dawn's General Manager.  Quivik ¶¶ 97-99; Ex. 028.

*The Year 1956*.  In the spring of 1956, the United States Bureau of Indian Affairs ("BIA") informed Dawn that the Boyd allotment was available, and Dawn submitted a bid in early June.  Ex. 1122.  Three weeks later, the BIA informed Dawn that its bid for the property had been successful.  Ex. 1127.  In June, 1956, Dawn was granted its second mining lease for the 120-acre Boyd allotment by the United States Superintendent of the Colville Indian Agency and on June 25, 1956, the Acting Area Director of the United States Bureau of Indian Affairs approved this lease.

With the acquisition of the Boyd allotment lease, there was apparently enough ore available to justify building a mill.  Newmont then agreed to advance Dawn funds "for use in financing the construction and operation of its treatment plant . . . aggregating not more than $2,000,000 upon terms to be agreed upon."  Ex. 1818 (05/29/1956 Newmont Board of Directors Minutes; 08/28/1956 Newmont Board of Directors Minutes).

On August 8, 1956, Plato Malozemoff (President of Newmont Mining Corporation and Vice-President/Director of Dawn) and John Grunow (Newmont employee and Secretary  of Dawn) executed a contract on behalf of Dawn with the AEC for the production and sale of uranium concentrate.  Ex. 2359A.  The contract called for Dawn to construct a mill "as

FINDINGS, CONCLUSIONS, AND ORDER - 17

promptly as possible" near Ford, Washington (20 miles away from the Mine) for processing uranium-bearing ore. Ex. 2359A. Dawn agreed to operate its mill to produce ore using the AEC's specifications, and the AEC agreed to purchase all of Dawn's uranium concentrate (U308) with a processing cap set at 80,000 tons of ore in any six month period, and 2.7 million tons of ore during the term of the contract, which was to expire on March 31, 1962. Ex. 2359A. The contract provided for a supplemental payment of $1.27 per pound of concentrate produced until Dawn recouped its mill construction cost of $3.1 million. Ex. 2354.

The contract was "authorized by and executed under the Atomic Energy Act of 1954, in the interest of the common defense and security." Ex. 2359A. Further, the contract stated that "the [AEC] desires to increase the domestic production of source materials by having uranium-bearing ore tributary to the area of Ford, Washington, processed for the recovery of uranium, to be sold to the [AEC] in the form of uranium concentrate." Ex. 2359A.Days after signing the contract with the AEC, Dawn hired Western Knapp Engineering Co. to build the mill and Isbell Construction Company to perform the initial stripping and mining work. With the necessary leases and the AEC contract in hand, Dawn was able to obtain the additional financing required to build the mill. By October 1956, Dawn and the Chemical Corn Exchange Bank had executed an agreement providing for up to $4.0 million in loans to construct the mill. Ex. 1159.

At this point, the three prerequisites to the full-scale development and operation of the Mine were in place: (1) sufficient ore reserves; (2) a mill to process the ore; and (3) a contract for a guaranteed quantity of uranium concentrate at a guaranteed price. Connochie ¶50.

*The Creation of Waste During the Early Period.* NEL continued to conduct exploration activities in 1956 even after it had determined the Midnite mine prospect merited development. For example, in September 1956, Mr. Norman of NEL reported on the development and exploration activities at the mine in the East Boyd ore body conducted by

NEL during the period from August 16 to September 13, 1956 which included bulldozer stripping, drilling, and trenching.  Exs. 263, 274.

The development and exploration activities conducted at the mine prior to full scale mining operations began generated thousands of tons of mineralized material at the mine in the form of ore, protore, and waste rock – all of which contained some amount of hazardous substances such as uranium or other metals.  Dahl ¶¶ 4-13; Lattanzi ¶¶ 92-93; Exs. 006, 011, 169, 178c, 261, 262, 263, 278.  During this period the AEC received 4,859 tons of ore from the Midnite Mine. Ex. 1848.

Ore is mineralized rock which can be mined and processed at a profit.  Material which is of no economic value is considered waste rock.  Lattanzi ¶ 40; ROD at 2-11; s*ee also* Ex. 1850 n.2.  Protore is a term used to describe rock which contains uranium in amounts that cannot be extracted at a reasonable profit and therefore does not qualify as ore, but could potentially become ore under different economic circumstances.  ROD at 2-11; s*ee also* Ex. 1850 n.3. Although protore is technically "waste," it is often stockpiled separately so that it may be processed if economic conditions change.  Lattanzi ¶¶ 41-43. During this time, the ore, protore, and waste rock generated by the development and exploration activities was left on site, exposed to the elements.  Ex. 169; Loncar ¶ 4.  In addition, some of the activities themselves (for example stripping overburden and excavating) resulted in or contributed to the generation of acid rock drainage.  Dahl ¶ 8; Exs. 006, 011, 169, 178c, 261, 262, 263, 278; *see also*, Lattanzi ¶¶ 17-18.

C.    **THE 1956 MANAGEMENT AGREEMENT**

On July 1, 1956, Dawn and Newmont entered into a four-page Management Agreement (the "1956 Agreement").  Ex. 1133.

The Preamble to the July 1, 1956 Agreement states:

WHEREAS Dawn requires management, technical and administrative services in connection with the conduct of its corporate activities in the State of Washington and desires to have available for its operations the advice and technical assistance of men

experienced in mining and treatment of ores such as will be produced from its properties, which Newmont is willing to provide to the extent and for the consideration herein expressed;

Ex. 1133.

Clause 1 of the 1956 Agreement specifies that *"**Newmont shall, subject to the Board of Directors of Dawn, act as a manager of all the operations and corporate affairs of Dawn**."* U.S. Ex. 004 (emphasis added); Lattanzi ¶¶ 20, 71; Quivik ¶¶ 38, 101-103. The Agreement contemplated that Newmont would provide Dawn with "management, technical and administrative services in connection with the conduct of its corporate activities." *Id.* These services included the provision of accounting services, legal advice, marketing and relations with the public and government agencies.

.    Clause (2)(a) of the 1956 Agreement specified Newmont's compensation, providing that Dawn would pay to Newmont, "in consideration of its services hereunder, a fee equal to one percent (1%) of the gross sales prices of uranium concentrates produced in the Dawn mill." It also provided that Dawn must reimburse Newmont for the salaries of certain Newmont personnel being provided to Dawn. Lattanzi ¶¶ 72, 127; Quivik ¶¶ 104, 105; U.S. 104.

Clause (2)(b) of the 1956 Agreement, addresses how certain types of support personnel were to be retained by Dawn.  More specialized services, including "metallurgical, engineering, legal or accounting consultants," were to be "retained in the name of Dawn and paid by Dawn."

Newmont used similar types of agreements with other subsidiaries. Quivik ¶ 106; Exs. 031, 032; *see also* DeGuire 113:7-15 (Newmont had management agreements with Idarado and Resurrection).The 1956 Management Agreement remained in effect through the operational life of the mine. Lattanzi ¶ 124, Ex. 034. During the term of the Management Agreement, Newmont received the management fee from Dawn. Quivik ¶ 249; Ex. 083; *see, e.g.*, Ex. 298.

FINDINGS, CONCLUSIONS, AND ORDER - 20

Two meetings occurred on July 31, 1956 where the new agreement was discussed and Newmont's role addressed: a shareholder's meeting and a Board of Directors meeting. In the shareholder's meeting, the minutes recognized that Messrs. Fulton and Hargrove, and "additional skilled personnel has [sic] been loaned to Dawn by various affiliates of Newmont Mining Corporation, and that equitable charges were being made to Dawn Mining Company by the employers of said personnel...." Lattanzi ¶ 119, Ex. 033.

At the meeting of the Dawn Board of Directors, the Dawn Board ratified the Management Agreement. Lattanzi ¶¶ 22, 124; U.S. Exs. 033, 034. The Dawn Board minutes reiterate that Newmont would be providing "for the management by Newmont Mining Corporation of the corporate affairs and operations of Dawn Mining Company…" Ex. 034. The minutes also explained that under the new Agreement, Newmont would:

> [U]ndertake to provide Dawn Mining Company with all services of its New York Personnel, including engineers, attorneys, accountants, purchasing and clerical staff, for which Newmont would receive reimbursement of a fixed sum of $500 per month until production commences, and thereafter would receive a fee equal to 1% of the gross sales price of uranium concentrates produced.

Ex. 1139.

Minutes from a subsequent meeting of Newmont's Board of Directors on August 28, 1956 describe the 1956 Agreement as "providing the terms and conditions upon which Newmont Mining Corporation shall act as manager of the corporate activities of Dawn Mining Company in the State of Washington." Ex. 1818.

### D.    PHASE I MINING OPERATIONS: 1956-1964

Full scale mining operations occurred at the Midnite Mine in two phases. Phase I mining began in 1956 under the AEC contract.

The actual Phase I mining and stripping was conducted by a contract-operator named Isbell Construction Company ("Isbell"), under contracts between Dawn and Isbell dated August 15, 1956 and March 4, 1957. Exs. 1148 and 1177. Isbell commenced operations in

early September. Exs. 1146; 1148; 1824, Tab 10. Mining was conducted by open pit method. Lattanzi ¶¶ 33, 40. Ores from the mine were processed at the Dawn mill. Lattanzi ¶¶ 32-34. The resulting product was uranium concentrate, or "yellowcake." Lattanzi ¶¶ 33, 35.Isbell was required by contract to provide and pay for all of the required supervisory personnel, labor, tools, equipment, transportation and other requirements necessary to conduct the onsite mining and stripping operations. Maps and plans appended to the Isbell contracts delineated road locations, the areas to be stripped and mined, waste dump locations, and where ore was to be delivered on the Site. The mining plans attached to the initial Isbell contract were drawn up by Dawn General Manager Robert Hundhausen, with the assistance of a Dawn-paid consulting mining and civil engineer named R. M. Belliveau. Ex. 1129. During Phase I, Isbell and its employees determined the best way to excavate down the face of the hill in conformance with the mining plans. Depending on the nature of the material to be excavated, Isbell would either dig or blast the material that needed to be removed.

Dawn was responsible for classifying material excavated by Isbell. According to Peter Loncar, this was his job and it consisted of making sure Isbell did not mix ore and waste or remove ore as waste, and so forth. Deposition of Peter N. Loncar (1/17/08) at 37; Ex. 1799 (Declaration of Peter Loncar, dated January 10, 2008) at ¶8. Mr. Loncar did this by continually checking the radioactivity levels of the excavated material and then indicating to Isbell what was ore, protore or waste. Loncar Dep. at 36. Isbell would then load the material onto its trucks and take it to the proper location on the Site. Ore from the Mine was transported by contract haulers to Dawn's mill for processing.

During Phase I, the AEC inspected the mill regularly and the U.S. Geological Survey ("USGS") also inspected the Mine site operations. USGS prepared reports describing various aspects of the operation such as the progress of mining operation, Dawn's ore weighing process, and the number of employees on the site. Ex. 2044, 2045, 2005.

In 1960, the AEC and Dawn entered into another contract substantially similar to the 1956 contract, but with the following differences:  the contract did not include a negotiated concentrate pricing, but instead adopted a flat base rate for ore concentrate; the contract permitted Dawn to sell uranium concentrate to licensed third parties with the approval of the United States, and specified exactly which independent producers and which properties Dawn could purchase ore from.  Exs. 1792, 1210.  This contract expired in 1966 and supported Dawn's operation through the termination of Phase I operations.  Id.; Ex. 1792.

The AEC's domestic uranium program was originally set to expire on December 31, 1966, but in November 1962 the AEC announced that a modified version of the program would continue through December 31, 1970.  Ex. 2060.  This so called "stretch-out" program was to slow the pace at which mills produced uranium concentrates.  Ex. 1792.  Under the program, milling companies could elect to delay delivery of part of their contract commitments to 1967-1968.  In return, the AEC would purchase additional concentrates from the company between 1969 and 1970 in an amount equal to that deferred.  The AEC's uranium procurement program ended on December 31, 1970, at which time the stretch-out program expired.  Ex. 2354.

On December 20, 1962, Dawn requested that it be permitted to defer delivery of 480,000 pounds of U3O8, which were at that time contracted for delivery to the AEC before 1967.  Ex. 2061.  Dawn proposed that it deliver the deferred U3O8 amounts between 1967 and 1970.  Ex. 2061.  In response to Dawn's proposal that it defer delivery of 480,000 pounds of U3O8, the AEC asked Dawn to confirm "the production capability of" the Mine.  Ex. 2063.  The AEC rejected Dawn's proposal to defer delivery of 480,000 pounds of U3O8 because "[s]uch an arrangement does not provide for continuous mill operation through 1970 as contemplated by" the procurement program.  Ex. 2064.  Dawn therefore did not participate in the "stretch-out" program.  Ex. 1792, 2065.

FINDINGS, CONCLUSIONS, AND ORDER - 23

*Renewing the Property Leases.*  Because the original land leases were set to expire, new leases were entered into in 1964 again with the United States Superintendent of the Colville Indian Agency and the individual allottees associated with the Boyd allotment.  The Tribe authorized the leases. Ex. 2066, 2067, Ex. 2358G.  The 1964 set of leases contained substantially similar terms to the initial leases and were prepared by the United States.  Dawn received no property interest other than the leasehold itself.  Both the initial and later leases provided various authorities and responsibilities to the United States and not to the Spokane Tribe.  The leases provided that the Tribe and the allottees would be paid royalties pursuant to a schedule set by the United States, and required Dawn to submit monthly reports to the BIA and to pay rents and royalties directly to the Superintendent of the Colville Indian Agency for the use and benefit of the Tribe or allotees, or directly "to the Treasury of the tribe where the tribe is organized."  Exs. 1002, 1131, 1226, 1227.

The leases also allowed the United States Superintendent of the Colville Indian Agency to audit Dawn's accounts and books, and authorized the United States Secretary of the Interior to suspend operations under certain circumstances, grant permission for assignments of the lease, collect the bond, inspect the property, approve the lessee's attempt to terminate the lease upon a satisfactory showing that full provision had been made for the conservation and protection of the property, approve or disapprove of the location of roads, required Dawn to hold the United States harmless from any negligent construction, and allowed termination of the lease for violation of its terms and conditions.  Exs. 1002; 1131; 1226; 1227.

The 1964 lease also contained the following provision regarding "damages":

> The lessee shall conduct all operations authorized in this lease with due regard to preventing unnecessary damages to vegetation, timber, soil, roads, bridges, cattle-guards, fences, and other improvements, including construction, operation, or maintenance of any of the facilities on or connected with this lease which causes damage to the watershed or pollution of the water resources.  On termination of operations under this lease, the lessee shall make provisions for the conservation, repair, and protection of the property and leave all of the areas on which the leases has worked in a condition that will not be hazardous to life or limb, and will be to the satisfaction of the Superintendent.

FINDINGS, CONCLUSIONS, AND ORDER - 24

Ex. 2358G.

The United States granted these leases to Dawn "for the sole purpose of prospecting for and mining minerals." *See e.g.*, Exs. 1226 & 1227 at Art. I. Dawn was required to diligently carry on mining and exploration. *Id.* at Art. III(3). Article III(5) of the 1964 leases mandated that "[t]he land described herein shall not be held by the lessee for speculative purposes, but for mining the minerals specified." *Id.* at Art. III(5). The United States had the authority to cancel the lease for a breach of these terms. In fact, the ultimate decision to terminate Dawn's leases was based, in part, upon a determination that Dawn's operations were not producing minerals in paying quantities. Exs. 1632; 1641.

*End of Phase I.* Dawn's Phase I operations at the Mine ended in the fall of 1964 after sufficient ore had been stockpiled to fulfill Dawn's obligations to the AEC. The AEC contract obligations were satisfied by Dawn in 1966. All of the uranium ore produced by the Midnite Mine prior to 1966 was either sold directly to the AEC in the form of ore or was sold to the AEC in the form of uranium concentrate. Ex. 2354 (AEC Stip, ¶11).

According to a Yearly Production Summary of Dawn's, from 1955 to 1964, the Mine produced 4,362,511 total tons of ore, protore and waste. Ex. 1516. Dawn's Phase I operation produced 1,138,283 tons of ore to be processed at the Dawn mill. Ex. 1849. The Phase I operations also produced 2,964,354 tons of waste rock and 294,016 tons of protore. Ex. 1849. While most ore was hauled off-site for processing, the waste rock and protore were not removed from the Mine site. Ex. 959b (EPA, September 2006 Record of Decision ("ROD") at 2-11. Thus, the extracted materials remaining at the Mine site consist primarily of protore and waste rock. *Id.* After Phase I operations ceased, no additional mining occurred at the Midnite Mine until August 1969.

**E.    INTERIM PHASE: SUSPENSION OF MINING FROM 1965-1969**

Operations at the Mine were suspended in 1965 and the Mine was left idle "until the commercial demand for uranium revived the market." Ex. 837; Nelson ¶¶ 4-5 (Ct. Rec. 409).

In 1966, the AEC suggested that the commercial uranium market was "getting off the ground" and that "companies considering future nuclear power plants were beginning to demand an inventory on hand before a plant would be planned and designed." Ex. 2073. During the period the mine was shut down, Newmont continued to conduct exploration activities. Lattanzi ¶ 206, 209. During this time, Newmont also negotiated sales contracts and took the lead in rehabilitating the mill. Lattanzi ¶¶ 210-211; Exs. 204, 272.

In 1967 and 1968, there were negotiations with General Public Utilities Corporation (GPU) and Jersey Central Power and Light as potential buyers of Dawn's concentrates. During these negotiations, Newmont made assurances that it was "manager for Dawn" and that "Newmont has been appointed and is acting as manager for Dawn." Quivik ¶¶ 261-267; Ex. 272, 962e, 962f. The Mine reopened in 1968 when it became apparent to Dawn to be profitable to mine uranium again and resumed production in 1969. Exs. 837, 1516.

## F. PHASE II MINING OPERATIONS: AUGUST 1969-NOVEMBER 1981

The Mine started operating again in 1969, and the Mill started operating again in 1970. Nelson ¶¶ 4-5. Phase II mining operations were conducted to provide mill feed to support contracts between Dawn and various private electric utilities, not the AEC. Exs. 837, 5134A, 5134G, 5134H, 5134I. During Phase II, onsite mining and stripping was performed by N.A. Degerstrom ("Degerstrom"), a Spokane-based contract-operator. *See* Ex. 1837.

During Phase II, Degerstrom provided and paid for all of the required supervisory personnel, labor, tools, equipment, transportation, material, explosives and other requirements necessary to conduct the onsite mining and stripping operations. Ex. 1837 (Degerstrom Contracts).

Degerstrom maintained a substantial onsite workforce. For example, in 1980, Degerstrom had an onsite workforce of sixty people, of which 50% were members of the Spokane Tribe. *See* Ex. 1446 at 4. Degerstrom also maintained a large fleet of equipment at the Mine. *See* Ex. 1446, Figure 5. Maps and plans appended to the Degerstrom contracts

delineated road locations, the initial areas to be stripped and mined, waste dump locations, and where ore was to be delivered on the Site. Mine planning was done by Dawn's mine Superintendent and his staff, who also oversaw the mining and stripping operations, tracked the mine plans, conducted surveys, employed ore control procedures, and made operational corrections as necessary in response to conditions in the pit(s). During Phase II, ore from the Mine was transported by contract haulers to Dawn's mill for processing.

After mining resumed, various government agencies, including the BIA and USGS, resumed their inspections of activities at the Mine. In 1972, Dawn initiated a reclamation program to refill old, mined-out pits with waste rock from new pits and to restore the surface elevation of the old pits to their original elevation. Ex. 2110.

*Royalty Negotiations, 1974-1976.* According to provision III(1) of the two land leases executed in 1964, the royalty rate was subject to "reasonable adjustment" ten years after they were executed. Exs. 5125, 5133; Smith ¶ 24. In 1974 Dawn, the Tribe and the individual Allottees attempted to negotiate new royalty formulas, but were unsuccessful. Ex. 2080.

Though the lease provisions called for the adjustment to be made by the Secretary of the Interior, the negotiations initially involved only the Tribe, Dawn and Newmont, and the Allottees, but did not include the BIA or other components of the Department of Interior. Smith ¶ 26. However, the BIA, through James Stevens, Superintendent of the Spokane Agency, "participated in all phases of negotiations." Ex. 2080. The BIA wrote to Dawn, "[r]epresentatives from this Department will be pleased to participate in these discussions if the parties desire." Ex. 5141; Smith ¶ 26. Copies of the letter were sent to the Tribe and the Tribe's attorney, Robert Dellwo, and to the individual allotment owners and their attorney, Willard Sharpe. Ex. 5141; Smith ¶ 26.

When negotiations in 1974 failed, the matter was forwarded to the United States Commissioner of Indian Affairs by the BIA Area Director. The Tribe advocated for a certain proposed royalty amount, and Dawn a different amount. The Tribe had also sought the

assistance of the USGS in crafting a new royalty schedule.  The USGS subsequently developed a uniform royalty rate which was different from what either party had advocated for.  The BIA Area Director recommended that the Tribe's proposed royalty amount be the adjusted amount.  Ex. 5147; Smith ¶ 29.

While the matter was under consideration by the Commissioner, the Tribe urged the Commissioner to return the matter to the BIA Area Director, in the hopes the parties could continue negotiations.  When negotiations failed BIA's Mr. Stevens stated that "it is apparent that since the parties were not able to negotiate a royalty rate that the Secretary of the Interior is empowered to establish a reasonable rate." Ex. 2080.  The Area Director of the Portland Area Office of the BIA then adopted a new royalty rate formula, the uniform royalty rate developed by USGS, on May 16, 1975.  Exs. 2083, 2084.  Both Dawn and the Tribe appealed the Area Director's decision (Ex. 2095) and re-commenced negotiations.  Ex. 5156; Smith ¶ 42. After a year of negotiations, on March 1, 1976, Dawn and the Spokane Tribe reached a compromise on the royalty calculation issue, and executed an agreement that asked the Secretary of the Interior to adopt an adjusted royalty rate that had been agreed to by the parties.  Ex. 2088.  The BIA Area Director approved the compromise on September 9, 1976. Exs. 2088, 5181, 5182; Smith ¶ 44.

*1976-1981: Reclamation and Mining Activities Change; Mine Ordered to Cease Operating.*  Dawn submitted a partial mining plan to USGS on March 18, 1976.  Ex. 2092. Dawn and the USGS agreed that the plan submitted by Dawn would serve "as notification of Dawn Mining's intended mining activities for 1976" (Ex. 2096), and that Dawn would submit a more comprehensive formal plan for future mining to USGS at a later date.  Ex. 2096, 1328, 1337, 1338, 1352.  Later that year, the USGS requested from Dawn further details on Dawn's plans for the Mine.  These details included plans for drilling holes, plans for mining methods and mine layout, locations of orebodies, maps of proposed pits, a map of waste disposal areas,

descriptions of how to handle protore and controlling grade, and a summary of reclamation plans.  Exs. 2082, 2087.

In December, 1976, Dawn submitted a more detailed mining plan ("Statement of Mining Plans") describing its projected mining plans for 1977-1980.  Ex. 1359 (also 2099, 2101).  At the same time, Dawn submitted a "Statement of Proposed Drilling Program" which described planned exploration and development activities for the upcoming mining season.  Ex. 1360.  At least by 1977, the BIA, Dawn, and the Spokane Tribe realized that "pollution-related reclamation and restoration costs" would be significant, and the parties renegotiated the royalty agreement accordingly.  Ex. 2103.  The parties estimated that the total reclamation cost would $2,448,000 plus 15% overhead.  Ex. 2103.  During 1977, Dawn continued to provide additional information to the USGS, including plans for construction of new dump sites, projections of ore and waste production and descriptions of reclamation activities.  Exs. 1367, 1369.  In June of 1978, the USGS informed the BIA that Dawn's 1977 proposed mining plan was generally acceptable, though it could not be fully approved until Dawn provided more detail regarding environmental protection and reclamation measures.  Ex. 1379.

On January 30, 1979, Dawn's resident manager, Jack Thompson, Jr. reported to the USGS and BIA that a mine drainage problem had developed at the Mine.  Ex. 2118.  During the summer of 1978, water started flowing from the base of the waste dumps at a rate of 10 to 40 gallons per minute, and the water contained a white precipitate.  Ex. 2118.  Dawn responded to the drainage issue by stopping the pumping of water from "Boyd 2 East" on to the dumps, digging trenches to impound the seepage of water from the dumps, and testing the water.  Ex. 2118.  After it was determined that the precipitate was a mixture of "aluminus salts" and gypsum, and that elevated levels of uranium and radium were present, Dawn built a "more substantial" impoundment for the seepage, discontinued pumping "Boyd 2 East" pit water, initiated a formal water sampling program, and initiated studies to examine alternatives

for controlling mine effluents.  Ex. 2118. Thompson's January 30, 1979 memorandum sought approval of several proposed control measures including the construction of a clay-lined pollution control dam to collect the seepage and the pumping of pit sump water from Pit 3 to Pit 4.  Ex. 2118.

In February of 1979, the BIA and USGS partially approved Dawn's plan, subject to the agencies' oversight of the project.  Exs. 1402, 1405.  In addition to approving Dawn's proposed plan, the USGS required Dawn to take specific actions to address the recently discovered uranium precipitate being deposited in certain drainages at the site, specified certain materials and methods which should be used in the construction of Dawn's proposed pollution control dam, and required Dawn to conduct additional monitoring.  Ex. 1405.

On March 5, 1979, Dawn proposed that it modify its mining plan because it had discovered a new body of high-grade ore to the north of Pit 3.  Exs. 2126, 2127. In order to monitor the effectiveness of the pollution control dam, which at the time was under construction, on March 20, 1979, Dawn asked the BIA for permission to install two monitoring wells and a weir to the south of the Mine.  Ex. 2129.  On April 3, 1979, Dawn asked the BIA and the Spokane Tribal Council to grant Dawn a mining easement so that Dawn could access approximately 2500 to 3000 tons of ore.  Ex. 2130. Dawn prepared a "Preliminary Report of the Proposed Reclamation Plan" on November 14, 1979.  Exs. 2131, 2133.  That report stated that "[t]he goal of the Midnite Mine Reclamation Project is to provide for the postmining usefulness, productivity, and scenic values of the land on the permit property, due to the recontouring and revegetation of the areas disrupted by the mining practices."  Exs. 2131, 2133.

The USGS prepared an Environmental Analysis of the Mine dated December 3, 1979. Ex. 2132.  That report noted that "[t]otal royalties paid on production from tribal and allotted lands amount to approximately $6 million," and that the Mine "is an important source of income to the Spokane Indian Tribe."  The report concluded that "the environmental impacts

of the proposed action [the proposed change in Dawn's mining plan] are not likely to be highly controversial." Exs. 2132, 2144, 2145, 2147.  Confirming that mining royalties were a significant source of income for the Tribe, a member of the Tribal Council stated in 1980 that 57% of the Spokane Tribe's income came from mines on the reservation.  Ex. 2152. In January 1980, in cooperation with the USGS and the Bureau of Mines, Dawn developed and submitted a proposed reclamation plan to the USGS, the BIA and the Spokane Tribe, pursuant to the mineral leasing regulations.  Exs. 1431 (also 2134); 1434 (also 2136).   The plan covered both the Mill and the Mine.

In February of 1980, the USGS itself undertook a hydrologic investigation of the site. Ex. 1464.  The objectives of this study were to evaluate Dawn's effluent control operations and evaluate the quality of the water both on-site and in the surrounding drainages. *Id*.  As part of this work, the USGS evaluated Dawn's water quality monitoring network, installed new water monitoring wells of its own, made recommendations for Dawn to install new wells, sampled surface and groundwater for the presence of contaminants, and studied the hydrogeologic characteristics of the site    *Id*.   Dawn complied with the USGS' recommendations.  Ex. 1471.

In early April of 1980, Dawn sent to USGS, BIA, and the Spokane Tribe a "Mine Drainage Report" that presented results of an interim monitoring program; that program showed the effectiveness of the pollution control dam.  Ex. 2140.  Dawn again verified the success of the pollution control dam in a report to USGS, BIA, and the Spokane Tribe on June 3, 1980 (Ex. 2143), and on July 28, 1980 (Ex. 2149).

In response to Dawn's January reclamation plan, on April 21, 1980, USGS sent a letter to Dawn that requested more information regarding Dawn's timetable for reclamation, specific areas to be reclaimed, a time frame for Dawn's proposed reclamation demonstration projects, a discussion of the measures for handling the water that had been accumulating in the Mine's

open pits, and an explication of Dawn's projected costs for reclamation.  Exs. 5230, 1444; 1453; Courtright ¶ 46.

On July 1, 1980, the USGS issued a "Finding of No Significant Impact" on the Mine's plan of operations from 1980 to 1983.  Ex. 2146.  The USGS observed that

> Our environmental assessment indicates that unavoidable adverse environmental impacts will result from the proposed action, including ground disturbance, noise and dust production, removal of vegetation, destruction of wildlife habitat, and soil erosion. However, these impacts will be adequately mitigated by the measures described in the environmental assessment, and therefore will not be significant.

Ex. 2146.

Dawn responded to the USGS's April request for additional information in a two-page letter dated August 22, 1980.  Ex. 5232; Courtright ¶ 47.  Dawn's response regarding the complicated problem of ground water degradation from infiltration and percolation of water through disturbed rock was simplistic and general.  Ex. 5232; Courtright ¶ 47.  With respect to this issue, Dawn explained that it was conducting the research and design work on a water treatment plant and that the contamination would "be minimized by reducing the inventory of waters in the pits."  Ex. 5232; Courtright  ¶ 47.  No explanation about how the inventory of waters would be minimized was provided.  Ex. 5232; Courtright ¶ 47. Dawn's approach to long-term management simply stated that "[t]he long term solution may take many different paths.  Advances in water treatment technology seem likely in the future based on the current high level of research on this subject here and abroad."  Ex. 5232.

The USGS was not satisfied with Dawn's August response to the reclamation aspects of the open pits with regard to water.  So in January 1981, the USGS wrote Dawn again explaining its concerns and requesting additional information on this issue.  Exs. 1453; 1460. The USGS would not approve Dawn's proposed reclamation plan until this information was furnished.  Ex. 1460, 1492. In the spring of 1981, Dawn began to focus its mining exclusively on Pit 3, which it described in March letters to the Tribe and the USGS.

On March 2, 1981, Dawn sent a letter to the Tribe that described to the Tribe Dawn's "extremely serious financial situation," and conveyed its plans to mine high grade ore from a single pit (Pit 3) and combine that with previously mined and stockpiled lower grade ore. Ex. 5195; Courtright ¶ 14; Smith ¶ 46.  According to Dawn, this action would save mining costs while production of uranium (from the combination of high and low grade ore) would occur at normal rates.  Ex. 5195;  Smith ¶ 46.

On March 23, 1981, the District Mining Supervisor for the USGS responded to Dawn's letter to the Tribe interpreting it as an indication of a "change of plan."  Ex. 1467. The USGS instructed Dawn, citing the terms of the leases and federal regulations, to immediately suspend mining operations until it submits and receives approval of a revised mining plan. Ex. 1467.

On March 23, 1981, the Tribe also expressed its opposition to Dawn's proposal to modify its mining plan, stating in a letter that the plan "is of great concern to the Spokane Tribal Business Council." Ex. 2157 (also 5196); Courtright ¶ 15; Smith ¶ 47.  The Tribe also stated that "[i]t is absolutely necessary to the welfare of the Tribe that our ore deposits be mined in a complete, orderly, systematic fashion, assuring the extraction of all the ore-mineral bearing rock." Ex. 2157.  The Tribe indicated that Dawn's proposal could cause adverse financial effects to the Tribe because it would focus only on the high grade ore found in Pit 3, leaving unmined and unprocessed lower grade ore that, by itself, would not be economical to mine.  Ex. 5196; Courtright ¶ 15; Smith ¶ 45.  The Tribe copied its letter to the USGS and BIA, and supported an immediate suspension of mining operations.  Ex. 5196; Ex. 5221; Courtright ¶ 15, 19; Smith ¶ 45, 47.

On March 26, 1981, Dawn argued in response to the USGS that it was only changing its mining emphasis or schedule, not its mine plan, and Dawn refused to suspend operations. Ex. 5198 (also 1468); Smith ¶ 49.

FINDINGS, CONCLUSIONS, AND ORDER - 33

As a result, on April 7, 1981, the BIA Superintendent of the Spokane Agency issued Dawn a "Notice of Noncompliance", stating that Dawn's operations being conducted in Pit 3 and Pit 3 extension were not in compliance with the approved mine plan. Ex. 5199 (also 1472). Dawn was ordered to stop mining activities on Pit 3 and Pit 3 extension pending the submittal of a proposed modification of the mine plan. Id. On April 8, 1981, Dawn formally requested a change to the mining schedule; "[i]n general the change in the schedule reflects a switch in mining emphasis entirely to Pit 3 and a delay in Pit 4N mining." Ex. 2163.

Citing to the authority granted under the mineral leasing regulations, on April 23, 1981, the USGS followed the BIA with its own order that required Dawn to suspend operations in Pit 3 and Pit 3 extension unless and until it either resumed mining under the existing approved mine plan or submitted a new plan for approval. Ex 5201, 1473; Courtright ¶ 16; Smith ¶ 50. The order was issued because of Dawn's failure to abide by the April 7, 1981 Notice of Noncompliance from the BIA. Ex. 5201. On April 27-28, 1981, Dawn appealed the USGS order and requested approval of a modification to its existing mine plan. Exs. 5204, 5203; Smith ¶ 50. In support of its appeal, Dawn submitted additional information. Exs. 5204, 5207.

A meeting was held on May 22, 1981 to address issues related to Dawn's appeal. Ex. 5210. A May 28, 1981 letter sent to Dawn by the USGS outlined the results of the meeting and the additional detailed information requested of Dawn, which included a profitability statement for Pit 3. Ex. 5210; Courtright ¶ 17. The letter also sought an evaluation of costs for mine reclamation and the consequent amount of bond needed for the reclamation. Ex. 5210; Courtright ¶ 17. The letter summarized the goal of the USGS, BIA, and the Tribe as seeking assurance that "the extraction of the uranium resource will be done in a systematic, planned, orderly manner." Ex. 5210; Courtright ¶ 17. On July 14, 1981, following its review of the additional information submitted in June by Dawn, USGS initially approved the change in Dawn's mine plan. Ex. 5216; Courtright ¶ 18; Smith ¶ 50.

FINDINGS, CONCLUSIONS, AND ORDER - 34

Nonetheless, USGS remained concerned about Dawn's approach to its operations at the Midnite Mine. Ex. 5219; Courtight ¶ 18. An August 26, 1981 internal memorandum characterized Dawn's views as "myopic" and "symptomatic of the present state of cooperation between the lessee [Dawn] and the lessor [Tribe]. . . . It is absolutely vital that [Dawn] understand and accept the fact that they must be responsive not only to the spirit and letter of the regulations and lease agreement but that they must also recognize the need for Tribal involvement in those areas where Tribal interests must be protected." Ex. 5219; Courtight ¶ 18. The memorandum stated further that

> [T]he Spokane Tribe entrusts the stewardship of their mineral estate to the BIA and the USGS. If they were told prior to signing a lease agreement that the mining supervisor will not be allowed to review and approve changes to a mining plan during the life of the agreement, then it is highly unlikely that the Tribe would believe that their mineral deposits are receiving proper or adequate protection. Precluding the mining supervisor from reviewing significant changes in the mining schedule would be tantamount to a total abrogation of the regulatory responsibilities entrusted to the USGS through the regulations and the lease agreement."

Ex. 5219; Courtight ¶ 18.

The Tribe also remained concerned about USGS decision approving Dawn's mine plan. Ex. 5217; Courtright ¶ 19; Smith ¶ 51. The Tribe called a special informational meeting. Ex. 5217; Smith ¶ 51. The notice for the meeting expressed concern about the "possibility of the Spokane Tribe receiving no royalty payments until 1982." Ex. 5217.

The Tribe appealed and sought reconsideration of the USGS' decision. Exs. 5218, 5220, 5221; Courtright ¶ 19; Smith ¶ 51. The Tribe outlined its arguments that Dawn's proposed plan would constitute high-grading of the ore deposit to the detriment of the Tribe. Ex 5221; Courtright ¶ 19; Smith ¶ 51. The Tribe argued that Dawn's plan would make it less likely that the remaining low grade ore would be mined and the ultimate goal of maximum recovery would not be achieved. Ex. 5221; Courtright ¶ 19.

The Tribe's written request included material that had not previously been

FINDINGS, CONCLUSIONS, AND ORDER - 35

presented to USGS.  Ex 5221; Courtright ¶ 19.  The Tribe also suggested that Dawn's argument that it faced significant financial problems was not a reason to allow the change, but a "red flag that Dawn, in order to meet its current financial crises, has every motivation to high grade and gut the mine rather than manage it and plan for its long range future."  Ex 5221; Courtright ¶ 19.  The Tribe suggested that any financial problems troubling Dawn were not related to its mining plan but were  the product of its habit of distributing dividends out of income that they should have held in reserve for future operations.  Ex 5221; Courtright ¶ 19. The Tribe's request was supported by analyses of a mineral economist, a BIA geologist, and the Tribe's mining consultant, which had not been presented previously to USGS.  Ex 5221; Courtright ¶ 19; Smith ¶ 51.

Based upon the Tribe's additional information and analysis, on September 30, 1981, the USGS issued an order to Dawn to cease mining, milling, and processing ore removed from Pit 3, though Dawn could continue to remove overburden and stockpile protore removed from Pit 3. Ex. 5223; Courtright ¶ 20; Smith ¶ 52.  The order stated it would remain in effect until Dawn submitted and received approval of a revised mining plan that fully addressed USGS's concerns about future operations at the mine.  Ex. 5223; Courtright ¶ 20.  This effectively ended active operations at the mine. Active mining has not occurred at the Midnite Mine after fall, 1981.  Smith ¶ 52.

Dawn  challenged the decision through administrative appeals and into federal court.  The USGS prevailed in that litigation.  *Dawn Mining Co. v. Watt*, 543 F. Supp. 841 (D.D.C. 1982), *aff'd without opinion*, 704 F.2d 1293 (D.C. Cir. 1983).

*End of Phase II.*  Operations ceased on November 6, 1981 and no mining has occurred at the Site since then.  Ex. 2175.

Dawn's Phase II operation produced 34,001,626 total tons of ore, protore, and waste rock. Ex. 1516.  This total consisted of 1,998,203 tons of ore processed at the Dawn mill; 31,206,689 tons of waste rock; and 1,192,530 tons of protore.  Ex. 1850.  Of the

FINDINGS, CONCLUSIONS, AND ORDER - 36

approximately 34 million total tons of ore, protore, and waste rock produced during the entire operation of the Mine, approximately 89% of the total material produced occurred during the second period of operation.

## G.   COMMAND OF THE MINE AND IMPLEMENTATION OF THE 1956 MANAGEMENT AGREEMENT

Between the 1920s to the time Dawn was organized in the mid-1950s, Newmont transformed itself from a company that invested in mining properties to a company that made its profits by holding and operating mining properties.  Quivik Test. ¶¶ 50-54, 132-135.  During this time, Newmont developed an operational management structure that allowed Newmont not only to oversee the financial performance of its subsidiaries, but also to manage their operations.  Id. ¶¶ 136-146.  Newmont also put in place management agreements with a number of its subsidiaries, including Dawn.  Exs. 31, 32; Quivik ¶ 106.

In the mining industry, it is common to appoint one party as the "operator" or "manager" of a mine.  The operator is given responsibility for managing the mining operations, typically subject to a board of directors or management committee.  Lattanzi ¶ 21. As the term is used in the mining industry, the operator is responsible for and has supervision of the day to day operations of a project.  Lattanzi ¶ 21.

The duties which Newmont undertook under the Management Agreement, as spelled out by the Dawn board, are those typically performed by the operator.  Lattanzi ¶ 27. Newmont fulfilled its commitment to manage Dawn's operations primarily by placing or appointing Newmont personnel in key management positions at Dawn.  Quivik ¶ 39.  One key position was that of the Resident Manager.  Lattanzi ¶ 27.  See also Lattanzi ¶¶ 25, 73.

Newmont's audits of Dawn demonstrate that Newmont viewed its "key control" over Dawn as being "the Resident Manager's personal involvement in day-to-day matters." Lattanzi ¶ 141; Ex. 223;  *See also* Lattanzi ¶¶ 142, 200, 202, 203; Exs. 206, 207, 208, 211

(operating budget for Dawn "approved by the Resident Manager and submitted to Newmont for approval").

*The Resident Manager.*  Pursuant to Newmont's duties under the 1956 Management Agreement to manage the operations of Dawn, Newmont provided a Resident Manager to Dawn.  Lattanzi ¶ 128, 240, 250; Ex. 84;DeGuire 108:18-109:4.  There were six Resident Managers of the Mine.  They were:

> *Robert Fulton* (June 1956 -April 1958);
>
> *Jack Crowhurst* (April 1958-January 1960);
>
> *James Pike* (February 1960 - July 1965);
>
> *Earl Craig* (1969 - November 1978);
>
> *Jack Thompson* (November 1978- June 1981); and
>
> *Marcel (or Mac) DeGuire* (August 1981- ).

From 1956 until the mine ceased operations, the Resident Manager had an onsite office and was  managing and directing the overall operations at the mine and mill, including reclamation activities.  Lattanzi ¶¶ 75, 120-121; Quivik ¶¶ 39(a), 138, 213; Thompson, Sr. 60:3-6.;  Humphrey 11:24 - 13:7; Ridinger 135:13-136:6 (testifying the Resident Manager was "king of the heap"); Exs. 034, 035.  Mr. Thompson also acknowledged that at Newmont subsidiaries, the Resident Managers had responsibility for reclamation activities. The Resident Managers made decisions relating to mine operations, including mine planning, waste disposal, and other environmental matters including the handling of contaminated water.  Lattanzi ¶¶ 166-167; Quivik ¶ 220.  Resident Managers would direct the development of, modify, review, and approve the mine plans that were developed by staff.  Lattanzi ¶¶ 37, 44, 166-167; Quivik ¶ 368; Ex. 153, 052g (Thompson, Jr. Deposition, pp. 42-44), 052h (Thompson, Jr. Deposition, pp. 52-66);  DeGuire 60:13-25.  The Resident Manager was responsible for environmental matters at the Midnite Mine.  Quivik ¶ 220.  The Resident Managers had the degree of responsibility, authority and autonomy normally conferred on the

operator of the mine, as that term is understood in the mining industry.  Lattanzi ¶ 149;  Ex. 218.

With perhaps one exception, the Resident Managers were on the payroll of Newmont or a wholly owned Newmont subsidiary.  Though the Resident Managers were not on Dawn's payroll, Dawn reimbursed the Newmont entities for the costs of the resident managers' salary, associated overhead, and benefits.  Quivik ¶¶ 39(a), 194; Lattanzi ¶ 169; U.S. Ex. 917d at MDEPO001637-40.    There is evidence that Newmont Board of Directors made salary decisions for Dawn's Resident Managers.  For example, a December 12, 1975, memorandum advises of "salary action taken by the Newmont Board of Directors with respect to NSL people at Idarado, Carlin and Dawn."  The memo shows that Earl Craig, Dawn's Resident Manager at the time, received a salary increase.  U.S. Ex. 935e at NEW0159298.

With the exception of Robert Fulton, who was the first on site General Manager after the 1956 Management Agreement was signed, none of the Resident Managers were appointed by, or even ratified by, the Dawn Board of Directors.  Lattanzi ¶¶ 22-23; Quivik ¶ 215; Ex. 034.  All of the Resident Managers were appointed by Newmont from within its own ranks or those of one of its subsidiaries.  Lattanzi ¶ 172; *see also* Lattanzi ¶¶ 171-184; Exs. 052j (Thompson, Jr. Deposition, pp. 87-90), 054, 193, 197, 198, 199, 213c (McAnany Deposition, p. 20), 213e (McAnany Deposition, p. 78), 220, 221b (Delcour Deposition, p. 77), 936d, 941c, 942i, 961f. Many were longtime employees within the larger Newmont
 organization.  Lattanzi ¶¶ 168-170; Quivik ¶¶ 193-214; U.S. Exs. 033, 077, 183, 189, 190, 214, 292; *see also* Koogler 157:7-22 (when hiring Resident Managers, Newmont's preference was to hire from within the Newmont organization);  Jack Thompson, Sr. was a former Vice president and President of Newmont Mining Corporation, joining Newmont in 1960 and retiring in 1986.  Thompson, Sr. 6:6 - 9:18.  According to Mr. Thompson, as Newmont became an operating company as opposed to a holding company, Newmont put "Newmont men" in a position of responsibility.  Thompson, Sr. 28:22 - 29:12.

FINDINGS, CONCLUSIONS, AND ORDER - 39

Though coming from the ranks of Newmont, and appointed and paid by Newmont, the resident managers were viewed by others, and held themselves out in correspondence, as representatives of Dawn. Exs. 1838; 1839; 1840; 1841; 1842. Third parties also treated the resident managers as a representative of Dawn. Exs. 1413, 1432; 1490; 1364; 1407; 1414; 1470; 1485. The resident managers reported to individuals who were both affiliated with Newmont and also were appointed to serve in a position for Dawn as an officer, director or offsite manager. It is noted that Earl Craig reported to Mr. Petty of Newmont for four years before Mr. Petty was ever appointed a Dawn officer.

*Robert Fulton.* Robert Fulton was the first on-site manager appointed by Newmont. He was appointed in June of 1956 pursuant to the 1956 Management Agreement, and his appointment was ratified at a meeting of the Dawn board in July 1956. The Board then defined, in detail, the scope of Mr. Fulton's responsibilities and authority, listing seven specific items. The authority delineated was broad. It included: (1) the authority to "have charge of, conserve and manage the operation of the Company's mining properties and to conduct its ordinary and usual business and affairs in the State of Washington;" (2) the authority to "appoint or employ, and to remove, suspend or discharge employees and agents of the Company and to fix their compensation;" and (3) the authority to "purchase machinery, equipment, tools, materials and supplies which are necessary in his opinion for the construction of plant facilities and for the satisfactory and effective operation of the Company's mining properties, provided that each capital expenditure in excess of $10,000 shall require the prior express approval of the President or Mr. M.D. Banghart or Mr. P. Malozemoff." Ex. 034, Ex. 1813. At the same meeting, the Dawn Board approved Mr. Banghart and Mr. Malozemoff of Newmont as Vice-Presidents of Dawn and elected them as Directors. Ex. 1813.

Although these powers were not *formally* conferred on subsequent Resident Managers, the same powers were vested in all of the Resident Managers subsequent to Mr. Fulton.

FINDINGS, CONCLUSIONS, AND ORDER - 40

Lattanzi ¶ 121.  Fulton was on the payroll of Newmont Mining Corporation.  Ex. 229.
Before he was Resident Manager at Dawn, Mr. Fulton had been an engineer at Newmont
since 1950.  Quivik ¶ 195; U.S. Ex. 001.  When he left Dawn as Resident Manager, Mr.
Fulton returned to Newmont's New York office and became vice president of exploration.
Quivik ¶¶ 195n, 214.

The powers and duties assigned to Mr. Fulton by the Dawn board are functions which
would typically be the responsibility of the operator of a mining project.  Lattanzi ¶ 26.

*Jack Crowhurst*.  Jack Crowhurst was Resident Manager from April 22, 1958 until
January 31, 1960.  Quivik ¶ 198; Ex. 917d at MDEPO001637.

*James Pike*. James Pike was Resident Manager from approximately February 1, 1960
until mid-July 1965. Quivik ¶ 195; U.S. Ex. 917d.

During the time he was Resident Manager, Mr. Pike was on the payroll of Newmont
Mining Corporation.  U.S. Exs. 292, 917d.  During the time he was Resident Manager, Mr.
Pike was neither an officer nor a Director of Dawn.  Ex. 917d.  Prior to his Dawn assignment,
Mr. Pike had been manager of a Canadian Newmont operation.  When he transferred to the
Dawn operation, he was transferred from the payroll of Newmont of Canada to the payroll of
Newmont Mining Corporation.  Quivik ¶ 199.  When he had finished preparing Dawn for
closure, he was transferred to Granduc and returned to the payroll of Newmont of Canada.
Quivik ¶ 199.

*Earl Craig*.  Earl Craig was the Resident Manager from the time the mine reopened in
1969 until November 1978.  Quivik ¶ 201-203; Ex. 295; *see also,* Ex. 917d.  Earl Craig
reported to a Dawn Vice-President or a Dawn general manager at all times during his tenure
as resident manager.  Ex. 1824. In mid-1978, Mr. Craig made the decision to install a pump
at one of the mine pits to send water from the pit to a sump near one of the waste dumps.
Quivik ¶ 367; Ex. 140.

Mr. Craig was originally a Dawn employee, and served as mill superintendent under Mr. Pike. When the mine shut down in 1978, Mr. Craig was transferred to the Carlin mill. Carlin was another Newmont property. Quivik ¶ 200. While at Carlin, Newmont put Mr. Craig on the Newmont Exploration payroll. Quivik ¶¶ 201, 297; Ex. 701. Mr. Craig was notified of his transfer to Dawn by a Newmont official who had no position at Dawn. Quivik ¶¶ 201, 296; Exs. 050, 524. While Resident Manager at Dawn, Mr. Craig remained an employee of Newmont Exploration from May 1969 until January 1971. Following that, Mr. Craig was transferred to the payroll of Newmont Services Limited ("NSL") from January 1, 1971 until November 30, 1978. Quivik ¶¶ 201, 240; Exs. 077, 295. On July 19, 1974, Mr. Craig signed an attendance sheet for a meeting of the Spokane Tribal Council with Dawn. Mr. Craig identified his affiliation as being "Newmont Services Ltd." Ex. 714. When he left Dawn as Resident Manager, Mr. Craig retired from Newmont Services. Quivik ¶ 204; Exs. 120, 295. During the time he was Resident Manager, Mr. Craig was neither an officer nor a Director of Dawn. Ex. 917d at MDEPO001608-MDEPO001613.

William Humphrey was an employee of Newmont Mining Corporation with the title of Vice President of Western Operations with responsibilities for the Carlin, Idarado, and Midnite mines. Humphrey 10:1- 11:14. He was also a Dawn Vice President/officer. In October 1978, Mr. Humphrey wrote a memorandum referring to Earl Craig as "a Newmont Services Limited employee," and noted that Craig would be retiring as Resident Manager of Dawn Mining Company. Ex. 935e at NEW0159295. Mr. Craig's application for Newmont's pension plan identifies Mr. Craig's employer as Newmont Exploration from May 1969 until January 1971. In January 1971, it shows that due to a transfer, Mr. Craig's employer became Newmont Services Limited. Ex. 935e at NEW0159390.

*Jack Thompson, Jr.* Jack Thompson, Jr., was Resident Manager from November 1978 until June 30, 1981. Prior to working at Dawn, Mr. Thompson worked for Magma Copper, a Newmont subsidiary, and then at Granduc Operating Company. Quivik ¶ 205-06. It was

FINDINGS, CONCLUSIONS, AND ORDER - 42

Mr. Humphrey's decision to take Mr. Thompson from Granduc and put him in charge of the Midnite Mine.  Lattanzi ¶ 162; Quivik ¶ 207; U.S. Exs. 052d (Thompson, Jr. Deposition, pp. 19-22), 052j (Thompson, Jr. Deposition, pp. 87-90), 051c (Humphrey Deposition, pp. 8-15); Humphrey 19:11-13.  Mr. Thompson's pension application shows that in September 1971, he was transferred from Magma Copper's payroll to Newmont Services Limited.  Ex. 941c at NEW0158562; *see also* Ex. 941c at NEW0158610.  During the time he was Resident Manager, Mr. Thompson reported to Mr. Humphrey.  When Mr. Humphrey resigned in 1981, Thompson reported to Dawn Director Wayne Burt.

 As Mr. Humphrey testified: Thompson had "complete authority for the operation.  He could make decisions about how to mine, where to mine.  Labor problems, if there needs to be some replacements or changes in the staff.  Everything involved with the operation was under his control."  Humphrey 13:8-20.

Mr. Humphrey also testified that environmental issues at the mine were "all taken care of" by Jack Thompson.  Humphrey 13:25 - 14:9.  Mr. Thompson had authority as to where to put waste rock and protore.  Humphrey 13:21-24.  Mr. Humphrey testified that Jack Thompson was in charge of:  mine operations at the Midnite mine; dealing with mine water discharges at the mine; dealing with protore issues at the Midnite mine; dealing with environmental compliance at the Midnite mine; and dealing with regulators at the Midnite mine.  Humphrey 12:7-13:7, 93:10 - 94:7; *see also,* Lattanzi ¶¶ 158-161, 166; Exs. 051b (Humphrey Deposition, p. 1), 052d (Thompson, Jr. Deposition, pp. 19-22), 177c (Lehrman Deposition, p. 143); Humphrey 43:4-16 (it was Jack Thompson's decision to install spray evaporation system at the mine), 93:12-94:12.

Sometime prior to June 1979, during the time he was Resident Manager, Mr. Thompson made the decision to install a pollution control dam at the mine, and made the decision to bring in truckloads of reagents to treat the material at the dam.  Lattanzi ¶ 159; Ex. 393e.  Mr. Thompson was responsible for obtaining Dawn's environmental permits.   Quivik ¶ 369.

In July, 1979, Mr. Thompson signed and submitted an application for a radioactive materials license to the State of Washington. Ex. 142. That application states that radioactive materials will be used at the Dawn mine and mill. Ex. 142 at NEW0025516, Items 1(B) and 2. That application also states that the Resident Manager "Reports to: Vice President - Operations, Newmont Mining Corp." Ex. 142 at NEW0025521; *see also,* Lattanzi ¶ 160; Quivik ¶ 369; Ex. 142. In May, 1981, Mr. Thompson also became an officer and a director of Dawn.

*Marcel DeGuire.* Marcel DeGuire became Resident Manager of Dawn in August 1981. DeGuire 20:11-20. Mr. DeGuire had worked for Newmont Exploration at its lab in Danbury for several years, then had gone to work for Exxon. From Exxon, Dawn hired him to be mill superintendent. Quivik ¶ 210; DeGuire 9:1-10:25. Although Mr. DeGuire was on the Dawn payroll as mill superintendent, as soon as he was made Resident Manager, he was transferred to the payroll of Newmont Services. Lattanzi ¶ 169; Exs. 052c (Thompson, Jr. Deposition, pp. 9-13), 055c-d (DeGuire Deposition, pp. 16-18, 20), 183, 189, 190, 214, 292; DeGuire 14:18-15:4, 16:21-17:1.

Mr. DeGuire testified he was the only Newmont Services employee on site during the time he was Resident Manager. DeGuire 20:1-4, 136:17 - 137:3. While he was Resident Manager at Dawn, Newmont Services provided Mr. DeGuire's benefits, including medical benefits. Additionally, Newmont Services provided Mr. DeGuire with a pension. DeGuire 20:25 - 21:11.

Mr. DeGuire's next assignment after being Resident Manager at Dawn was as a Research Metallurgist at Newmont Exploration, followed by other Newmont assignments until 1996. DeGuire 9:15 - 11:5. Mr. DeGuire left the Dawn property in February 1983 to move to Newmont Exploration in Danbury. DeGuire 26:6-17.

Mr. DeGuire made decisions related to environmental concerns and pollution control issues at the mine. Lattanzi ¶¶ 163-164; U.S. Exs. 055c (DeGuire Deposition pp. 16-18),

055e-h (DeGuire Deposition pp. 34, 38, 40, 42), 055m-n (DeGuire Deposition pp. 159, 168). DeGuire 184:13-22, 187:24-188:8.  For example, in April 1982, Mr. DeGuire retained a company to test whether contaminated water at Pit 4 could be treated by reverse osmosis, but determined not to use that approach.  DeGuire 65:3 - 66:25.  Additionally, in March 1983, Mr. DeGuire decided to take certain steps to "prevent any abnormal discharge of contaminated water" at the mine site, including seeking approval from the federal government to pump water to Pit 3 at the mine.  Ex. 814; DeGuire 61:21 - 64:18, 163:15-164:12.  Mr. Deguire also approved the reclamation plans that were submitted to regulatory agencies.  DeGuire 40:3-19, 84:18 - 85:16.  He took the lead in dealing with federal regulatory agencies.  DeGuire 87:5 - 17.

In September 1981, Mr. DeGuire was ordered by the USGS to cease mining operations. Wayne Burt told Mr. DeGuire to ignore the order.  DeGuire 54:15-57:7.  During the time he was Resident Manager, Mr. DeGuire had authority over hiring and firing at the mine. DeGuire 59:19-24.  In February, 1984, Mr. DeGuire also became an officer of Dawn. DeGuire 22:12-23.  Sometime between 1987 and 1989, Mr. DeGuire became a director of Dawn.  DeGuire 31:21 - 32:2.

*The Mine Superintendent.*  The mine superintendent was responsible for mine planning and the actual mining operations, and reported to the Resident/General Manager of the Mine. Ex. 1446 at NEW0013855 ("Dawn maintains its own staff…at the mine site" and that this staff "is responsible for all exploration, pit design, surveying, production statistics, and ore control."); Ex. 1263 at NEW0046686-87 ("mining is according to plans provided by Dawn's Mine Supt., who maintains continuous check on mining and exploration activities.").

Mine superintendents at the Midnite Mine were: Peter Loncar (summer 1956 – 1959); Keith Payne (1959 – 1964); Walter Johnson (1969 – 1972); and Don Shultz (1972 – 1982). Mr. Loncar testified that it was his responsibility as mine superintendent to supervise Isbell, classify materials for Isbell as ore, protore or waste, and to ensure production at the mine was

FINDINGS, CONCLUSIONS, AND ORDER - 45

meeting the AEC contracts.   Mr. Loncar was paid by NEL while serving as mine superintendent and Dawn paid NEL for Mr. Loncar's services.   All of the mine superintendents after Mr. Loncar, were paid directly by Dawn and were employees of Dawn.

*The Dawn Board and Officers.*   Dawn's Board of Directors consisted of seven members, with four members nominated by Newmont and three by MMI.  The Dawn Board did not involve itself in managing the day-to-day operations of the Mine.

Dawn's Board elected the company's officers.  With the exception of Mr. Hinsdale and Mr. Hundhausen, every officer of Dawn during the operation of the Mine was on the payroll of Newmont Mining Corporation or a wholly owned subsidiary, and served Dawn without additional compensation.  Quivik ¶ 39(B); Ex. 917d.  The Dawn Board was not involved in management of the facility.  R. Thompson ¶ 20; *see also,* R. Thompson ¶¶ 21-24 (when Newmont personnel participated in decisions for Dawn, the participation was seldom as part of a collective decision as one would expect to find with board action); Exs. 112, 113, 114; Humphrey 22:11-22, 29:20-25.

*Newmont's Vice President of Operations and the Off-Site General Manager.* Dawn's resident managers reported to individuals who were Newmont employees and held Newmont titles, but who also were at some point named as officers or directors of Dawn Mining Company.  From 1955-1968, the resident managers reported to Marcus Banghart, Newmont's vice president for operations "with responsibility for all the mining properties for which Newmont is the manager." Quivik ¶ 155; Ex. 001.  However, before becoming an officer or director of Dawn, Mr. Banghart was involved in overseeing the Mine.  In December 1955, Mr. Banghart of Newmont wrote to Mr. Hinsdale, president of Dawn, to inform Mr. Hinsdale that Mr. Hundhausen was not going to be the Resident Manager of the mine property.  Ex. 026.

David Pearce succeeded Mr. Banghart as Newmont's vice president of operations in 1968 and was also named a director of Dawn in 1969.  Pearce had Newmont responsibilities

for three of its mines (Dawn, Carlin, and Idarado): "All three mines fall under my general direction as vice president - Mining, Newmont Mining Corp."  Ex. 085.

In 1969, Newmont created a new layer of management to oversee operations at Dawn, Carlin and Idarado.  This position was the off-site General Manager, based in Ouray, Colorado.  Lattanzi ¶ 193; Quivik ¶¶ 223-236.  The off-site General Managers were also Newmont employees and were also not on Dawn's payroll.  Lattanzi ¶ 196; Ex. 057.  The off-site General Managers reported to Newmont officers in New York.  Lattanzi ¶ 200; Ex. 206.

There were two off-site General Managers named between 1969 and 1976: Arthur C. "Bob" Hilander and John Petty.  Mr. Hilander began supervising operations of Dawn in November 1968, before he was officially appointed as General Manager of Dawn in April 1969 (Ex. 72).  Mr. Hilander received bids for Dawn's ore-hauling contract and he hired Walter Johnson to superintend work at the Midnite Mine. Quivik ¶¶ 282-292; U.S. Exs. 064, 068, 825a.  Similarly, Mr. Petty was not named an officer or director of Dawn until 1975, although he had begun overseeing Dawn operations in 1971.  U.S. Ex. 917d.

From 1975-1981, the resident manager reported to William Humphrey, Newmont's Vice President of Western Operations and also to Wayne Burt, Newmont's senior vice president of operations.  Both of these individuals also held executive positions with Dawn.

*Newmont's Technical Assistance.*  The 1956 Management Agreement anticipated and permitted Newmont to send specialists to Dawn to provide direction and technical assistance. Quivik ¶ 145.  NEL, for example, conducted a variety of activities at or in connection with the site throughout the operating life of the mine including development and exploration activities in the 1966 - 68 time frame.  Lattanzi ¶¶ 206, 209; Exs. 270, 275, 276, 280, 283, 466b, 961m.

*NSL.*  In December 1970, Newmont created another wholly owned subsidiary, Newmont Services Limited ("NSL").  Lattanzi ¶ 233; Exs. 052j (Thompson, Jr. Deposition, pp. 87-90), 917d.  Newmont stated that one function of NSL was "to make available a broad

FINDINGS, CONCLUSIONS, AND ORDER – 47

assemblage of key operating personnel that can be assigned and reassigned as the need arises for different talents at each subsidiary."  Quivik ¶ 237; Ex. 75.

NSL streamlined Newmont's ability to move managers to its subsidiaries by enabling technically skilled individuals to remain on the same payroll and have access to continuous benefit packages, including health care and pension plans, over time.  Koogler Depo. at 47; 146 – 147; Ex. 1624 (Affidavit of John H. Johnson, Jr.); Quivik ¶ 238, 250-58; *see also*, Lattanzi ¶ 234; Thompson Sr. 42:4-13 (one purpose of Newmont Services was to keep and have available individuals to potentially work at other Newmont subsidiaries);Ridinger 144:16-145:23 (Newmont Services allowed the Newmont organization to have a pool of capable people who could be sent wherever they were needed.  Newmont created NSL to foster job security and a long term future within the Newmont organization. *See,* Lattanzi ¶¶ 235-240. NSL personnel were assigned only to Newmont properties. Ridinger 148:3-149:13.

Dawn entered into an agreement dated January 1, 1971, under which Newmont Services was to provide Dawn with the services of certain of its personnel. Ex. 076.  Under the agreement, NSL was to provide the services of Messrs. Craig, Lee and Mr. Hilander.  In return, Dawn was to pay NSL the allocable share of payroll benefits, taxes and insurance. Lattanzi ¶ 241.  In addition, Dawn was to pay to NSL a fee equal to 6 ½ percent of the reimbursable salaries.  Lattanzi ¶ 241; Ex. 076. The signature for Dawn on the agreement is that of David Koogler, who was also vice president of NSL, and assistant to the vice president of Newmont.  Lattanzi ¶ 241; Quivik ¶ 240; Ex. 076, 077. The same day, NSL also signed identical agreements with Newmont subsidiaries Carlin and Idarado.

From January through September 30, 1971, NSL charged Dawn pursuant to the terms of the 1971 NSL Agreement.  Lattanzi ¶ 245; Ex. 216. However, it was not until April 27, 1972, over a year after it was signed, that the 1971 NSL Agreement was brought before the Dawn Board.  Lattanzi ¶ 242; Ex. 083.  Mr. Wynecoop, MMI's nominee to the Board, protested that the services provided pursuant to the 1971 agreement were also provided

pursuant to the 1956 Management Agreement.  Lattanzi ¶¶ 242-243; Ex. 083. On May 12, 1972, Mr. Pearce wrote that Newmont Mining Corporation would absorb the 6 ½ percent fee. The 1971 agreement was then approved by Mr. Wynecoop.  Lattanzi ¶ 244; Ex. 084.

Two individuals provided by NSL to Dawn were David Ridinger and Dale Buob.

*David Ridinger.*  Ridinger was Newmont's employee used to coordinate environmental activities for Newmont subsidiaries as a cost-efficiency measure and to ensure that subsidiaries would have a consistent approach to regulatory matters.  Ex. 146g (Ridinger Deposition pp. 76-77); Ridinger 76:19 - 79:1, 87:8-23.  Ridinger advised Newmont subsidiaries, visited them, and helped them identify environmental issues and alerted them when various regulatory matters came up that would have an effect on their operations or their compliance.  Ridinger 76:19-23, 108:13-109:7.

Mr. Ridinger was on the payroll of Newmont Services from 1972 to 1980, first while he was working at a Newmont subsidiary called Magma Copper and then when he officially worked at Newmont Services, starting in 1978, as the Director of Environmental Affairs. Ridinger 24:5-6, 31:24-32:4, 35:15-16, 36:10-13, 43:11-13.  Mr. Ridinger never held a title or position at Dawn.  Ridinger 48:16-22.

While assisting Dawn, Mr. Ridinger provided recommendations to resident manager Thompson regarding environmental issues at the Midnite Mine.  Lattanzi ¶¶ 250-253; Exs. 146g-h (Ridinger Deposition, pp. 76-77, 109), 146j (Ridinger Deposition, p. 145), 222, 268, 269. Mr. Ridinger reviewed Jack Thompson, Jr.'s, environmental compliance work.  Quivik ¶ 388; U.S. Ex. 146n (Ridinger Deposition, p. 130).  Dawn prepared a spill plan using the model provided to them by Mr. Ridinger.  Ex. 252 at MDAWNF039426-430.

It was Mr. Ridinger who in 1980 prepared and submitted to EPA for Dawn a document called Notification of Hazardous Waste Activity for activities at the Midnite Mine, and he served as the contact with EPA on this particular matter.  In that document, he listed Newmont as the owner of the site.  Ridinger 126:6 - 127:13; Ex. 251.  Ridinger sent a copy of the

FINDINGS, CONCLUSIONS, AND ORDER - 49

notification to the resident manager of Dawn, Jack Thompson, on August 29, 1980, indicating that Newmont would attempt to prevent EPA from listing sub-ore as a hazardous waste but advising Thompson to start testing overburden and sub-ore to determine radium-226 activity. Ex. 268.

Mr. Ridinger and Mr. Humphrey made the decision on whether or not to take a position that materials at the mine were in fact subject to hazardous waste regulations (and therefore whether the site needed a RCRA permit). Ridinger 129:24 - 130:25; 136:14-137:21. In December 1980, Ridinger wrote EPA informing them that Dawn did not need a RCRA permit and would not file a RCRA permit application. Ex. 269.

The resident managers were tasked with handling environmental decisionmaking for Dawn. Ridinger Dep. 63:15 - 64:5; 66:12 - 19. While Ridinger did not have decision making authority at Dawn, when Ridinger gave recommendations to Dawn, there was a strong expectation that it would be followed. Ridinger 182:12-183:2; Thompson, Jr. Testimony, ¶31; McAnany Testimony at ¶21; Humphrey Depo. at 33. Dawn did not have its own environmental affairs department. Mr. Ridinger did not deal with the Dawn Board on environmental issues at the mine; he dealt directly with the resident managers, and the resolution of these environmental issues did not require review by the Dawn Board. Ridinger Dep. 110:12 - 111:14; 111:20 - 112:14. Dawn first hired an environmental engineer, Dale Deming, in April 1978. Ex. 297.

*Dale Buob*. Toward the end of the operating life of the mine, Newmont assigned Dale Buob, a Newmont Services Limited engineer based in Tucson, to evaluate the mine water problem at the Midnite Mine. Lattanzi ¶¶ 254-256; U.S. Exs. 081, 152, 224, 253, 961l.

In July 1981, Jack Thompson, Resident Manager at Dawn, along with Roger Ferland, Newmont engineering and legal counsel, recommended that Dawn use a spray evaporation system to remedy the contaminated mine water problem. U.S. Ex. 152.

FINDINGS, CONCLUSIONS, AND ORDER – 50

In August of 1981, Wayne Burt, Newmont Mining's Senior Vice-President of Operations, suggested to Marcel DeGuire, the new resident manager at Dawn that Dawn undertake a review of alternative solutions with the objective of confirming the selection of spray evaporation as the preferred course of action. Burt told DeGuire to seek the assistance of Ferland in coordinating the technical and legal aspects of the project to insure the attainment of the objectives set out in Ferland's July 24 memorandum. Ex. 152.

Given the task of evaluating the various alternatives for dewatering the mine, Mr. Buob commissioned and supervised the engineering study by an outside consultant on the feasibility of the spray evaporation system for the mine water. Ex. 224; Lattanzi 254-256. Mr. Buob also participated in a meeting with various government and tribal entities regarding Dawn's mine water problem in October 1981. Ex. 253. Subsequently, Mr. Buob reported on his evaluation efforts of the Dawn mine water problem to P.J. Crescenzo of Newmont Services, advising of the recommended remedial measures. Ex. 225. Mr. Crescenzo was Newmont's vice president for engineering and held no Dawn title. Quivik ¶ 222.

*Affirmations Made that Newmont was Managing the Operations of the Midnite Mine.* Newmont and Dawn made representations that Newmont was operating Dawn's mining operations at the Midnite Mine. Quivik ¶ 40(a); Lattanzi ¶¶ 129-139; Exs. 099, 103, 200, 202, 299, 300, 301, 581, 728, 961d. There are many examples of this in the record.

In April 1956, Plato Malozemoff, President of Newmont Mining Corporation, wrote to the Securities and Exchange Commission to discuss the possibility of building a uranium mill for the Dawn mining operation. In that letter, Malozemoff explained that the "actual management and operation of the Dawn properties, and also the arrangement of financing for Dawn Mining Company, will be handled by Newmont Corporation." Lattanzi ¶ 130; Ex. 180.

On October 22, 1956, John Grunow of Newmont contacted the Atomic Energy Commission regarding Dawn's contract with the AEC and forwarded copies of certain

FINDINGS, CONCLUSIONS, AND ORDER - 51

documents. Among the items submitted was the July 1956 Management Agreement, which Grunow described as, "providing for the management of the finances and operations of this company by Newmont." Lattanzi ¶ 130; Exs. 180, 581.

In October 1956, the minority shareholder's nominee to the Executive Committee complained that he was not being informed of Executive Committee decisions prior to being asked to ratify them. However, he was told by a Newmont employee (who was also a Dawn officer) that at a Newmont property, the onsite manager is delegated a great deal of authority. He was further told that this was how it would be handled at Dawn. Exs. 112, 113, 114. Mr. Grunow wrote:

> It has been a long standing policy in the Newmont group of operating companies that the Manager of the operations is delegated a good deal of authority in deciding the details of operation. This will be a standing principle with Dawn as well. We never contemplated that either the Executive Committee or the Board would pass on details of the specifications of construction. ... Consequently, the ratifying actions by the Executive Committee will be done post factum. This is the way we intended it originally, and this is the way all Newmont operating subsidiaries are handled. Our control of the Managers is, of course, their performance. ..."

Ex. 114.

In 1956, Newmont negotiated a loan for Dawn with Chemical Corn Bank. The Bank informed John Grunow of Newmont that "[i]f the loan is to be granted, favorable consideration will necessarily depend upon Newmont's sponsorship and reputation for successful operation." Quivik ¶ 122; Ex. 037. In response, Dawn warranted certain facts to the Bank, including the fact that Dawn and Newmont had entered into the 1956 Management Agreement with Newmont "duly authorized, executed and delivered by each of the parties thereto and valid and enforceable in accordance with its terms, providing for the management of the finances and operations of [Dawn] by Newmont. Quivik ¶ 123; Ex. 039. The loan agreement gave the bank the right to terminate the contract and call in the loan if either the AEC contract or the Management Agreement were canceled. Quivik ¶ 124.

FINDINGS, CONCLUSIONS, AND ORDER - 52

In advance of a April 12, 1962 Stockholder's meeting, Newmont issued a proxy statement which referenced Dawn as one of the "operating companies" which are managed by Newmont.  Lattanzi ¶ 134; Ex. 200. On November 9, 1967, Robert Fulton wrote to Commonwealth Edison Company and stated, "Newmont Mining Corporation owns a 51% stock interest in Dawn and is manager of its operations." Ex. 919e.

In April 1968, Jacques LeRoy, Secretary of Newmont, wrote to Jersey Central Power & Light Company and Metropolitan Edison Company, representing himself as Dawn's counsel and secretary, regarding the authority of Dawn to enter into a Sales Agreement with these two companies.  LeRoy stated that he reviewed the 1956 Management Agreement and opined that, "pursuant to the aforesaid Management Agreement of July 1, 1956, Newmont has been appointed and is acting as Manager for Dawn for a term commencing on July 1, 1956 and continuing thereafter indefinitely until cancelled by either party... ." Lattanzi ¶ 135; Quivik ¶ 422; Exs. 272, 962d.

Dawn's Financial statements from 1969-1971 include a note about a bank loan from Seattle-First National Bank that reads "in connection with this loan, which is not guaranteed by Newmont Mining Corporation, Newmont has agreed to maintain its ownership of not less than 51% of the Company's common stock and continue to provide effective day-to-day control and supervision of Dawn's management." Lattanzi ¶ 133; Exs. 299, 300.  Newmont made these representations in order for Dawn to be able to secure the loan from Seattle-First National Bank.  In a December 1970 letter from Roy Bonebreak (who identifies himself as Executive Vice President of Newmont) to Seattle-First, Newmont represented as a condition of the loan that:

> Newmont will continue to own and maintain ownership of not less than 51% of the capital stock of Dawn, and will continue to provide effective day-to-day control and supervision of the management of Dawn to the end that Dawn will abide by and perform its obligations under such proposed Loan Agreement.

Ex. 301; *see also,* Lattanzi ¶ 132.

FINDINGS, CONCLUSIONS, AND ORDER - 53

Newmont's President and Chairman, Plato Malozemoff, gave a series of speeches in 1969 describing how Newmont managed the operations of some of Newmont's subsidiaries. Mr. Malozemoff first described how Newmont had changed over time from a holding company to one that "actually . . . manage[s] properties." Ex. 46 at 2; *see also,* Ex 001 at 5; Quivik ¶¶ 132-134; Ex. 958c at MEPRXC009169 (1929 Annual Report noting that mining exploration was actively conducted in South Africa); 958d at MEPRXC009179 (Annual Report for 1934 noting that Newmont has continued efforts for the "acquisition, development, financing <u>and operation</u> of mines," and noting that "members of your staff are actively participating in the development and operations" of several mines) (emphasis added); 958e at MEPRXC009188-91 (Annual Report for 1938, noting, among other things, Newmont's staff directing operations at Empire Star Mines). Newmont's holdings in 1969 fell into two groups: interests held without management responsibilities, and "operations that we manage." For managed operations, Mr. Malozemoff was very clear that Newmont's management including the operations of the companies. *Id*. at 3 ("In addition to managing the operations of 18 companies . . ."); *id*. at 4 ("In addition to the companies whose operations we manage . . ."). Newmont's primary method for managing operations was to appoint "highly capable men" as the resident management and give them "a high degree of autonomy." *Id*. at 3. Dawn was one of Newmont's "managed" operations. Ex. 377g (1969 Annual Report to Shareholders).

In an August 19, 1974 letter to Cleveland Electric Illuminating company, Newmont's manager of marketing stated that, "Newmont operates one uranium mine – the Dawn Mining Company, whose total production is sold under long term contracts." Lattanzi ¶ 136; Exs. 103, 202. Newmont's manager of marketing wrote to Public Service Electric and Gas Company that "Dawn Mining Company is managed by Newmont, as indicated on the enclosed annual report." Quivik ¶ 406; Ex. 103. On November 6, 1974, Byron Hardie of Newmont

Exploration wrote to the USGS and noted that, "Newmont acts as manager of the mine at Dawn Mining Company and holds a 51% equity in the operation." Ex. 462c.

In 1976 Newmont and Midnite submitted a joint proposal to the Dawn Board. That document begins by recognizing "Newmont Mining Corporation (Newmont), as Manager of the operations and corporate affairs of Dawn Mining Company . . . ." Lattanzi ¶ 137; Quivik ¶ 408; Ex. 104. In December 1980, on Newmont letterhead, William Humphrey wrote to a coal company that "[w]e manage two relatively small mining operations in the Western part of the United States" and then named Dawn and Carlin. Quivik ¶ 407; Ex. 109.

Midnite Mines also understood and acknowledged that Newmont was managing the mining operations. For example, in March 1958, Midnite Mines Board of Directors requested their attorney to write to Newmont to thank the company for "the splendid businesslike manner in which the mine is being developed and mined and the mill was being constructed and operated." Quivik ¶ 321; Ex. 963c.

Newmont also provided guarantees that Dawn would deliver uranium concentrates under its sales agreements. For example, Newmont guaranteed performance of an agreement with Omaha Public Power District. Quivik ¶¶ 325-327, Exs. 116, 117, 118, 291; *See also*, Exs. 288 (guarantee pursuant to agreement for loan of uranium hexafluoride between Dawn and Carolina Power & Light, dated 8/26/80), 289 (guarantee pursuant to Uranium Sales Agreement between Dawn and Combustion Engineering, dated 5/20/75), 290 (guarantee of performance dated 2/4/75).

*Newmont's Conduct as Corporate Parent*. Newmont officials with no Dawn titles also made management decisions for Dawn. Quivik *¶¶ 331-341*. In addition, to the actions taken by Newmont employees from NSL and individuals before they eventually obtained Dawn titles, the following decisions were made by people who *never* held Dawn titles.

FINDINGS, CONCLUSIONS, AND ORDER - 55

When the mine was preparing to reopen in the late 1960s, Newmont managed the rehabilitation of the mill. This project was overseen by Eugene Tucker, a Newmont engineer based in New York, who held no Dawn title. Quivik ¶¶ 268-274.

Harry Volkman was the Newmont officer in charge of purchasing for all Newmont subsidiaries. In 1968, Volkman hired Elof Enbon to serve as Dawn's purchasing agent, and he placed Enbon on Dawn's payroll. Volkman never held a Dawn title. Quivik ¶¶ 279-281; Exs. 021, 096, 124.

On September 19, 1980, Mr. P.E. Lapat of Newmont signed an agreement with Impact Environmental Consultants Limited. That agreement related to a uranium mill compliance analysis. Mr. Lapat signed on behalf of "Newmont Mining Corporation - Dawn Mining Co.," despite the fact that he held no Dawn title. Ex. 467f.

Newmont's participation in Dawn's management went beyond the participation of normal parental oversight and evidenced actual involvement in the operations of the facility. R. Thompson ¶ 11.

Through the closure of the Midnite Mine in 1981, there is not a single mining operation conducted under the name of Newmont Mining Corporation. Quivik ¶ 159.

Between 1958 and 1965, Dawn provided an average of $1 million per year in dividends to Newmont. Lattanzi ¶ 55; Ex. 001 at 26.

Newmont USA Limited has assumed the liabilities of Newmont Mining Corporation, its predecessor company that existed from 1921 until 2000. Ex. 285 at 30.

Newmont USA Limited has assumed the liabilities of Newmont Exploration Limited. Ex. 285 at 29.

**H.    THE MIDNITE MINE AFTER THE CESSATION OF ACTIVE MINING OPERATIONS**

*The Environment and Inherent Impact of Mining.* The processes used to conduct open pit mining (such as drilling, stripping overburden, trenching, excavating, forming adits, stockpiling and storing excavated material) are intrusive in nature and result in the release

of hazardous substances.   Open pits produce waste, and waste dumps are a matter of environmental concern because of the materials they contain. Lattanzi ¶¶ 48-49.  Dealing with environmental issues is an inherent aspect of any mining operation.

At the Midnite Mine, far more waste than ore was produced.  Lattanzi ¶ 50.  Hazardous substances, including cadmium, chromium, copper, nickel, zinc, lead, lead 210, radium 226, uranium 234, uranium 238, polonium 210 and radon, have been released at the Midnite Mine as a result of mining activities carried out from 1955 through 1981.  Dahl ¶ 13; Ex. 284.

Additionally, Midnite was operated on a seasonal basis with no mining over the winter. When operations resumed in the spring, a considerable amount of water accumulated in the bottom of the open pit.  This water had to be pumped out of the pit before mining operations could resume.  Lattanzi ¶ 24; Exs. 001, 033, 035, 075, 377d-g, 378a, 936d.

Mine operations during the second period of operation caused water quality and water management problems that linger to this day.  "Mining in Pit #3 encountered significant amounts of groundwater which interfered with mining activities[,] and dewatering of the pit became necessary.  These dewatering activities created a seepage area at the toe of the waste rock pile downgradient of the pit area."  Ex. 837 at 6; *see*, *e.g.*, Ex. 959b, ROD at 2-11, 2-65 - 2-66.


The primary environmental problem at the Mine is acid rock drainage, or ARD.  *See*, *e.g.*, Ex. 959b, ROD at 2-11 ("In summary, the primary sources of contamination are exposed uranium-bearing rock, with the primary release mechanisms being ARD and radioactive decay.  Contaminant migration pathways include surface water flow, groundwater flow, wind erosion and deposition, and sediment transport."), 2-29 ("[s]urface water quality at the Site reflects the impacts of ARD, with elevated sulfate, radionuclides, and metals concentrations"), 2-64 (in summarizing the need for remedial action: "The uranium mining

FINDINGS, CONCLUSIONS, AND ORDER – 57

operations at Midnite Mine have resulted in widespread distribution of contaminated surface materials in and near the Mine area . . ..").

Acid rock drainage is directly related to the production of ore, protore and waste rock at the Mine because the mining activities that generate ore, protore and waste rock greatly accelerate the natural weathering of the rock. ROD at 2-11; *see also* ROD at 2-28 (describing problematic surface materials as including ore, protore and waste rock). The mined, exposed rock surfaces oxidize and, in the presence of certain sulfide minerals, acid rock drainage causes water that contacts the exposed rock surfaces to become acidic. ROD at 2-11. Then, "[t]he acidified water dissolves minerals (including metals and radionuclides) in the rock, mobilizing the minerals into groundwater and surface water." *Id.*

*The Midnite Mine from 1981-2000.* After Dawn's mining operations ceased in 1981, various agencies were involved in requiring, monitoring, approving, disapproving, and evaluating action at the Mine, especially actions to deal with water and drainage at the site throughout the 1980s.

The BIA, the BLM, and the Tribe worked to get Dawn to either: (1) resume mining with an approved mining plan; or (2) begin the process of reclaiming the mine site as required by the terms of the leases and regulations. Smith ¶ 60. Despite these efforts, Dawn failed to resume mining or reclaim the site to the degree necessary. Smith ¶ 60. As a result, Dawn's mining lease rights were terminated in 1990. Smith ¶ 60.

The BLM and BIA have certain responsibilities at Indian trust land leased for mineral development. Under the regulations promulgated by the Secretary of the Interior pursuant to 25 U.S.C. § 396d, a BLM official acts as the "authorized officer" and is tasked with certain actions after BIA has approved a mineral lease of trust land. Courtright ¶ 11. The responsibilities of the BLM are set forth in both BIA and BLM regulations, and include using BLM's expertise to review and approve mine and reclamation plans, and monitoring

compliance with approved mine and reclamation plans.  25 C.F.R. §§ 211.4 and 212.4; 43 C.F.R. §§ 3590.0-7 and 3590.2; Courtright ¶ 12.

Between 1983 and 1993, BLM issued <u>eleven</u> mine orders to Dawn regarding Dawn's activities at the Mine and the conditions present there.  Courtright ¶ 24.  Mine orders are issued by BLM when a "failure to comply with the established requirements threatens immediate, serious or irreparable damage to the environment, the mine or the deposit being mined, or other valuable mineral deposits or other resources."  43 C.F.R. § 3598.4©; Courtright ¶ 24.

The repeated issuance of such mine orders is unique.  Courtright ¶ 25.  For the other approximately 30 mines in the State of Washington, BLM has issued a combined total of approximately three mine orders from 1984 to the present.  *Id.* BLM did not issue any mine orders to the lessee at the Sherwood Uranium Mine, which was another open pit uranium mine located approximately five miles from the Midnite Mine on the Spokane Indian Reservation. *Id.* ¶ 26.

The following facts recount some of the reactions, of both Dawn, the United States agencies, and the Tribe, regarding the Mine after the suspension of operations.

During the 1981 calendar year, the year the mine ceased operating, Dawn undertook several reclamation activities at the Mine, including:  planting 9,136 Ponderosa Pine seedlings over 25.5 acres at the Mine, fencing the southern portion of the Mine, placing topsoil onto the Pit 3 waste dump, placing topsoil on the Pit 3 East dump, grading topsoil that had been placed onto dump slopes, and hydroseeding 24.4 acres, including the Pit 2 waste dump, the Pit 3 East dump, and an area near Pit 3. Ex. 2176.

The United States Minerals Management Service ("MMS") was also involved in evaluating environmental conditions at the Mine.  In May of 1982, after reviewing water monitoring data collected by Dawn and the USGS, the MMS wrote to Dawn proposing that it install a new network of monitoring wells and institute a new regime of water quality

sampling.  Ex. 1522.  In October of 1982, the MMS' Stephen Tyley recommended to the MMS' District Mining Supervisor that the MMS direct Dawn to intercept certain surface water runoff and utilize the pollution control pond to store those waters.  Ex. 1529.  Tyley also recommended that DOI conduct a new study to resolve the effluent problems at the site.  *Id.*

In February of 1983, the BLM informed Dawn that its proposed reclamation plan submitted in January 1980 was inadequate and would have to be revised to provide more information regarding rehabilitation of the pits, overall site contouring and drainage, the ultimate disposition of protore at the site, water treatment, revegetation, radiation control, air quality and post-reclamation monitoring.  Ex. 1537.

In February 1983, the BIA and BLM created two "work groups" to deal with environmental issues at the site.  Ex. 1554.  The "management group" and the "study management group" included individuals from the BIA, the BLM and the Regional Solicitor's Office.  *Id.*  The study group coordinated with the Water Resources Division of the USGS to determine short-term actions to "immediately manage mine drainage."  *Id.*  By the spring of 1983, the study management group had commenced a water sampling program at the site; begun monitoring of the water level in pits 3 and 4; had taken actions to control standing water in the pollution control pond; and was engaged in inspecting the Mine area for other problems including uncontrolled erosion and landslides.  *Id.*

The weather in the spring of 1983 created higher runoff volumes and influx into the pollution control pond such that it created a situation reaching "critical proportion" where the control pond was filled to capacity.  Exs. 1552, 1547.

BIA Order 3/17/1983:  On March 17, 1983, the BIA, invoking "paragraph 16 of Lease No. 14-20-0503-823," in a letter to Dawn's Resident Manager, Marcel DeGuire, stated that because certain surface runoff at the site contained unacceptable concentrations of contaminants sufficient to constitute a human and livestock health hazard, it had begun

FINDINGS, CONCLUSIONS, AND ORDER - 60

erecting fences around the property to keep livestock out. Ex. 1546. The agency also ordered Dawn to take "whatever steps are necessary to prevent further degradation of water resources in the mining area." Ex. 1546. On March 28, 1983, Dawn responded to the order advising the BLM of its plan to pump water out of the pollution control pond into Pit 3. Exs, 1547, 2200, 2203; Nelson ¶ 27

BLM Order 4/12/1983: Also in the spring of 1983, invoking "the authority of 30 C.F.R. Part 231.4" (the regulations governing the leasing of hard rock minerals on public lands), the BLM directed Dawn to take immediate action to lower the level of water in the pollution control pond and neutralize the water's pH. Exs. 1544; 1550 (also 5234). Dawn complied with these mandates. Exs. 1547; 1553.

By May, 1983, both Pits 3 and 4 had become filled with water. Ex. 1558.

On May 10, 1983, immediately after the United States Court of Appeals affirmed the lower court's decision upholding the USGS' September 30, 1981 suspension order, BLM wrote to Dawn and explained that the administrative responsibilities that the USGS had exercised at the time of the order had been transferred to BLM, and reiterated that it expected compliance with the suspension order. Ex. 5104; Courtright ¶ 35.

Dawn responded on May 19, 1983 informing the BLM that the submission of a revised mine plan in accordance with the USGS September 1981 order would be complicated by the presence of water in both pits 3 and 4 and the currently depressed market for uranium. Ex. 1558. Dawn's Resident Manager, Marcel DeGuire, expressed his opinion that Dawn, the agencies and the Tribe should meet to discuss the future of the site before a useful mining plan could be formulated. *Id.*

In August 1983, Dawn was requested to consider several "short-term emergency mine water management actions to prevent potential uncontrolled over topping from Pit 4 and the pollution control pond." Ex. 5234. On August 30, 1983, the BLM and BIA met and discussed the critical water levels, the lack of an approved reclamation plan, mine plan, or adequate bond

at the Mine. Ex. 1563.  At this meeting, the agencies decided that Dawn should pump water from Pit 4 and the pollution control pond in order to establish a freeboard for fall and winter precipitation and that Dawn should also improve surface drainage control ditching.  *Id.*

In September 1983, Dawn began siphoning water from Pit 4 to Pit 3. Nelson ¶ 31; Exs. 2211, 2215.

BLM Order: 10/12/1983: On October 12, BLM issued a detailed directive ordering Dawn to take the actions previously ordered and other actions at the site to address concerns regarding water in the pollution control pond, water in Pit 4, surface drainage and seepage control, and slope maintenance. Ex. 1566.  BLM's order sought to compel Dawn to take the interim measures of: (1) capturing seeps of water from the Mine site so that the water could be pumped up to a pollution control pond; and (2) installing and operate a pumping system to transfer water from the pollution control pond to Pit 3.  Ex. 5234; Courtright  ¶ 49. The BLM also informed Dawn that its long-term water management system submitted a part of the 1981 plan was not acceptable.

In December 1983, Dawn commenced construction of surface drainages at the Mine. Nelson ¶ 31; Ex. 2219.

Approximately four years after BLM issued the October 12, 1983 order, Dawn submitted a plan to address the serious water contamination problem that was adequate for BLM's partial approval.  Courtright ¶ 51.  On May 22, 1987, BLM partially approved Dawn's plan to collect contaminated water at various locations at the Mine site – where water seeps were appearing and from the pollution control pond – and pump that contaminated water into Pit 3 for temporary storage. Ex. 5108; Courtright ¶ 51.  The long range plan called for Dawn to construct a water treatment facility but BLM's order did not grant authority to operate the facility because Dawn had not yet obtained the permits it needed to do so.  Ex. 5108; Courtright ¶ 51.

BLM Order 9/5/1984:  On September 5, 1984, the BLM ordered Dawn, again pursuant to the leases, to implement corrective action to improve water quality, minimize run-off, correct erosion, and improve the general "safety and good housekeeping" of the site.  Ex. 1580.

Dawn prepared a proposed operations plan for the Mine in January of 1985 that described, among other things, a pilot program for treating mine water with a reverse osmosis system and Dawn's intent to apply for a Clean Water Act "NPDES" discharge permit to treat and discharge mine water. Ex. 2230.  Dawn did in fact apply for a NPDES permit in 1985. Nelson ¶ 33; Exs. 2232, 2237, 2245.  The permit was issued on September 30, 1986.  Ex. 2245.

BLM Order 6/16/1986:  The BLM viewed Dawn's proposed plan as insufficiently detailed and technical to pass as an acceptable mine and reclamation plan.  Ex. 5235.  On June 16, 1986, the BLM issued an order pursuant to 43 CFR 3570.0-2(b) and 3571.1(a) and 43 CFR 3570.0-7 requiring Dawn to demonstrate how it would meet the terms and conditions of its leases.  Citing the need to complete the mine reclamation, the declining quality of water, the deterioration of mine workings, and the "still unresolved issues which brought about the September 1981 partial suspension order", the BLM mandated Dawn submit a revised mine plan within 90 days, or cease operations.  Ex. 1611, 5235; Courtright ¶ 36.

In response, on September 9, 1986, Dawn submitted a proposed operations plan incorporating and supplementing the 1985 plan.  Ex. 5259; Courtright ¶ 36.

In the proposed plan, Dawn stated that its plans were "very preliminary and cannot be finalized until the ore body has been fully delineated with further drilling." Ex. 5259; Courtright ¶ 37. Dawn requested that BLM approve the company's proposed mine and Reclamation Plan before Dawn completed the following actions: (1) necessary drilling to delineate ore reserves; (2) negotiation of a royalty rate with the Tribe; (3) obtain other required

permits/licenses from EPA and the State of Washington for the mine and mill; (d) obtain or renew business and haul road leases from the Tribe and BIA. Ex. 5259; Courtright ¶ 38. No operations would have been able to commence until these actions had been completed. Courtright ¶ 38.

BLM Order 5/19/1987:  After seeking input from the Tribe, BLM responded formally to Dawn's plan on May 19, 1987.  Exhibit 5106; Courtright ¶ 40.  BLM's May 19, 1987 order attached BLM's detailed comments on Dawn's plan. Ex. 5106; Courtright ¶ 40. BLM criticized the plan because it was "largely conceptual, lacking sufficient background information, supplemental calculations, and/or supporting data to explain, justify, or substantiate actions as proposed." Ex. 5106; Courtright ¶ 40.  Because Dawn did not appear serious about its efforts, BLM established a deadline of September 1, 1987, for Dawn to submit a new plan that addressed BLM's comments, and set forth a proposed schedule of actions Dawn would need to take in order to restart mining. Ex. 5106; Courtright ¶ 40.

The order directed that Dawn's plan contain a schedule "illustrating how [Dawn] intend[ed] to diligently pursue bringing the mine back into production." Ex. 5106; Courtright ¶ 40.  The order envisioned that BLM could provide partial approvals as Dawn progressed through the steps necessary to resume mining.  Ex. 5106; Courtright ¶ 40.  The order established a November 1, 1987 deadline for Dawn to begin implementing the approved portions of its new plan. Ex. 5106; Courtright ¶ 40.

Dawn did not comply with this order and did not appeal it.  Courtright ¶ 40.

In 1988, BLM determined that Dawn's leases were not producing in paying quantities as required by its "lease terms and requirements of 25 CFR 211.10 and 211.12," and on February 29, 1988, it recommended to the BIA that it consider whether Dawn's "inaction and lack diligence are grounds for cancellation of the subject leases." Exs. 1641, 2256. On June 24, 1988, BIA informed Dawn that BIA intended to issue a notice of cancellation of Dawn's leases unless Dawn provided evidence that in intended to reclaim the Mine. Ex. 2258. Dawn

responded to the BIA's letter on July 11, 1988, affirming its intent to reclaim the Mine and detailing the steps that it had taken to work toward resuming operations and reclaiming the mine.  Ex. 2259.

BLM Order: 4/29/1989:  BLM grew concerned about the hundreds of millions of gallons of water that were accumulating in Pit 3 at an increasing rate of 50 to 75 million gallons per year.  Courtright ¶ 52.  BLM did not want the water level to over top Pit 3 and discharge into the disturbed rock located downslope of the pit.  *Id.*  To address these concerns, BLM issued an order on April 29, 1989 to accelerate the time by which Dawn would commence treating contaminated mine water.  Ex. 5112; Courtright ¶ 52.  BLM issued the order to prevent "serious or irreparable damage to the environment."  BLM's order required Dawn to submit a detailed plan describing how it would address disposal of the waste product that would be generated by treatment of the contaminated water.  Ex. 5112; Courtright ¶ 52.  The issue of waste product disposal from the water treatment plant needed to be resolved because the waste product had been classified as source material by the Washington State Department of Health and the Nuclear Regulatory Commission, and had to be treated specially.  Courtright ¶ 53.

The BIA issued a notice of intent to terminate Dawn's right to mine under the leases on July 11, 1989.  Ex. 2265.

Faced with its continued failure to either resume mining or comply with the requirements to post an adequate reclamation bond and submit mine/reclamation plans, Dawn argued that it lacked the financial resources to comply.  Smith ¶ 65.  On April 30, 1990, after an informal hearing, the BIA terminated Dawn's rights under the 1964 mining leases based, in part, on findings and conclusions that Dawn had failed to comply with the terms of the leases and failed to provide the United States with an adequate mining plan.  Ex. 1658.  The BIA Area Director rejected Dawn's argument regarding its financial condition, noting that accepting Dawn's argument would result in the absurd situation that a lessee could excuse

FINDINGS, CONCLUSIONS, AND ORDER - 65

compliance with lease terms solely on the basis of its poor financial condition.  Ex. 5025; Smith ¶ 66.

Dawn appealed the Area Director's decision to the Interior Board of Appeals, which affirmed the Area Director's decision.  Ex. 2272 (also 1665, 5256); *Dawn Mining Co. v. Portland Area Director*, BIA, 20 IBIA 50, 1991 I.D. LEXIS 90 (1991)  Dawn did not seek judicial review of that decision.  Smith  ¶ 67.

Though Dawn's right to mine had been terminated, the United States maintained that Dawn was still obligated, under the lease terms, to make provisions for the conservation, repair and protection of the property.  Ex. 1665.  Dawn was still required to submit a plan for the "conservation, repair, and protection of the property" and to leave the Mine "in a condition that will not be hazardous to life or limb" as required by Provision III(16) of the leases.  Ex. 2271.

To comply with its obligation to submit a plan for the reclamation of the Mine, Dawn submitted an extensive reclamation plan to BLM on July 12, 1991.  Exs. 2272, 2273. According to the BLM, Dawn's 1991 reclamation plan was "largely adequate to comply with" applicable regulations.  Ex. 2274.  The BLM noted that "[t]he only significant shortcoming is the lack of a noxious weed control plan."  Ex. 2274.

BLM Order 12/9/1991: On December 9, 1991, BLM issued an order requiring Dawn to commence operation of the water treatment plan no later than July 1, 1992.  Courtright ¶ 54.  The commencement date was established based upon BLM's analysis of historic pit water volume increases, climate data, and other data that BLM had been gathering and evaluating with respect to how quickly Pit 3 would fill with water and how soon treatment of that water needed to begin to avoid over topping Pit 3.  *Id.*

Dawn appealed this order, and it was affirmed by the Interior Board of Land Appeals with two minor modifications.  Courtright ¶ 55.

BLM Order 6/16/1992: BLM reissued the order on June 16, 1992.  Ex. 5114, 5238; Courtright ¶ 55.  BLM's order required treatment at the rate of 300 gallons per minute.  Ex.

5114; Courtright ¶ 55. However, consistent with BLM's orders, the plant had been constructed so that it was capable of immediately increasing the treatment rate to 500 gallons per minute. Courtright ¶ 56.

Dawn constructed a water treatment plant at the Mine, which became operational in 1992. Nelson ¶¶ 34-35; Ex. 2276. Dawn operates the water treatment plant.

BLM Order: 7/23/1993: On July 23, 1993, BLM issued a mine order that required an increase in the water treatment rate to 500 gallons per minute. Ex. 5239; Courtright ¶ 56. This increase in treatment rate was based on BLM's forecasted water accumulation rates for the Mine, and was deemed necessary in order for all of the water at the Mine to be treated in approximately 8 to 10 years. Courtright ¶ 56.

In January 1996, as part of the reclamation process, BLM published a notice of its intent to prepare an Environmental Impact Statement (EIS) to evaluate alternative plans for the final reclamation of the Midnite Mine. 61 Fed. Reg. 2528 (Jan. 26, 1996). Dawn prepared a more extensive reclamation plan for BLM in June 1996. Ex. 2298.

In August of 1996, BLM, BIA, EPA, and the Washington Department of Health signed a "Memorandum of Understanding For NEPA Scoping Midnite Mine Reclamation." Ex. 2300. The purpose of the MOU was to "set forth obligations for the review of data, the conduct of meetings to gather public input, and the development of the EIS data needs regarding reclamation of the Midnite Uranium Mine." Ex. 2300.

At the time, EPA did not plan on listing the Mine on the National Priorities List (NPL). Ex. 2304. BLM similarly opposed listing of the Mine on the NPL, and instead believed that BLM should "continue with the ongoing NEPA process to address reclamation issues at the Midnite Uranium Mine." Ex. 2308. BLM was concerned that "EPA may be rushing to the conclusion that reclamation planning should proceed using a combined RI/FS-EIS approach, which in my view could force the Department into a CERCLA action." Ex. 2310. Such action was "of particular concern since we have been working on a document which would provide

for a thorough evaluation of several approaches, not just CERCLA, and this document is yet to be reviewed by policy makers within the Department." Ex. 2310.

BIA geologists continuously monitored the site. During one of the BIA geologist's spring 1997 site visits, the geologist observed a major overflow event during which the water management system at the Mine was overloaded, and a large volume of untreated water was flowing away from the Mine and into downstream waters. Smith ¶ 77. The geologist immediately reported the conditions to BLM (who agreed to contact Dawn), the Tribe and EPA. *Id.* This overflow event created three specific areas of potential slope instability and land erosion that BLM identified immediately. Courtright ¶ 57. A fourth area of potential slope instability was identified later. *Id.* BLM determined by laser survey monitoring methods that two of four areas were stable. Courtright ¶ 58.

BLM Order 4/23/1997: Because Dawn was not taking action on its own to address these issues, BLM issued a mine order on April 23, 1997. Ex. 5240; Courtright ¶ 57. The BLM order required Dawn to monitor slope stability in two areas of the mine, backfill slopes damaged by erosion, stabilize a power pole that provided electricity to the water treatment plant, and re-vegetate damaged slopes. Courtright ¶ 58. Based on BLM's quick attention, all of the areas recovered and did not become more significant slope stability problems. *Id.*

In July of 1998, BLM and Dawn entered into an Interim Agreement "to more fully characterize the Site and the nature and extent of hazardous substance releases (if any) and impacts, by designing and conducting the studies specified in this Agreement and the Appendices." Nelson ¶¶ 42-43; Exs. 2317, 2318. The goal of the Interim Agreement was to collect data for the eventual reclamation of the Mine. Nelson ¶ 42.

Although the EPA was not a "formal signatory" to the Interim Agreement, it was involved in its negotiation. AR 1225074 at 2-17. "[I]t has been directly involved in the review of the Work Plan, along with BIA, the Spokane Tribe, the Department of Energy, and the Washington State Department of Health." Ex. 2320; see also AR 1067337l AR 1967339.

In July of 1998, EPA sought the Tribe's support for listing the Mine on the NPL.  The Tribe expressed its support for listing the Mine on the NPL in a letter to EPA on August 12, 1988. Ex. 2319. In September of 1998, BLM wrote to EPA, stating that BLM was "concerned that further action to formally propose listing of the [Mine] site on the NPL may negatively impact implementation of the Interim Agreement and resulting Work Plan."Ex.2320. Nevertheless, EPA proposed the Mine for listing on the NPL on February 16, 1999.  Ex. 2323.

Initially, BLM's cooperation with EPA involved coordinating the details of BLM's mine orders concerning management of contaminated water with EPA's concerns in enforcing the Clean Water Act through Dawn's Clean Water Act "NPDES" discharge permit. Courtright ¶ 61. BLM also consulted with EPA during BLM's NEPA "scoping" process so that the information BLM gained during that process would be useful if EPA listed the site on the National Priorities List under CERCLA.  Courtright ¶ 61.  When EPA listed the site and began the Remedial Investigation and Feasibility Study process, BLM provided technical information and offered technical comments on written material.  *Id.*

From 1998 through 2000, BLM also worked cooperatively with EPA on the Midnite Mine Workplan, the purpose of which was to collect additional environmental baseline information on the Midnite Mine.  Courtright ¶ 66.  BLM served as the federal government's "Project Manager" for this $2.5 million project (which was paid for by Newmont).  *Id.*  BLM took responsibility for quality assurance and data collection, management of the project even though those responsibilities normally would be the borne solely by the mining company.  *Id.*

## I. ADDITIONAL FACTS REGARDING THE UNITED STATES' INVOLVEMENT AT THE MINE

*Strategic Benefits.*  Dawn's uranium production provided the United States with a significant, material benefit by supplying uranium for the nation's nuclear weapon and energy needs during the Cold War.  The AEC's total purchases of 1,143,142 tons of ore accounted for more than 36 % of Dawn's total production through 1981. Exs. 1848; 1849; 1850.  In addition,

Dawn's supply of nuclear material to the domestic power industry during the 1970's provided the United States with a significant strategic benefit in the form of a reliable, local and independent source of energy.

Without the encouragement and direct involvement of the United States, the Mine would not and could not have been developed in the 1950s and 60s.

*Lease Administration*.  The United States administered Dawn's mining leases. It authored and specified the terms of the leases and its authority over these lands allowed it to prevent the very contamination that underlies the claims in this case.  Ex. 1472. The Tribe relied upon the United States to manage the site.  As the Tribe explained in 1997, "[t]hroughout the history of the Midnite, the Tribe has relied entirely on direction and expertise provided by the United States as trustee, as well as the United States' authority to manage and regulate the site." Ex. 1803, A.R. Doc. No. 107646 at p. 2.  The BIA also worked closely with the Tribe to communicate the Tribe's concerns regarding environmental conditions and proposed reclamation actions at the Mine. Smith ¶ 78.  BIA also provided technical support and funding for the Tribe to retain legal and environmental consultants to represent and assist the Tribe on Mine-related issues.  Smith ¶¶ 60, 78.

Throughout the terms of the leases, the United States, through the Department of the Interior ("DOI") and its various agencies — including the Bureau of Indian Affairs ("BIA"), the United States Geologic Survey ("USGS"), the United States Bureau of Land Management ("BLM"), and the United States Minerals Management Service ("MMS") — exercised authority over operations at the Mine granted by the lease, and by statute and regulation.  This included coordinating agencies and directing, policing, and supervising pollution control, bonding and reclamation activities.

The United States' active involvement at the Midnite Mine was very different from the norm. Courtright ¶¶ 63-68.  For example, as evidenced by the numerous meetings held, site

FINDINGS, CONCLUSIONS, AND ORDER - 70

visits, correspondence, and number of mine orders issued, the BLM played a very active role in coordinating and directing Dawn to take corrective action in regards to the critical water pollution (especially the over topping risks) and discharge problems in the 1980s.

The BLM also played a much more active role than it usually would in connection with classifying the solid waste that would be produced by operating the water treatment plant. Courtright ¶ 65. The classification of this waste material determined how and where it could be legally disposed of and in what type of a repository. *Id.* It was Dawn's and Newmont's responsibility to work with EPA, the Nuclear Regulatory Commission and the Washington Department of Health to have the material classified (as solid waste, hazardous waste, or "Source Material"). *Id.* Nonetheless, this task fell to BLM because Dawn and Newmont were not taking adequate initiative to obtain the classification. *Id.* Resolution of this issue allowed Dawn to begin treating water at the Midnite Mine. *Id.*

Dawn and Newmont's own conduct and inaction, as well as critical site conditions, demanded more extensive involvement of the United States. Courtright ¶ 62. The intensity of the involvement both cost and benefitted the United States, and directly affected the release of hazardous substances at the site.

*Reclamation Bond Requirements.* In accordance with the terms of Dawn's leases and the applicable mineral leasing regulations, the United States set and adjusted Dawn's bonding requirements.

The two 1964 mining leases, drawn by the United States, required a total of only $15,000 in performance surety bonds from the lessee. Smith ¶ 61. However, Provision III (9) of the leases also stated that "the right is reserved to the Secretary of the Interior or his authorized representative to increase the amount of bond above the sum named." Exs. 5023 (MBIAPT000134), 5024 (MBIAPT000181); Smith ¶ 61. Through the 1980s, the BIA sought to compel Dawn to post a reclamation

bond sufficient to protect the Mine site. Smith ¶¶ 60-67.

In 1982, with reclamation plans in flux, the USGS determined that "it would not be reasonable to set an amount of bond at this time that would satisfy the total reclamation requirements," but nevertheless specified dollar amounts to cover specific proposed reclamation actions. Ex. 1508 at NEW0028464. In the fall of 1982, the BIA issued a final bond order requiring Dawn to post a reclamation bond in the amount of $10 million. Ex. 7, Smith ¶ 62. Dawn appealed the BIA's bond order, which was invalidated on the basis that Dawn had not been afforded sufficient opportunity to participate in the process. *Id*.

In 1986, the BLM and BIA jointly issued a new bond recommendation which would require Dawn to post a $9.7 million bond. *Id*. Thereafter, on June 18, 1987, the Department of the Interior's Assistant Secretary for Indian Affairs ordered Dawn to post a single bond covering both leases in the amount of $9,730,000. Exs. 1635, 5132; Smith ¶ 63. Dawn refused to post the bond, stating it did not have sufficient funds, but it did not challenge the bond order. *Id.*

*Royalties.* Dawn paid its rents and royalties directly to the United States BIA. After the BIA received the payments, it would deposit them into a special deposit account, determine the appropriate allocation of the amount, and then transfer the deposits into the appropriate accounts of the Tribe or individual owners.

The United States Department of the Interior, either through the Office of Inspector General's Audit Division or the Minerals Management Service, would conduct audits of the payment and calculation of royalties. After approval of the new royalty rate in 1976, the United States continued to oversee and audit Dawn's royalty payments and contributions to its reclamation fund. *See e.g.*, Exs. 767, 1384, 1462, 1489, 1518, 1531, 1532, 1590. The United States undertook these activities as part of its responsibilities as landlord of the Mine site.

Over the course of Dawn's operations, the United States collected over $9.6 million in royalty payments. Ex. 1846.

FINDINGS, CONCLUSIONS, AND ORDER – 72

**J.   INTERIM AGREEMENT SAMPLING, EPA'S SITE INSPECTION AND REMEDIAL INVESTIGATION**

As set forth above, in July of 1998 and prior to adding Midnite Mine to the NPL, the BLM and Dawn entered into an "Interim Agreement" "to more fully characterize the Site and the nature and extent of hazardous substance releases (if any) and impacts, by designing and conducting the studies specified in this Agreement and the Appendices." Nelson ¶¶ 42-43; Exs. 2317, 2318. The goal of the Interim Agreement was to collect data for the eventual reclamation of the Mine. Nelson Direct ¶ 42. EPA was not a signatory to the Interim Agreement, though provided input during the negotiation.

Pursuant to the Interim Agreement, Dawn's consultant Shepherd Miller, Inc. collected extensive data at and around the Midnite Mine. Rosasco Test. ¶ 15. The agreement required Shepherd Miller to provide copies of all data reports to the EPA, which it did on an ongoing basis from September 1998 to August 2001. AR 1067357; Rosasco Table 1. That same year, EPA also retained the consulting firm Ecology & Environment (E&E) to perform an Expanded Site Inspection ("ESI"). The ESI included sampling (34 surface water samples, 45 sediment samples, 13 soil samples and 6 groundwater samples) to support the evaluation of the site for listing on the NPL. Rosasco ¶ 15; Hale ¶ 11.

In February 1999, after recommending the Mine be added to the NPL for remediation under CERCLA, the EPA retained the consulting firm URS Corporation to perform a Remedial Investigation and Feasibility Study (RI/FS) at the Midnite Mine. The purpose of the RI/FS is to determine the nature and extent of contamination, assess the site risks to human health and the environment, and develop and evaluate remedial alternatives. Hale ¶ 13. EPA's contractor followed a process of identifying and documenting the data quality objectives (DQOs) to determine the type, quantity and quality of data needed to support EPA's site decisions. The EPA began this decisionmaking process in February 1999 and completed its preliminary sampling plan in June 1999 (*see* SF 1169111 at 2), while Shepherd Miller was simultaneously in the process of conducting its sampling pursuant to the Interim Agreement.

The EPA's DQO decisions were documented in Quality Assurance Project Plan documents or "QAPPs". EPA published various versions of the Phase 1A QAPP beginning in July 1999 (AR 1133100) and various versions of the Phase 2A/1B QAPP beginning in August 2000 (AR SF [EPA Site File] 1169521 at 1; AR 1133103, AR 1137851(Addendum)).

By July 1999, EPA had received many (approximately 60), though not all, technical reports related to the data collection efforts pursuant to the Interim Agreement. *See* Administrative Record citations in Rosasco Table 1 (list of submitted reports). By August 2000, it had nearly 40 more. In June 2000, EPA's contractor prepared a technical memorandum summarizing the "significant studies that had been performed at the Midnite Mine prior to implementation of the Phase 1A RI/FS", including those performed by Shepherd Miller pursuant to the Interim Agreement. AR 1156082. In July 2000, URS completed a historical chemical and radiological data assessment of existing data collected by E&E and Shepherd Miller. AR 1219056.

EPA conducted its field work in two phases: Phase 1A and Phase 2A/1B. During these two phases EPA collected 569 more samples at the Mine and the potentially impacted areas nearby, including soil, surface water, sediment and ground water samples. Phase 1A sampling took place in September-October 1999 and March-April 2000, and Phase 2A/1B took place in September-October 2000, and summer 2001. AR 1225186 Appendix A at 1. The summer 2001 sampling concluded the EPA's site characterization. The Phase I QAPP text and tables describe and provide the EPA's justification for the sampling of surface water, sediment and groundwater. AR 1133100. Phase II QAPP text and tables describe and provide the EPA's justification for scoping of soil characterization, mined area groundwater, radon, radon flux, radiation levels, and site geotechnical and hydraulic information. AR 1133103 at A-14, Section A.5.3. The final analysis of the EPA's data collection was published in the Remedial Investigation Report in September 2005. AR 125074.

At issue at trial was the EPA's decision to collect 187 of the 569 samples collected during Phase 1A and Phase 2A/1B. The Administrative Record evidences the EPA and its contractor's awareness the ESI sampling data of E&E and Interim Agreement data provided (and expected to be provided) to the EPA, as well as the EPA's intent to integrate, where possible, such data into the RI/FS process.  Hale Attachment 1 (listing administrative record documents). The Phase I QAPP and Phase II QAPP describe gaps in the Interim Agreement data.  AR 1133100 and AR 1133103.

The lengthy briefs and written testimony submitted to the court are very detailed and have directed the court to hundreds of references to the Administrative Record.  The court will not make separate factual findings as to each of the 187 individual samples.  The record contains adequate support that the EPA's decision to collect 124 of the disputed samples was primarily to address inadequate spatial coverage of existing data; the EPA's decision to collect 19 of the disputed samples was primarily to address incomplete data for potential constituents of concern; the EPA's decision to collect 44 of the disputed samples was primarily to address insufficient number of representative and comparable samples for statistical comparison.

For example, regarding inadequate spacial coverage the QAPPs explain:

Substantial amounts of historic analytic chemistry data exist to estimate PCOC concentrations for groundwater, surface water, and sediments in the PIA [potentially impacted area] AOIs [Areas of Interest] south of the MA [mined area]...Little or no information exists for other PIA AOIs.

AR 1133100 at A-39.

The major data gaps identified for the Phase 2A/1B DQO process are: 1...2. Incomplete external radiation data.  Historic gamma radiation exist for some areas but are absent or inadequate for other key areas...3. Incomplete or no airborne radon data for various areas...4. Incomplete groundwater hydraulic and chemical data for MA and Blue Creek...5. Incomplete or no background conditions information for various external radiation, surface water, sediment and groundwater.

AR 1133103 at A-17.

Regarding potential constitutents of concern, for example, the record states:

In the case of more recent investigations conducted by the EPA and SMI (i.e. data collected since 1998), the investigations appear to have used protocols required by EPA (1991a) and, after review of the quality of the data, the data from those studies may be useable quantitatively for baseline risk assessment purposes when combined with data collected during the RI...However, these data are not sufficient for conducting a baseline risk assessment for a variety of reasons. First in all cases, the constituent analyzed in previous studies comprise only a subset of the PCOCs that must be evaluated for the baseline risk assessments. For example, a number of metals and radionuclide isotopes needed for the risk assessments were not analyzed for in the previous studies. Examples include cobalt, vanadium, and antimony, as well as decay series isotopes for radionuclides. Therefore, it is necessary to collect additional PCOC concentration data for the missing PCOCs.

AR 1133100 at A-39.

"Historic data for surface materials within the MA do not include all metals or full radioactive decay series." AR 1133103, Table A.7-4.

Historical data exist for surface material in the MA but do not include all PCOCs. In particular, existing data do not include PCOC activities for all radioactive constituents or isotopes of concern. Because the surface materials may not be in radioactive equilibrium activities of decay products cannot be reliably estimated from activities of parent constituents. Therefore, measurements of individual constituents and isotopes are necessary for estimating risk."

AR 1133103 at A-20.

Regarding the insufficient number of representative and comparable samples justification, for example, the QAPP provides:

Based on 10 constituents per medium to be compared to background and the number of site groundwater and site-related surface water sample locations, the power analysis indicates a minimum of 16 sample locations is needed to perform the non-parametric analysis of the data.

AR 1133100, A-53.

However, current conditions must be representative of maximum PCOC concentrations, therefore, seasonal data are required....A preliminary evaluation of existing water quality data appears to indicate that PCOC concentrations vary with season, particularly for surface water and seeps/springs...Therefore it is proposed that water samples be collected at two times during the spring....An additional sample is proposed for the low flow season....Therefore, a total of there sampling events are proposed for groundwater and surface water.

AR 1133100 at A-41-42.

The QAPP also provides that, "For historic data to be used in the risk assessment, and to be statistically compared to background, requires that samples be collected in the same manner as historic data." AR 113100 at A-51. "Thus to conduct a statistically appropriate comparison, a minimum of 16 background sediment samples for each sample type (discrete and composite) is needed for comparison to the downstream samples." AR 1133100 at A-53.

## III. ANALYSIS and CONCLUSIONS OF LAW

### A.    JURISDICTION AND VENUE

The court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1345.

Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and © and 42 U.S.C. § 9613 because the claims arise, and the releases of hazardous substances occurred at the Site located in the Eastern District of Washington.

### B.    CLAIMS GENERALLY

The United States makes its claims under sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 , 9613.

Dawn and Newmont counterclaim against the United States under § 113(f) of CERCLA, 42 U.S.C. § 9613(f)(1), because the United States is liable under CERCLA sections 107(a)(1) & (a)(2) as a current owner of the facility and as an owner of the facility at the time hazardous substances were released. On August 21, 2007, this court granted NUSA's and Dawn's motion for summary judgment on the issue of the United States' liability as an "owner" under CERCLA. *United States v. Newmont USA Ltd.*, 504 F. Supp. 2d 1050 (E.D. Wa. 2007) (Ct. Rec. 290).

The parties have not disputed that the Mine is a "facility," 42 U.S.C. § 9601(9), or that there has been a "release" of hazardous substances from the facility that have caused the incurrence of response costs. *Id*. § 9607.

FINDINGS, CONCLUSIONS, AND ORDER - 77

Dawn does not dispute that it is liable for the release of hazardous substances from the Mine as an operator the facility at the time hazardous substances were disposed. *Id.* § 9607(1)(2).

**C.    NEWMONT IS LIABLE AS AN OPERATOR OF THE MIDNITE MINE UNDER *BESTFOODS***

To recover its costs for engaging in response actions under § 107 of CERCLA, the EPA must demonstrate (among other elements which have already been established pre-trial) that Newmont falls into the category of a responsible party, in this case being a person who operated the Site at the time of disposal. 42 U.S.C. § 9607(a)(2)("any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of" shall be liable for responses costs). Those falling within this category are liable for "all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

In *United States v. Bestfoods*, the Supreme Court held that a corporate parent may be held liable as an operator under two theories. 524 U.S. 51, 118 S. Ct. 1876, 1881, 141 L. Ed. 2d 43 (1998). First, a corporate parent is derivatively liable for the conduct of the subsidiary if the corporate veil may be pierced. 524 U.S. at 66-67. Second, a corporate parent is directly liable based on its own conduct at a facility if it manages, directs, or conducts "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id*. The United States only asserts Newmont is an operator based upon a theory of direct liability. Under *Bestfoods*, the analysis of direct operator liability should not focus on "whether the parent operates the subsidiary, but whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." *Id.* at 68 (quotation omitted).

CERCLA, however, only generally defines an operator as "any person . . . operating [a covered] facility." 42 U.S.C. § 9601(20)(A)(ii). The Supreme Court in Bestfoods refined the rather circular statutory definition of "operator" by stating that:

> An operator is simply one who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 67.  The Court observed that "the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71.

With regard to the parent's operation of the facility, the Court identified three possible situations in which a parent may be held directly liable as an operator: (1) when the parent operates the facility rather than its subsidiary or alongside the subsidiary in some sort of joint venture; (2) when a dual officer or director departs so far from the norms of parental influence exercised through dual office holding as to serve the parent, even when acting ostensibly on behalf of the subsidiary in operating the facility; and (3) when an agent of the parent "with no hat to wear but the parent's hat" might manage or direct activities at the facility.  *Id.*

As to the second scenario, the Court acknowledged the possibility that directors and officers might hold positions with both a parent and a subsidiary, and recited the corporate law principle that it is entirely appropriate for them to do so.  *Id.* at 69, 118 S.Ct. 1876.  Such dual officers can and do "change hats" to represent the two corporations separately.  *Id.* (quotation omitted).  Again citing basic principles of corporate law, the Court noted the presumption that directors wear their "subsidiary hats" rather than their "parent hats" when they act for the subsidiary, and concluded that:

> it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility. The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as [parent] officers and directors, and not as [subsidiary] officers and directors when they committed those acts.

*Id.* at 69-70.

FINDINGS, CONCLUSIONS, AND ORDER - 79

As to *Bestfoods'* third scenario regarding an agent with no subsidiary hat to wear, the Court stated that activities that "involve the facility but which are consistent with the parent's investor status ... should not give rise to direct liability." *Id.* at 72. Thus, the Court directed lower courts considering these issues to determine "whether ... actions directed to the facility by an agent of the parent alone are *eccentric under accepted norms of parental oversight of a subsidiary's facility.* [citation omitted]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* (emphasis added).

With the principles of *Bestfoods* guiding this decision, the court concludes Newmont is liable as an operator under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a). In reaching this decision, the court relies upon Newmont's direct connection to the operations of the Mine, and does not rely merely or solely upon the closeness of the relationship between Newmont and Dawn, Newmont's representation on the Dawn Board of Directors, the interlocking directors and officers between the companies, Newmont's general financial oversight over Dawn, or Newmont's monitoring of Dawn's performance. Nevertheless, these facts are relevant in this case because in degree and detail, Newmont's inextricably interwoven involvement in the management of Dawn departed from the accepted norms of corporate oversight.

Newmont is liable as an operator under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for its actions in managing, directing and conducting operations at the Midnite Mine in 1955 and 1956 prior to the 1956 Management Agreement. The evidence shows that MMI lacked the knowledge or resources to meet the AEC contract to deliver 2400 tons of ore. Newmont, on the other hand, had both. In April 1955, Newmont sent employees to investigate the site and then later to conduct the exploration and development activities at the mine while Dawn was being established. Newmont's agreement with MMI required it to provide the financing, equipment, supplies and personnel for the development program, which it did.

Activities conducted at the Site at this time included mapping, drilling, stripping overburden, bulldozer trenching, excavating, forming adits, stockpiling ores creating waste dump areas and shipping ore to the AEC.  Although Dawn was incorporated and Mr. Hundhausen and Mr. Hinsdale were acting at the time on Dawn's behalf, there is no evidence these men were directing or making decisions regarding the operations being performed by NEL:  Mr. Hundhausen did not have operating experience and did not have the authority to supervise the NEL employees activities.  Mr. Hinsdale, a banker, did not possess the knowledge to direct the mining operations.  Newmont's undisputable lead role taken in the supervising, directing and actually *conducting* the work at the Mine during this early period provide the basis for operator liability.

Newmont is liable as an operator under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for its actions in managing, directing or conducting operations at the Midnite Mine pursuant to the 1956 Management Agreement.

Just prior to entering into the 1956 Management Agreement, Newmont represented that it was planning to transition to full scale operations of the Midnite Mine and that it would "be running the show."  The exploration and development efforts of Newmont employees lead to the 1956 Management Agreement which continued in effect throughout the operation of the Mine.  Moreover, the Agreement's terms are entirely consistent with Newmont's intention to operate the Mine in that it expressly provides that Newmont "shall act as Manager of all the operations and corporate affairs of Dawn."  Ex. 4.  The record contains a large number of affirmations by Newmont, MMI, and Dawn that Newmont was "managing" the operations, finances and corporate affairs of Dawn.

Regardless of whether the agreement is characterized as a "management" agreement or a "fee for service" agreement as disputed by the parties' experts, the critical matter is that Newmont in fact undertook the obligation under the Management Agreement and carried out *its* business as a direct participant in the management of all operations of Dawn, including its

polluting operations at the Midnite Mine, by providing directors, officers, managers, and technical staff to Dawn who directed the operations of the Mine and the corporate affairs of Dawn. This included providing the most critically involved players in the decisionmaking at the Mine – the resident manager, the off-site general managers, and Pete Loncar as Dawn's first mine superintendent. In order to ensure the management of the operation was well-run, Newmont also furnished senior officials as officers and directors (so-called "dual hat" individuals) and technical specialists Dawn needed to make decisions on mining and environmental affairs.

As the *Bestfoods* court observed and consistent with long accepted principles of agency law, the "fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent 'corporation is [itself] responsible for the wrongs committed by its agents in the course of its business.'" 524 U.S. at 65. The Court concluded, "If any such act of operating a corporate subsidiary's facility is done on behalf of the parent corporation, the existence of the parent-subsidiary relationship is simply irrelevant to direct liability." Because a corporation cannot physically act except through its employees and authorized agents, principles of agency law come front and center, even in cases of the assertion of direct liability. One such principle is that "[a] person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other." *Dazo v. Globe Airport Security*, *Servs,* 295 F.3d 934 (9th Cir. 2002).

The so-called "dual hat" Newmont personnel it provided to Dawn were discharging both Newmont's duties as "manager" of Dawn's operations and at the same time were acting on behalf of Dawn under the authority of their Dawn titles. There is also evidence of these dual hat individuals acting arguably contrary to the interests of Dawn when sending the message that Newmont would operate Dawn as it wanted. For example, in what the court has coined the "that's-the-way-it-is letter", Newmont denied a request from the Midnite Mines

minority member of Dawn's executive committee to participate more actively in managing Dawn's operations.  Newmont flatly stated that practice at all its operating subsidiaries was to give the resident manager substantial autonomy without executive committee input, and that is how things would be done at Dawn as well.  Ex. 114.

Yet another example, is Newmont's vice-president of operations M.D. Banghart (and also Dawn's vice-president) refusal of  MMI's request to have its geologist inspect the Dawn property, explaining in a memo to the file: "that it was not Newmont practice to allow brokers to send geologists and engineers to examine mining properties under its management." Ex. 922e.  In the same memo, Mr. Banghart states that he explained to the MMI nominee that when giving out information to the public MMI needed to "stay in line with...customary Newmont policy." *Id*. While the court concludes the evidence supports the conclusion that Newmont operated the facility pursuant to the terms 1956 Management Agreement, at a minimum, the evidence also supports that Newmont was operating the facility alongside Dawn jointly.  Newmont is liable as an operator under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for its actions in managing, directing or conducting operations at the Midnite Mine, because its actions exceeded the norms of corporate parental oversight of subsidiaries based on its role as an investor.

Both in terms of degree and detail, Newmont's involvement in reviewing and managing Dawn's operations exceeded the actions typically associated with investor status such as, oversight of finance and budgetary choices, monitoring performance and expression of general policies. *Bestfoods*, 524 U.S. at 72.  The facts show a level of participation and control by Newmont that exceeds the bounds of a merely interested investor and instead became an active operator.

The court's factual findings surrounding Newmont's evolution from a holding company to a company that "actually...manages properties" support the foregoing conclusion.  In 1969, President and Chairman, Plato Malozemoff, gave a series of speeches describing

FINDINGS, CONCLUSIONS, AND ORDER - 83

how Newmont managed the operations of some of Newmont's subsidiaries, and how its primary method of doing so was to appoint "highly capable men" as the resident management and give them "a high degree of autonomy."

In the case of Dawn, Dawn's management structure was always set by Newmont, not Dawn, based on Newmont's determination as to how to best manage the operation. For example, it was Newmont's idea to create the position of the off-site general manager for its three operations in the Western United States – Carlin, Idarado, and Dawn. Quivik Test. ¶¶ 223-236; Robert Thompson Test. ¶ 36. Moreover, it was always Newmont, not Dawn, who determined who the Dawn resident manager - the main decisionmaker at the Mine-would be. Robert Fulton, Dawn's first resident manager, was picked by Newmont months before the 1956 Management Agreement was in place.

Moreover, as *Bestfoods* advises, investor status wanes when agents of the parent with no subsidiary hat to wear make decisions involving the facility which exceed the norms of general oversight. As part of Newmont's management practices, Newmont developed corporate expertise in various disciplines needed for mining operations and used these expertise (and created NSL) to facilitate the management of its subsidiary operations. This meant, in the case of Dawn, that at times Newmont officials with no Dawn titles performed critical functions: for example, they negotiated the first mining contract with the AEC; they designed the first Dawn mill; they negotiated sales contracts, which in turn affected the pace of mining operations required for each year; they played a significant role in rehabilitating the Dawn mill for the second operating period; and they determined transfers of Newmont personnel between other Newmont operating subsidiaries and Dawn, particularly during the periods of significant operational change.

**D.    DISPUTED COSTS ARE NOT INCONSISTENT WITH THE NATIONAL CONTINGENCY PLAN**

CERCLA § 107 provides for the recovery of "*all costs* of removal or remedial action incurred by the United States Government...not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A) (emphasis added).

The EPA is generally entitled to all costs, even if unreasonable or unnecessary unless the defendant proves that such costs are inconsistent with the NCP. *See In re Bell Petroleum Serv. Inc.*, 3 F.3d 889, 906 (5th Cir.1993).

Judicial review of the EPA's response action is governed by statute:

(j) Judicial review

(1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

(2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

(3) Remedy

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.

(4) Procedural errors

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

42 U.S.C. § 9613(j).

The court has already found (it was undisputed) at the summary judgment stage that the EPA has provided sufficient information to the court to establish a prima facie case that the

government is entitled to its costs. *See U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir.1998); 42 U.S.C. § 9607(a)(4)(A) (defendants may be held liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan").    The costs are presumed to be recoverable, unless Dawn is able to demonstrate on the Administrative Record that the government's choice of response action is inconsistent with the NCP. *Chapman*, 146 F.3d at 1169. "The NCP is designed to make the party seeking response costs choose a cost-effective course of action to protect public health and the environment. If that party follows the detailed process set forth in the NCP, then its costs are not inconsistent with the NCP." *Id.* It is therefore not the court's role to decide the cost-effectiveness of individual expenditures, but rather it must evaluate the government's action for consistency with the NCP. The court looks to the NCP that was in effect at the time that the EPA incurred the response costs.

To show that the government's response action is inconsistent with the NCP, Dawn must demonstrate that the EPA acted arbitrarily and capriciously in choosing a particular response action to respond to a hazardous waste site. *See Washington State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir.1995). The narrow arbitrary and capricious standard of review is applied "because determining the appropriate removal and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the EPA." *United States v. Northeastern Pharmaceutical & Chemical Co. (NEPACCO)*, 810 F.2d 726 (8th Cir.1986), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43

(1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made....In reviewing that explanation, [the Court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *In re Bell Petroleum Serv. Inc*., 3 F.3d 889, 905 (5th Cir.1993).

More specifically, in determining the scope of the RI/FS, 40 CFR 300.430(b), requires the EPA to tailor its study to site circumstances so that the scope and detail of the analysis is "appropriate to the complexity of site problems being addressed." During scoping, the EPA must:

> (1)   Assemble and evaluate existing data on the site, including the results of any removal actions, remedial preliminary assessment and site inspections, and the NPL listing process.
>
> (2)   Develop a conceptual understanding of the site based on the evaluation of existing data described in paragraph (b)(1) of this section.
>
> ....
>
> (8)   Develop sampling and analysis plans that shall provide a process for obtaining data of sufficient quality and quantity to satisfy data needs.

40 CFR 300.430(b).

The EPA is required to act upon the informed scientific opinion of its employees. Thus, even when specialists express conflicting views, the agency must be accorded the discretion to rely on the reasonable opinions of its own qualified experts at the time, even if, as an original matter, a court might find the contrary views expressed in litigation more persuasive. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). When, as in this case, examining scientific determinations, a reviewing court must be generally at its most deferential. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc*., 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).    The court has reviewed the Administrative Record. The court has also relied upon the affidavits of government expert Ellen Hale and Dawn's expert Paul Rosasco solely to evaluate whether there is anything in the record to support the agency's decision and to assist the court in understanding the voluminous

and detailed scientific content of the record evidence. From this review the court concludes the EPA's decision to conduct the sampling disputed by Dawn was not arbitrary and capricious and was consistent with the National Contingency Plan. Thus the associated approximately $1.8 million in CERCLA response costs incurred by the United States at the Midnite Mine are recoverable under CERCLA.

Dawn's contention at trial was that given the time-frame in which EPA made its decisions regarding what sampling to conduct at the site, it did not give adequate attention to the data already collected and submitted to the EPA pursuant to the Interim Agreement. While Dawn can not deny the Administrative Record includes statements that the agency considered the Interim Agreement data, citing to the chronology of events, Dawn claims the record lacks evidence of a *sufficiently detailed analysis* of the data (and data reports) prior to the development of the EPA's sampling plan. Moreover, the record shows the EPA conducted a more thorough evaluation of the data after EPA had finalized its sampling plan. Thus, Dawn argues, the agency's decision violated the NCP because the record necessarily lacks a satisfactory explanation of the basis for its decision to collect the samples at issue. It is Dawn's contention the EPA largely ignored the data and thus went to unnecessary expense duplicating sampling efforts.

The record evidences that the agency both assembled and examined the existing data, including site specific data, and articulated a satisfactory explanation for its decision to conduct the sampling Dawn disputes, including a "rational connection between the facts found and the choice made." *See Bell Petroleum, 3 F.3d at 900; Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245-246, 9 L.Ed.2d 207 (1962). The court does not find that the lack of a more detailed analysis or discussion of the existing data prior to the decision to conduct the sampling, evinces a clear error in judgment.

Dawn's expert supported assertions that the sampling was duplicative and/or unnecessary and that the RI work was "wasteful, ill conceived and poorly conducted" (Ct. Rec.

444) does not overcome the deference accorded to the EPA's expertise. Dawn's position is ascribed to a difference in view with the decisionmaker, based in part upon a retrospective view of information made available and events occurring subsequent to or simultaneous with the EPA's decision-making process.

The fact that a particular response action was perhaps not the best or most cost-effective choice in hindsight does not make the response action arbitrary and capricious.

**E.    JUDGMENTS ON THE UNITED STATES' CLAIMS AGAINST THE DEFENDANTS**

*Joint and Several Liability or Divisibility.* Section 107's basic liability provision provides that "subject only to the defenses set forth in subsection (b) of this section [PRPs shall be liable for]-(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan ...." § 9607(a). The scope of liability in a § 9607(a) cost recovery action is said to be strict, joint, and several, unless the harm is divisible. *See U.S. v. Burlington Northern & Santa Fe Ry. Co.*, 520 F.3d 918, 934 (9th Cir. 2008)(citing *Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 945 (9th Cir. 2002) and *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir. 2001)); *see also, California v. Montrose Chemical Corp. of California*, 104 F.3d 1507, 1518 n. 9 (9th Cir. 1997).

In order to avoid joint and several liability on a § 107(a) cost recovery claim and succeed on a divisibility defense, the direct defendant must show the harm at issue is capable of apportionment and to provide sufficient evidence for the court to apportion liability. *See Burlington Northern & Santa Fe Ry. Co.*, 520 F.3d at 942 (9th Cir. 2008). Newmont's divisibility argument at trial was based upon its contention that its liability, if any, should be limited to its discrete involvement during the "early exploration period." Newmont contended at trial that the evidence demonstrated the "footprint" of the activities during the early period was subsumed by more invasive excavation, and therefore, any harm from these early efforts "was so negligible as to be de minimis, especially compared to the harm

FINDINGS, CONCLUSIONS, AND ORDER – 89

associated with Phase I and Phase II of mining." See Ct. Rec. 459 [Prop. Findings of Fact] at 21. The evidence requires the court to reject these contentions. Newmont has not met its burden of demonstrating the divisibility defense to liability. Newmont acknowledged this to be the case post-trial in light of the court's oral ruling at trial. Ct. Rec. 487.

*Prejudgment Interest.* The award of prejudgment interest is provided for in § 107(a) of CERCLA, 42 U.S.C. § 9607(a), and is mandatory. *United States v. Consolidation Coal Co.*, 345 F.3d 409, 415 (6th Cir. 2003). Under § 107(a), prejudgment interest accrues "from the later of (I) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a).

*Judgment as to Past Response Costs*. Pursuant 42 U.S.C. § 9607(a) and the court's conclusions herein and at the summary judgment stage, the court concludes the United States is entitled to a judgment in its favor on its cost recovery claims under § 9607(a) that Newmont and Dawn are jointly and severally liable for recoverable response costs incurred as of December 31, 2004 in responding to the release of hazardous substances at the Midnite Mine Site**,** plus pre-judgment interest**.**

*Total Amount of Costs Recoverable under CERCLA*. The court previously directed the United States to submit its calculation of the amount of costs incurred, including any pre-judgment interest. The United States filed its submission (Ct. Rec. 486, Att. A [Declaration of Ruth Broome]) and neither Dawn nor Newmont have objected to the United States' calculation. The United States' submission reflects the total costs incurred by the United States as of December 31, 2004 was $12,346,336.99 and the amount of pre-judgment interest as calculated from September 1, 1999 through July 31, 2008 is $3,476,310.86.

Accordingly, the total liability amount upon which to base a judgment for the past response costs incurred until December 31, 2004 is $ **15,822,647.85**.

***Declaratory Judgment.*** In an action for recovery of response costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on

FINDINGS, CONCLUSIONS, AND ORDER – 90

any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2) (emphasis added).

The United States is entitled to a declaratory judgment that Dawn and Newmont are jointly and severally liable for all response costs consistent with the National Contingency Plan incurred after December 31, 2004 by the United States in responding to the release of hazardous substances at the Midnite Mine Site, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).

## F.    CONTRIBUTION CLAIMS OF NEWMONT AND DAWN: ALLOCATION

CERCLA's § 113(f), 42 U.S.C. § 9613(f), is intended to provide a liable party under CERCLA with a cause of action to mitigate what could be harsh effects of joint and several liability imposed under § 107(a). *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1582 (5th Cir. 1997). Section 113(f)(1) states: "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f). This court held on summary judgment that the United States was liable in contribution as an "owner" under CERCLA based upon the United States' ownership and title to the Spokane Indian Reservation land on which the Midnite Mine is located and its actions as the owner.

Congress included the contribution provision in the CERCLA statute to "compensate for the potentially unfair burden that section 107 joint and strict liability might impose on named PRP's, when other PRP's have not been named in an action brought by the government under that section." *U.S. v. Kramer*, 757 F.Supp. 397, 412 (D.N.J.1991). The contribution liability of a responsible person under § 113 corresponds to that party's equitable share of the total liability. *Fireman's Fund Ins. Co. v. City of Lodi, California*, 302 F.3d 928, 945 (9th Cir. 2002) (internal citations omitted). While a defendant in a § 107 cost-recovery action may be jointly and severally liable for the total response cost incurred by the Government,

"[t]hird-party defendants ... are, by judicial precedent, only severally liable for contribution under § 113(f)(1)." *State of N.J., Dept. of Environmental Protection v. Gloucester Environmental Management Services*, 821 F.Supp. 999, 1004 (D.N.J.1993) (*citing U.S. v. Kramer*, 757 F.Supp. 397, 414 (D.N.J.1991)).

    In apportioning response costs among responsible parties, CERCLA requires only that the Court use "such equitable factors as the court determines are appropriate." 42 U.S.C. 9613(f)(1). In enacting the contribution section of CERCLA, Congress was concerned "that the relative culpability of each responsible party be considered in determining the proportionate share of costs each must bear." *United States v. Monsanto Co.*, 858 F.2d 160, 173 n.29 (4th Cir. 1988), cert. denied, 490 U.S. 1106 (1989); Environmental Transp. Sys., Inc., 969 F.2d at 508 ("[T]he language and legislative history of [section 113(f)] indicates, at the very least, Congress'[] intent that courts should equitably allocate costs of cleanup according to the relative culpability of the parties rather than [according to] an automatic equal shares rule."). To determine culpability, many courts, including the Ninth Circuit, have endorsed the consideration of the "Gore factors" that were enumerated in a bill sponsored by then-Congressman Albert Gore, but never enacted. *See U.S. v. Burlington Northern & Santa Fe Ry. Co.*, 520 F.3d 918, 940 n. 26 (9th Cir. 2008). The Gore factors include:

(i)     the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii)    the amount of the hazardous waste involved;

(iii)   the degree of toxicity of the hazardous waste involved;

(iv)    the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v)     the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi)    the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

FINDINGS, CONCLUSIONS, AND ORDER - 92

*Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 508-09 (7th Cir. 1992).

> This list is not exhaustive.  One court distilled the following four "critical factors":
>
> (I)     The extent to which cleanup costs are attributable to wastes for which a party is responsible;
>
> (ii)    The party's level of culpability;
>
> (iii)   The degree to which the party benefitted from disposal of the waste.
>
> (iv)    The party's ability to pay its share of the cost.

*United States v. Davis*, 31 F.Supp.2d 45, 63 (D.R.I.1998), aff'd, 261 F.3d 1 (1st Cir. 2001); Robert P. Dahlquist, Making Sense of Superfund Allocation Decisions: The Rough Justice of Negotiated and Litigated Allocations, 31 Envtl. L. Rep. 11098, 11099 (2001)("The Gore factors are most relevant in academic and theoretical analysis of the way Superfund liabilities should be allocated. But in the real world Judge Torre's list of four critical factors often provides the basis upon which Superfund allocations are made.").  Indeed, "the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors and any other factors deemed appropriate to balance the equities in the totality of the circumstances." *United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 572-73 (6th Cir. 1991); *accord Envtl. Transp. Sys., Inc.*, 969 F.2d at 509 (7th Cir. 1992) ("[A] court may consider any factors appropriate to balance the equities in the totality of the circumstances."); *Weyerhaeuser Co. v. Koppers Co.*, 771 F. Supp. 1420, 1426 (D. Md. 1991) ("[T]he Court is not limited to any specific equitable factors but may consider the factors relevant to the circumstances of the case.").

In considering the degree to which a party has benefited, courts have considered both financial profits as well as non-monetary benefits, such as the furthering of war or national defense efforts.  *See, e.g., Cadillac Fairview/California, Inc. v. Dow Chem. Co.,* 299 F.3d 1019, 1026 (9th Cir. 2002) (affirming the district court's allocation of 100% of the response costs for cleanup of a former World War II rubber production facility); *United States v. Shell*

*Oil Co.*, 294 F.3d 1045, 1060 (9th Cir. 2001) (affirming the district court's allocation of 100% of the response costs to the United States in part because the activity that caused the contamination, the production of aviation gasoline, was "properly seen as part of the war effort for which the American public as a whole should pay"); *see also FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 846 (3d Cir. 1994) (en banc) ("Furthermore, we point out that at bottom our result simply places a cost of the war on the United States, and thus on society as a whole, a result which is neither untoward nor inconsistent with the policy underlying CERCLA."). Additionally, "[t]he knowledge and/or acquiescence of the parties in the contaminating activities", as well as any support provided for those activities, is a relevant equitable factor for a court to consider when allocating response costs among liable parties. *Weyerhaeuser*, 771 F. Supp. 1420, 1426 (D. Md. 1991).

Having considered all of the credible evidence presented at trial and considering all of the circumstances of this case as outlined in the court's factual findings, the court finds the following factors most critical to the court's allocation in this case:

*The benefits each of the liable parties received from the activities which caused releases of hazardous substances;*

*Each of the liable parties' knowledge of, or acquiescence in, the activities that caused the release of hazardous substances at the site;*

*The degree of involvement by all the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;*

*The degree of control and care exercised by all the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste. This includes the authority granted the United States over its leases and pursuant to those leases, the Mine operations;*

*The degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment;*

FINDINGS, CONCLUSIONS, AND ORDER - 94

*The degree to which all the parties directly oversaw, managed, or conducted activities related to pollution at the site.*

Unraveling the over fifty-year history of the parties' involvement at the Midnite Mine in view of these equitable factors, the court concludes that the United States' equitable share of responsibility under CERCLA is one-third.

The court recognizes that Dawn and Newmont have not advocated for the court to allocate shares of responsibility between each of them (other than to argue Dawn represents an orphan share, which the court discusses below), perhaps because the contribution claims are made only against the United States and thus the only necessary determination is that of the United States' share. However, the court has discretion to account for the role of and equitably allocate responsibility to *all* liable parties. Applying the foregoing equitable factors to all the parties in this case, the court finds that a fair and equitable allocation of Dawn's share of the response costs is one-third and Newmont's share is one-third under the facts of this case.

As set forth in the court's Findings of Fact, each of the factors identified by the court apply to each of the liable parties in this case. Each of the parties benefitted from the Mine's polluting operations; each of them, from the onset of mining operations, were extensively involved at the Mine and with the Mining operations; and each of them had knowledge of and acquiesced to the site specific and inherent environmental issues associated with open pit mining. In the court's view, each of the parties in their own way allowed the contamination problems at the Mine to persist and worsen over time, and each of the parties had their own equal authority and opportunity to assure better stewardship of this land.

The United States, as an owner of the Mine, both knew that Dawn would mine uranium at the Mine, specifically contracted for Dawn to mine uranium at the Mine, and knew of the inherent environmental problems associated with open pit uranium mining. The Midnite Mine's uranium production provided the United States with a vital national security benefit by supplying uranium for the nation's nuclear weapon and energy needs during the Cold War.

FINDINGS, CONCLUSIONS, AND ORDER - 95

During Phase I, the United States was the sole purchaser of uranium from the Mine.  The AEC's contracts directly controlled the amount production at the Mine and the AEC's total purchases of 1,143,142 tons of ore during the first 12 years of the Mine's operation account for more than 36 % of the uranium produced by the Mine.  Exs. 1848; 1849; 1850.  Without the direct involvement and encouragement of the United States, the Mine would not have been developed at the time it did.

Additionally, one of the goals of the AEC's domestic uranium procurement program was to establish a domestic uranium production industry to support a viable commercial nuclear power industry, and the Mine was a result of these efforts.  Thus, even during Phase II, the Midnite Mine supplied nuclear material to the domestic power industry during the 1970's which provided the United States with a significant strategic benefit in the form of a reliable, local and independent source of energy.

The United States as owner and landlord, knew of and acquiesced in Dawn and Newmont's activities at the Mine.  Under its responsibilities as landlord and lease administrator, from the onset of mining operations the United States had both the authority and duty to inspect the mining operations, monitor water quality, control the rents and royalty obligations, conduct oversight and audits, and set and monitor the amount of the reclamation bond/fund.  Both the action and inaction of the United States pursuant to its responsibilities under the leases directly impacted the operation and extent of reclamation efforts at the Mine.

Newmont and Dawn, on the other hand, not the United States, conducted the mining activities that have caused the environmental problems that are now being addressed by EPA.  Dawn and Newmont sought to profit financially and did profit from the operation.  While steps were taken to address pollution issues at the Mine, there was a demonstrated lack of care and recalcitrance in reclaiming the mine site.  The majority of actions taken by Dawn and Newmont were performed not on their own initiative, but pursuant to government involvement and orders to do so.

FINDINGS, CONCLUSIONS, AND ORDER - 96

*Orphan Share and provisional allocation*.  One additional factor some courts consider when allocating responsibility is the inability of an entity to pay their full share of responsibility.  "A party otherwise qualifying as a responsible party under CERCLA may be defunct, bankrupt, uninsured, or otherwise lack the resources to bear its ideal measure of responsibility in monetary terms."  *U.S. v. Kramer*, 953 F.Supp. 592, 595 (D.N.J. 1997).  This inability to assign an ideal measure of monetary responsibility to an otherwise responsible party, gives rise to a so-called "orphan share" under CERCLA.  The existence of an orphan share, may be cause for the court to consider the need to increase the ideal allocation of liable parties.  *Id*.  The amount of an orphan share is usually measured by

> the gap between a party's narrowly defined ideal share (based on perfect knowledge of harm caused by that party only, expressed as a proportion of the total costs of remediation at the site) and the party's actual share (if equitably apportioned among all responsible parties considering such factors as, for example, the proportion of the party's wastes-however measured-to the total wastes for which responsible parties have

> been identified, and the ability of each party to pay for its responsible share when financially disabled parties are excluded from consideration.

*Id*.

The orphan share concept was not advanced by the Defendants as an equitable factor the court should consider until *after* trial.  In their post-trial briefing to the court, Defendants jointly argue "In making an allocation and entering a judgment in this case, a critical fact is Dawn's lack of assets and its acknowledge inability to pay its share of past or future response costs."  Ct. Rec. 487 at 5. Defendants now urge the court to divide Dawn's share or responsibility equally between Newmont and the United States, leaving Dawn with a zero allocation.

Despite Defendants' apparent view that it was a "critical fact" for the court to consider (and presumably find), the parties presented no evidence at trial and the court was never asked to determine the existence or size of any orphan share.  Perhaps this is somewhat explainable considering Newmont's position at trial that it was not liable for *any* of the contamination at

FINDINGS, CONCLUSIONS, AND ORDER - 97

the Midnite Mine.  Nevertheless, in light of Defendants' post-trial argument, the court permitted the parties the opportunity to supplement the record on this issue.

On September 11, 2008, Dawn filed the Affidavit of Thomas P. Mahoney which estimates Dawn's net worth is a negative -$47,762,153.  Ct. Rec. 495.  Dawn's statement of assets and liabilities lists "Land" (valued at $309,523.00) as Dawn's only asset, and "Notes payable to Newmont" and reclamation as its only liabilities (valued at a total $48,071,676.00). *Id.*  The Affidavit also provides evidence that although Dawn ceased operations in 1981 and since that time has had "no source of revenue", Dawn has continued to exist operating the water treatment plant at the Midnite Mine and reclaiming the mill near Ford, Washington using funds "loaned" from Newmont.  No further information was supplied by the Defendants.

Based on this limited record, the court is unable to determine whether Dawn is "defunct, bankrupt, uninsured, or otherwise lacks the resources to bear its ideal measure of responsibility in monetary terms."  *Kramer*, 953 F.Supp. at 595.  Defendants have not provided any testimony on Dawn's ability to pay its share of responsibility in this case.  In addition, as the United States identified in its response to Dawn's Affidavit  (see Ct. Rec. 498 and Ct. Rec. 500), missing from the record on this issue is evidence regarding any potentially applicable liability insurance policy insuring Dawn and evidence regarding whether Newmont has provided any ongoing assurances to cover Dawn's future financial needs, including judgments. Accordingly, the court's equitable allocation has not included any orphan share in arriving at the appropriate share of responsibility of the liable parties.

## G.    ALLOCATION JUDGMENT AND COSTS INCURRED AFTER DECEMBER 31, 2004

The court's equitable allocation will not only apply to already incurred qualifying response costs, but also to qualifying response costs incurred after December 31, 2004 and future response costs that the parties are likely to incur. See 42 U.S.C. § 9613(g)(2); *Boeing Co. v. Cascade Corp.*, 920 F.Supp. 1121, 1140 (D.Or. 1996)(explaining the logic in allowing contribution plaintiff declaratory judgment allocating future costs, although the contribution

section of CERCLA does not expressly provide for declaratory relief). The court's final equitable allocation will be reduced to a declaratory judgment to guide any future disputes regarding allocation of future qualifying response costs.

Defendants have intimated that the court's declaratory judgment fixing the parties' equitable share of future response costs should contain a contingency provision, generally favored in CERCLA contribution actions, which authorizes the parties to re-litigate the equitable allocation of *future costs* for good cause shown if *new events* or *new evidence* render the current division inequitable. Ct. Rec. 487 at 10-11.

In imposing this allocation of future costs, the court has no reason to believe at this time that it does not also accurately reflect the situation as it has likely existed since December 31, 2004 and is likely to exist throughout the remaining remediation. Pretrial, the court specifically decided that fairness and judicial economy weighed against bifurcating the issues of past and future costs and in favor of hearing at trial the entire issue of allocation, despite the fact that the recoverability of future costs has been left for another day. Ct. Rec. 366 at 8. Newmont had advised the court that it intended to proffer evidence at trial and to contend that the equitable considerations informing the decision as to allocation of future costs would be different since it would account for components of the remedy. *Id*. Despite being given the opportunity to do so, very little evidence, if any, and no such argument was presented at trial. Indeed, in their post-trial memorandum , Defendants advocated for the same allocation of liability as to both past and future costs. Ct. Rec. 487 at 2. Accordingly, the court does not foresee this allocation decision being subject to change in the future.

**IV. ORDER**

Pursuant to the foregoing Findings of Fact and Conclusions of Law and having fully adjudicated the parties claims in this matter and a decision having been duly rendered, the court having further determined there is no just reason for delay, hereby directs the Clerk of the Court to enter Final Judgment on a separate document as follows:

FINDINGS, CONCLUSIONS, AND ORDER – 99

1. Judgment for the United States on its claims against Newmont and against Dawn, joint and severally, for the recovery of $15,822,647.85 in costs incurred at the Midnite Mine Superfund Site through December 31, 2004 (including prejudgment interest), pursuant to 42 U.S.C. § 9607(a).

2. Declaratory judgment in favor of the United States and against Dawn and against Newmont, joint and severally, for response costs consistent with the National Contingency Plan since December 31, 2004 and to be incurred by the United States in responding to the release of hazardous substances at the Midnite Mine Superfund Site, pursuant to § 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2). This part of the judgment bears interest, on each sum of costs paid by the United States, from the later of (i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned, as provided in 42 U.S.C. § 9607(a).

3. Judgment for Dawn and for Newmont on their claims against the United States for contribution, pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f).

4. Declaratory judgment for Dawn and for Newmont on their claims for contribution against the United States for response costs consistent with the National Contingency Plan incurred after December 31, 2004 or to be incurred by the United States in responding to the release of hazardous substances at the Midnite Mine Superfund Site, pursuant to 42 U.S.C. § 9613(g)(2).

5. The contribution judgment shall declare with respect to *all* past and future recoverable costs of remediation, the United States' equitable share of the costs is one-third; Newmont's equitable share of the costs is one-third; and Dawn's equitable share of the costs is one-third. This part of the judgment bears postjudgment interest from the date the clerk enters judgment on the docket. 28 U.S.C. § 1961.

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order and judgment, and furnish copies to counsel.

1    **DATED** this 17th day of October, 2008.

2                          s/ Justin L. Quackenbush
                        JUSTIN L. QUACKENBUSH
3              SENIOR UNITED STATES DISTRICT JUDGE